also told his associates that they had prepared business plans to make things look fine – but "*the reality was we would not have submitted the plan if we were not trying to protect the Group's reputation externally ... and could have been honest about past failures*," including the reserve manipulation.

25. Later, van de Vijver complained to Watts: "*I am becoming sick and tired about lying about the extent of our reserves issues and the downward revisions that need to be done because of far too aggressive/optimistic bookings*." In another note to senior Shell Group executives, van de Vijver again warned of the trouble those executives were confronting in trying to keep the market "*fooled*."

26. In a December 2002 memo, van de Vijver's staff presented a "script" for van de Vijver to force the Shell Group to disclose immediately that it knew its booked reserves were wrong and that non-disclosure would be a serious violation of U.S. securities laws. That same day, van de Vijver e-mailed one of the "script's" authors, Frank Coopman, head of finance for the E&P unit: "*This is absolute dynamite, not at all what I expected and needs to be destroyed*."

27. Watts, the ousted executive Chairman of the Shell Group, and other former Shell Group executives, including van de Vijver as well as van der Veer, the Shell Group's new Chairman, and Boynton, the former finance director, are all under SEC and U.S. Department of Justice ("DOJ") investigation. At the center of the criminal investigation is a series of memos allegedly written to the Boards

in February 2002.  The documents show that the Boards of Shell Transport and Royal Dutch, *i.e.*, the Shell Group, were told about the reserve shortfall by van de Vijver and that van de Vijver sent memos to them to express concern that the Shell Group's reporting of its reserves was "*no longer fully aligned*" with SEC rules.

28.  In January 2004, amid mounting SEC scrutiny and the arrival of yet another year-end which would now require the largest falsification of the Shell Group's proved reserves to date if the scheme was to continue, defendants' course of conduct to defraud and mislead the shareholders of Shell Transport and Royal Dutch came apart — in one of the most startling exposés of fiduciary failure and wrongdoing in recent years.  *In a series of revelations between January 2004 and April 2004, the Shell Group admitted it had improperly classified as proved oil and gas reserves almost 4.5 billion barrels, thus reducing the Shell Group's proved oil reserves by over 22% and its forecasted future cash flows by over $100 billion*!

29.  The magnitude of these reductions was staggering.  Between 1998-2002, the Shell Group had reported to its shareholders a 105% reserve replacement ratio.  However, now that the truth is known and the almost 4.5 billion barrels of claimed "proved" reserves have been eliminated, *the Shell Group's actual reserve replacement ratio during that period was a pitiful 57%*!  According to press reports, during 1998-2002, the Shell Group reported finding and development "costs of about $4.27 per barrel."  Based

- 21 -

upon the elimination of the Shell Group's billions of barrels of bogus "proved" reserves, the Shell Group's actual per-barrel finding and development costs *are an astonishing $7.90 per barrel, exposing bare for all to see the miserable failure of Shell Transport's and Royal Dutch's Boards and the Shell Group's managers in recent years!* As a result of these startling reserve eliminations, the Shell Group now has only 10.2 years of proved reserves compared to production requirements, two to three years less than its peer competitor companies have and well below the over 13 years it had repeatedly represented to the Shell Transport and Royal Dutch shareholders it had. And the Shell Group's future cash flows have also been slashed by over $100 billion!

30. After its early 2004 proved reserves downgrades, the Shell Group badly lags behind its peers in a number of key competitive metrics:

Reserve replacement ratio: The rate at which reserves are found to replace production, between 2001 and 2003:

| | |
|---|---|
| BP | 155% |
| Total | 118% |
| Chevron/Texaco | 112% |
| Exxon/Mobil | 109% |
| Shell | 61% |

Reserve life: The time it would take to deplete existing reserves at current production rates:

| | |
|---|---|
| BP | 14.1 years |
| Exxon/Mobil | 13.5 years |
| Chevron/Texaco | 13.0 years |
| Total | 12.3 years |
| Shell | 10.2 years |

31.  The Shell Group has also admitted that it will now have to restate its financial statements going back several years to eliminate hundreds of millions of dollars of reported profits and has delayed release of its 2003 Annual Report to Shareholders.  And now that the truth is known and the ability of the Shell Group's insiders to continue to falsify the Shell Group's proved reserves has come to an end, the Shell Group's oil production, proved reserve levels and reserve replacement ratio will fall even further during 2004-2005, further impairing its financial and competitive position.

32.  Upon the first of these shocking revelations in January 2004, Shell Transport's ADRs on the NYSE fell to below $40 per ADR from $46 per ADR on January 6, 2004.  Shell Transport's stock on the London Exchange fell from 401.25p to 371.25p.  Royal Dutch's ADRs on the NYSE fell from $52.70 to below $47 per share.  As the revelations continued, the stocks and ADRs fell further and *billions of dollars of Shell Transport's and Royal Dutch's market capitalization vanished.*

33.  The reaction of investors and analysts to these "*shocking*" revelations was swift.  According to press reports, investors were "*blind-sided*" by the "*bombshell*" revelations of the "*staggering*" restatements of the Shell Group's proved reserves.  The Shell Group's reputation and standing in the investment communities was severely damaged.  Morgan Stanley said:  "The shares have come down 20% in the past six weeks and *that is all to*

- 23 -

*do with credibility. While investors have seen Shell as the most conservative of companies, it turns out that it is not what we thought. The market is traumatised and shocked."*

34. While the full details of the actual extent of the manipulation of the Shell Group's proved oil reserves is still being concealed by the Boards of the two companies in order to try to limit their own personal exposure to liability for their participation in this fiasco, from what has become known to date, it is evident that the reserve misclassifications were not the result of inadvertence, oversight or intervening changed circumstances beyond the Shell Group's control, but rather, of the deliberate or reckless misconduct and fraudulent actions of the Shell Group's top insiders and the Boards of the two companies. This is not a situation where the reserves were originally properly booked as proved and the downward re-classification was required by a later change in the rules or other extraneous factors. They were improperly booked as proved in the first place. Van de Vijver e-mailed a colleague:

> *[W]e are heading towards a watershed reputational disaster ... the problem was created in the 90's and foremost in 97-00 and any clean-up must reflect that.... I will not accept cover-up stories that it was Ok th[e]n but not OK with the better understanding of SEC rules now and that it took us 2-1/2 years to come to the right answer.*

35. In order to facilitate the falsification of its proved reserves, the Shell Group's guidelines on accounting for natural gas reserves were deliberately altered and relaxed in the mid-

1990s.   This helped allow the Shell Group to overstate or prematurely book reserves in two big natural gas fields in Australia and Norway as proved.   The Shell Group's actions involving natural gas fields in Norway and Australia show the Shell Group was inconsistent with its partners in booking proved reserves.   Other guidelines – for booking crude oil reserves – were similarly relaxed.   The guidelines were relaxed because the Shell Group was facing intense pressure from investors and analysts to keep up with its peers in finding new reserves of crude oil and natural gas.

36.   The directors and officers of the two companies (and their outside auditors) pursued a fraudulent course of conduct and scheme, aiding and abetting one another or acting recklessly, to conceal the increasingly serious failures of the Shell Group in replenishing proved oil and gas reserves by misrepresenting the success of the Shell Group in replacing its proved reserves.   In order to deal with the mounting reserves problem, the Shell Group insiders created a so-called "Leadership and Performance Group" ("LEAP") to create more proved reserves.   LEAP secretly changed the internal rules the Shell Group used to classify reserves as proved, or disregarded those rules, so they could create billions of barrels of proved reserves, **not** because of successful new discoveries or developments, but because they manipulated and abused oil and gas reserve criteria to re-classify old oil and gas deposits, promoting them to proved or maintaining them in that

status when, in fact, they were not proved. For instance, the Shell Group secretly dropped the requirement that proved developed reserves can exist only when the money to do the drilling has been appropriated or allocated. By these manipulations, defendants reversed the Shell Group's trend of declining proved reserves and enabled it to report to Shell Transport and Royal Dutch shareholders that it was replacing proved reserves as fast as it was pumping them out of the ground, reporting billions of barrels of boe of new proved reserves during 1998-2003, which defendants represented would yield over $100 billion in future cash flows.

37. In the early 1990s, the Shell Group's reserve booking guidelines allowed executives to book proved natural gas reserves only if the Shell Group had signed a sales contract for the gas. However, the Shell Group loosened the rules to allow gas reserve bookings with only a "reasonable expectation" of an available market. At the Gorgon field in northwestern Australia, the Shell Group began booking gas reserves in 1997, even though a final investment decision at the Shell Group had not been made and no sales contracts for that gas had been signed or were in sight. The Gorgon reserves totaled some 557 million boe.

38. In order to book the gas reserves at the Gorgan gas fields in Australia, the Shell Group insiders caused the Shell Group to use the subterfuge of a reserve "revision" as opposed to a "new discovery," so as to attract less attention. However, the Shell Group's partners in the Gorgon gas field, Chevron/Texaco and

Exxon/Mobil, *never booked any proved reserves from Gorgon, as they were complying with industry standards and SEC requirements*. The fraudulent classification of Gorgan gas reserves as proved came amid a track record of disaster and miscalculation by the Shell Group in Australia. For instance, the Shell Group had once described the Cornea gas field in Australia as a *"massive find,"* only to discard it later on. And with regard to the Shell Group's Greater Sunrise project north of Darwin on the Timor Sea, the Shell Group had categorized reserves as "proved" when, in fact, it knew because of ongoing protracted disputes with its partner in developing that field, Conoco/Phillips, that it was unable to commercially develop the reserves there because, *inter alia*, it had failed to locate reliable customers willing to accept sufficient quantities of production from that field to justify its development and did not have a way to deliver the product to any customers that could be found.

39. The Shell Group's reserve manipulation at Ormen Lange, an offshore gas field in northern Norway, underscores how fraudulent the Shell Group's booking practices were. The Shell Group began booking proved reserves at the Norwegian field in 1999, years before the Shell Group and its partner companies (Norsk Hydro ASA, Statoil ASA, BP PLC and Exxon/Mobil) at the site worked out difficult technical and marketing hurdles on the project. When the Shell Group booked Ormen Lange reserves in 1999 as proved, the consortium partners had drilled just two exploration wells and done

some preliminary feasibility studies.  The Shell Group and its partners struggled with the tremendous technical challenges of drilling a field in the deep Norwegian water, where subzero temperatures could freeze pipes at the site.

40.  The Shell Group's oil reserves in Nigeria was another area of fraud and abuse.  The Shell Group's Nigerian oil fields were one of the biggest sources of overstated proved reserves.  The Shell Group has now eliminated 1.5 billion barrels of proved reserves in Nigeria, compared to a total of previously claimed proved reserves of 2.5 billion barrels - *a 60% reduction*!  The internal investigation concluded that, by early 2000, it was clear that the Nigerian reserves *"could not be produced as originally projected or within its current license periods."*  Shell Group executives (and the Shell Transport and Royal Dutch directors) have knowingly or recklessly disregarded for years that a significant portion of the Shell Group's claimed proved reserves in Nigeria could not be commercially developed in the applicable license period, in part because of political unrest and environmental problems which blocked development of a significant portion of the claimed reserved, in the Niger River delta area.  The Shell Group was over-classifying its reserves in Nigeria as proved, not only for its own benefit but to accommodate pressures from what the Shell Group referred to internally as its "host country."  Nigeria is Africa's most populous nation, the world's seventh largest oil producer and a member of OPEC.  Over 90% of Nigeria's export

- 28 -

revenues come from oil exports - about $17 billion per year. Nigeria has been desperate to obtain larger oil exporting revenues for its country but can do so only if it can achieve a higher export and production quota from OPEC. This, in turn, depends upon Nigeria demonstrating that it has proved oil reserves of a size that are sufficient to justify a major increase in its production and export quota. So the Shell Group was to receive a multi-hundred-million dollar bonus payment from Nigeria if its proved reserves were at a certain level.

41. Thus, the Shell Group's top executives conspired with the Nigerian government to take mutually beneficial steps to try to maximize the claimed proved reserves of the Shell Group, and therefore Nigeria, in Nigeria. The Shell Group and Nigeria faced a serious problem in Nigeria, in that the indigenous population in the Niger River area - the Ogoni people - was adamantly opposed to the destruction of their culture and way of life and the environmental damage which would result from the type of massive development for oil production which Nigeria and the Shell Group wanted to undertake in their ancestral homeland. As a result, the local population resisted attempts to proceed with oil development in that area, actions which, if continued and successful (as they were), would disqualify any oil reserves in the area from being treated as proved because they could not be commercially exploited in a reasonable period of time, including the Shell Group's Nigerian license period. In order to try to avoid this outcome,

Nigeria and the Shell Group cooperated to violate the rights of these local peoples, taking actions which have been condemned by international human rights organizations. The Shell Group colluded with Nigeria's military dictatorship, which cracked down hard on the Ogoni. *One series of raids on Ogoni villages in August 1993 left 750 people dead and 30,000 homeless.* A leader of the resistance was hanged. This campaign of terror resulted in a class action suit against the Shell Group here in the U.S., which is costing the Shell Group millions of dollars to defend and could potentially result in billions of dollars of liability to the Shell Group.

42. As a result of this recent fiasco with respect to Shell's "proved" oil reserves, the Shell Group undertook a limited internal investigation which concluded:

> *Australia (Gorgon).* As of December 31, 1997, the Group booked over 500 million boe of Gorgon gas reserves as proved.... *From its inception, the Gorgon "proved" reserves did not meet the overriding SEC standard of "reasonable certainty."* There is no written audit trail indicating who made the decision to categorize Gorgon reserves as proved, or the basis of that decision. Sir Philip [Watts] ... reports no recollection of the Gorgon booking, notwithstanding its size and impact on [proved reserves] for 1997.... Gorgon had long *"stuck out like a sore thumb,"* but, at over 500 million boe, debooking of the reserve was *"too big to swallow."*

> *Oman.* Proved reserves were increased in 2000 in response to *"top down"* encouragement from Shell executives to bring its proved reserves of mature fields in line with its expectation reserves. Insufficient technical work was done to support this increase. *When serious production declines were suffered thereafter, these increased reserves were maintained based upon aspirational production targets.* It is clear that

- 30 -

various members of management at EP, including Mr. van de Vijver, were aware of this situation since late 2001, when the production problems increased and Shell agreed to make a $30 million "down payment" (in the form of a deduction against its 2001 net reward) in partial payment for an inchoate debooking of expectation reserves.

**Nigeria.** Shell accumulated over the 1990s ... very large volumes of proved oil reserves.... *[H]owever, ... [these] substantial proved reserves could not be produced as originally projected or within [Shell's] current license periods.* Rather than de-book reserves, [they were retained and] an effort was undertaken to "manage" the problem through a "moratorium" on new oil and gas additions in the hope that SPDC's production levels [in Nigeria] would increase dramatically to support its reported reserves. This solution remained in place for the next several years, until January, 2004, notwithstanding the knowledge of [Shell's executives] that, in fact, production was not increasing to a level which could support the booked proved reserves.

**Brunei.** *The large volume of [proved reserves] were either uneconomic to develop or had been booked well ahead of any final investment decision or analogous financial commitment being made ....*

43. The shocking impact of the proved oil and gas reserve restatement is shown by the following table:

| | Proved Crude Oil & Natural Gas Liquids Reserves (billions of barrels) | Proved Natural Gas Reserves (billions of boe*) | Total Proved Reserves (billions of boe) | Reserve Replacement Ratio (using 5-year averages) | "Finding Cost" per barrel (3-year average) | Number of Years of Current Production Reflected in Proved Reserves | Future Cash Inflows (billions of dollars) |
|---|---|---|---|---|---|---|---|
| 1997 | 9.681 | 9.678 | 19.359 | 130% Oil/ 210% Gas | $0.95 | 14.5 | $249.320 |
| 1998 | 10.031 | 10.456 | 20.487 | 140% Oil/ 250% Gas | $0.93 | 15.3 | $184.345 |
| 1999 | 9.775 | 10.093 | 19.868 | 147% | $1.05 | 14.9 | $271.627 |
| 2000 | 9.751 | 9.704 | 19.455 | 136% | $1.12 | 14.4 | $295.729 |
| 2001 | 9.469 | 9.626 | 19.095 | 108% | $1.45 | 13.9 | $234.175 |
| 2002 | 10.133 | 9.213 | 19.346 | 100% | $3.32 | 13.3 | $329.034 |
| As Corrected | 7.013 | 7.676 | 14.689 | 65% | $4.21 | 10.2 | |

\*      Natural gas reserves are converted to boe based on the ratio of 5,800 standard cubic feet of gas equals 1 boe.

44.   The fraudulent booking of "proved" reserves was only possible because of gross deficiencies in the Shell Group's internal financial and accounting controls, which were in clear violation of the Sarbanes-Oxley Act of 2002.   For example, the internal hydrocarbon reserves audit function was understaffed with under-trained personnel. *This function was performed by a single, part-time, former Shell employee; his cycle of field audits was once every four years; he was provided with virtually no instruction concerning regulatory requirements or the role of an independent auditor and no internal legal liaison. And, when this person did raise questions or concerns regarding certain reserves categorized as "proved," he was brushed aside by senior executives and he had no way to challenge them. In fact, he has stated that had he attempted to have the executive decisions reviewed or amended he was made to understand he would have been fired!*

45.   The directors of Shell Transport and Royal Dutch and the top Shell Group executives deliberately or recklessly allowed the Shell Group to operate with internal and financial controls which did not comply with Sarbanes-Oxley because to force compliance would have resulted in an end to defendants' scheme to falsify and inflate the Shell Group's proved reserves and its financial statements, including the Shell Group's reported net income.   The Shell Group's internal controls were grossly insufficient to assure

- 32 -

proper booking of oil and gas reserves. In addition to the woefully deficient internal audit/review procedures, the Shell Group's structural and control deficiencies also included:

- The Shell Group's written guidelines for proved reserves did not ensure regulatory compliance.

- The roles and responsibilities of the Shell Group personnel involved in proved reserves on compliance responsibility were ill-defined and confused.

- Consideration of meeting reserve replacement targets was part of the management and executive compensation "scorecard."

- There was not a formal review on an annual basis by the CMD and the Group Audit Committee ("GAC") of the Shell Group's proved reserve positions.

- The reporting structure did not require that the CFOs of the Shell Group's business units report directly to the Shell Group's CFO.

- The role of the Shell Group's legal director was insufficiently integrated with the CMD, the Boards and Conference to ensure compliance with all regulatory obligations.

- The line responsibilities and compliance training for reserve reporting from local reservoir engineers upwards were inadequate.

- The Shell Group did not have or enforce a culture of compliance that, regardless of business concerns, all decisions were to be made to ensure compliance with regulatory and fiduciary obligations. Management and employees were not trained or instructed to recognize that their conduct was required to be in accord with the highest ethical and legal standards.

- The Shell Group's guidelines blurred the distinction between reserves reporting for internal decision-making and the requirements for regulatory reporting of proved reserves.

- The Shell Group's guidelines were slow to incorporate SEC staff interpretations and, while reflecting an increased

awareness of SEC rules, occasionally adopted an expedient of partial compliance.

- The Shell Group's guidelines did not require upper level management employees to review existing bookings for continued compliance and did not adequately address the need for debooking.

- The Shell Group's guidelines were not clearly and succinctly written or organized to offer useful guidance to reservoir engineers.

46. On March 31, 2003, van der Veer and Watts, as the President and Managing Director of Royal Dutch and Chairman and Managing Director of Shell Transport, respectively, and Boynton, as director of finance of both companies, signed and filed false certifications on behalf of themselves and their companies with the SEC relating to the companies' joint report on Form 20-F. They stated in part:

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the period presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the issuer and have:

(a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those

entities, particularly during the period in which this annual report is being prepared;

(b)   evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

(c)   presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a)   all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.   The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

The certifications were false.   The Form 20-F was false in a number of respects, including inflated proved reserves, forecasted cash flows and reported net income.   Thus, the financial statements and other financial information in the report was not fairly presented. The Shell Group's disclosure controls and control procedures were deficient and had not been properly tested or evaluated.

- 35 -

47.   Shell Transport and Royal Dutch insiders are not required to file "Form 4s" with the SEC disclosing their transactions in the stock of Shell Transport or Royal Dutch. Thus it is impossible, without discovery, to determine if those insiders sold Shell Transport or Royal Dutch stock at inflated prices while they were fraudulently falsifying the Shell Group's proved oil reserves and financial statements.   However, public reports indicate that regulatory authorities have discovered such insider trading and are investigating it.  In fact, as detailed in ¶¶72, 74, 76-77 and 81, many of the individual defendants reported receiving proceeds from the exercise of stock options as a part of their compensation package.   To the extent such insider trading occurred, Shell Transport and/or Royal Dutch are entitled to the disgorgement of any profits obtained by such insiders.

48.   As a result of this debacle, the directors of Shell Transport and Royal Dutch were forced to undertake an internal investigation into these matters.  However, in order to try to assure that the investigation would not conclude that the directors themselves had been involved in or were aware of the wrongdoing, they improperly limited the scope of the internal investigation to the *involvement of members of management in the wrongdoing*, so as to limit the charter of the investigators, such that they could not investigate or report on the involvement and knowledge of the Boards.   The directors of the companies also imposed an unreasonable time deadline on the internal investigation, so that

- 36 -

the investigating parties would not have sufficient time to review all the relevant documentation or interview all the knowledgeable parties to secure a full factual understanding of the scope of the wrongdoing inside the companies and the knowledge of and involvement of the directors therein.

49. As a result, the internal investigation report focused *only* on the wrongdoing of the Shell Group's top managers, including Watts, the Chairman of the Board of Shell Transport, van de Vijver, head of E&P of the Shell Group, Boynton, Chief Financial Officer or Finance Chief of the Shell Group, and Coopman, the Chief Financial Officer of the E&P segment of the Shell Group. Because the report concluded that all of these individuals knew of the fraudulent inflation of Shell's reported proved oil reserves, the Boards had to force these individuals out. However, they have permitted these individuals to retain millions of dollars in salaries and bonus compensation which they should not be permitted to retain, but have done this as a pay-off to them in an effort to get these individuals not to point the finger at the Boards.

50. Unhappy with the conclusions of the internal investigation, the Shell Transport and Royal Dutch directors attempted to block its findings and to avoid accepting the full report. However, the Shell Group's outside attorneys insisted the directors had to accept the report in its entirety. Nevertheless, the Shell Group has distorted the report, trying to conceal the existence of endemic structural problems. Lord Oxburgh, the new

Chairman of Shell Transport, has repeatedly blamed the reserves debacle on "*personal failings*" or "*human failings,*" rather than any structural or control deficiencies. He also belittled the incriminating e-mails as "*ill-considered, hyperbolic e-mail chatter.*" The Shell Group is also seeking to undermine the status of the investigative report in its dealing with the regulators who are investigating the companies' misreporting of reserves.

51. In fact, the Shell Transport and Royal Dutch Boards are engaged in a massive cover-up of their own reckless conduct and violation of their fiduciary responsibilities to oversee and manage these enterprises and insure their compliance with, *inter alia*, the U.S. securities laws, in order to avoid their own personal liability and personal accountability for what has gone on. As part of this cover-up, even though the internal investigation report itself stresses that it is incomplete, the investigators were forced to work under undue time constraints and accept testimony not under oath and to forego the review of large amounts of potentially relevant documents, the Shell Transport and Royal Dutch Boards have proclaimed that they have "*complete confidence*" in the remaining top managers of the Shell Group and *have even gone so far as to elevate van der Veer to be Chairman of the Shell Group Committee of Managing Directors, even though there is significant evidence that van der Veer, who was Vice Chairman of the Committee of Managing Directors during the relevant period, was deeply involved in the fraudulent inflation of the Shell Group's proved*

- 38 -

*oil reserves and resulting falsification of its financial statements!*

52. The result of this fiasco has been one of the most shocking exposures of fraud, deception, failure of management, unjust enrichment and directorial oversight in the history of oil and gas exploration companies. The Shell Group's corporate reputation and goodwill has been greatly damaged by these exposures. Its credibility with the investment community has been undermined. The Shell Group's reserve fiasco represents "a very big issue on sentiment and trust," said Jonathan Wright, an oil analyst in London for Citigroup. The problem, he said, is that *"we have to take what these companies tell us because we can't clarify it one way or the other."* But such a substantial cut in stated reserves, he said, *"puts a very big question mark over anything they tell us."*

53. Shell Transport and Royal Dutch have been badly damaged by defendants' fraudulent misconduct. Defrauded investors have sued the two public companies in massive class action suits in the U.S. which expose the companies to billions of dollars of damage and will cost many millions of dollars to defend. In addition, the companies are being subjected to several governmental and regulatory investigations, including investigations by the SEC and the DOJ, which will cost millions to defend and will likely result in large fines and/or penalties. The credit rating agencies – Standard & Poor's, Fitch and Moody's – have all downgraded the

Shell Group's credit rating, taking it out of the coveted "AAA" category.   Also because of the damage to the Shell Group's reputation and goodwill, the stocks of the two public companies currently trade at a substantial discount – about 20% – to the stocks of their peer group competitor companies and are likely to suffer from what is known as the *"liar's discount"* going forward. Finally, the revelations that a substantial part of the proved reserve overstatement came from the Shell Group's operations in Nigeria will further damage the Shell Group by greatly increasing its exposure to liability in a class action suit brought on behalf of the indigenous population in Nigeria for human rights violations – alleging that the Shell Group and the Nigerian government abused the rights of and killed hundreds of the indigenous peoples in Nigeria who were resisting oil exploration in areas where the Shell Group and the Nigerian government were desperate to develop the reserves to justify them as proved, but could not properly do so because of an inability to develop those reserves due to the indigenous population's resistance to the destruction of their traditional way of life and the horrible environmental damage being inflicted on their living areas and land by the Shell Group and the Nigerian government.

54.  While the Shell Group and its public shareholders have suffered great damage and losses due to the deceit and deception committed by its insiders and the directorial oversight failings by the Shell Transport and Royal Dutch Boards, the insiders and

directors of these two public companies have not only suffered no damages but, in fact, have profited from their participation in the illegal conduct. The managers of the Shell Group pocketed millions of dollars in salaries and bonuses which would have been denied them had the truth been disclosed. These individuals have pocketed millions of dollars in salaries and bonus compensation as a result of their deceptive activities and the few individual officers who have been fired as scapegoats by the Boards wishing to cover up their own participation and wrongdoing have left with millions of dollars in unjustly obtained compensation, bonuses and severance payments. As a result of their concealments and falsifications, the directors of Shell Transport and the top managers of the Shell Group held onto their positions of power, prestige and profit at the two companies. The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors of one of the largest oil and gas companies in the world, enjoying the emoluments of their offices.

55. The Royal Dutch and Shell Transport Boards are still dominated and controlled by malefactors who are covering up their own misconduct and will not take sufficient action to protect the interests of the Shell Group and its shareholders:

- Despite the fact that van der Veer was Vice-Chairman of the CMD during the relevant period and has acknowledged receiving van de Vijver's memos and other internal materials putting him on notice of the oil reserve overstatements for years, and despite the fact that van

de Veer did not require truthful disclosures or corrective action, the Shell Transport and Royal Dutch Boards elevated him to Chairman of the Shell Group's CMD, so that he would protect them.

- The Royal Dutch and Shell Transport Board members decided as a group that van der Veer did not bear responsibility for the reserve overstatements, even though he participated in it and was aware of the wrongdoing.

- Oxburgh, the new Chairman of Shell Transport, said in an interview with The *Wall Street Journal* that CFO Boynton's integrity was determined to be "*unimpeachable*" and defended van der Veer, saying the two Boards supported him fully, even though they were both deeply implicated in the wrongdoing.

- Oxburgh has also said the Boards have unanimous confidence in the CMD, even though several members are clearly implicated in the wrongdoing, belittling the incriminating e-mails many of them received as nothing more than "*hyperbolic e-mail chatter.*"

56.  In addition, Aad Jacobs, Chairman of the Shell Group's Audit Committee, has said that the Committee "recommended to the Boards ... that **they should feel confident in relying on the representations of the group's current senior management**," even though van der Veer – the new Chairman of the Shell Group CMD – was clearly implicated in the reserve wrongdoing, as he was Vice-Chairman of the CMD throughout the time period of falsification.

57.  Because the directors and officers of these two public companies were personally involved in or were aware of the alleged wrongdoing and illegal violations, demand on them to take appropriate legal action to protect the companies and their shareholder communities is futile.  The directors will never sue themselves.  And, were they to do so, such a lawsuit would trigger

the insured vs. insured exclusion in the directors' and officers' liability insurance policies covering them as Shell Transport and Royal Dutch officers and directors, exposing them to billions of dollars of uninsured personal liability. Under such circumstances, any request or demand from the directors of these two companies to institute this legal action would be futile and is thus excused, so that this derivative action brought by shareholders may proceed.

58.  Thus, the named plaintiffs, institutional investors and large shareholders of the Shell Group, have come together to sue the directors and certain officers of the companies for their illegal conduct in connection with this disaster.  This suit — pursued derivatively — seeks to obtain legal and equitable relief in the form of monetary damages, injunctive relief, and corporate governance changes to not only compensate for this apparent wrongdoing, but also to protect these public companies and their shareholder communities from a recurrence of such defalcations in the future.

## JURISDICTION AND VENUE

59.  The Shell Group does business in the U.S., maintaining extensive operations and offices here, including in Middlesex County of the State of New Jersey.  The stock of Shell Transport and Royal Dutch (or their ADRs) are listed and traded on the New York Stock Exchange.  Shell Transport and Royal Dutch file periodic reports with the SEC.  Hundreds of Shell Transport and Royal Dutch shareholders who own hundreds of millions of shares of both

companies with a value measured in the billions of dollars reside in the U.S.   The Shell Group has an Investor Relations office in the U.S.   Hundreds of Shell Transport and Royal Dutch shareholders live in New Jersey.   The Shell Group has extensive operations throughout New Jersey, including subsidiary Shell Oil Company's Special Warehouse/Storage Packing/Crating Service facility located at 111 State Street, Sewaren, in the municipality of Middlesex New Jersey, and Equilon Enterprise L.L.C.'s Cranbury, municipality of Middlesex, New Jersey facility.   Shell Transport and Royal Dutch are being sued in class action suits for violating the U.S. securities laws and other U.S. and international laws in connection with the falsification of the Shell Group's proved oil reserves and the falsification of its financial statements.   The securities class actions suits are pending in and proceeding in the Newark Vicinage of the Federal District Court of New Jersey.

60.   The Sarbanes-Oxley Act is unique to the United States and applies to companies like Shell Transport and Royal Dutch which, although incorporated in protective foreign jurisdictions, sell their securities to U.S. investors, list their securities on U.S. securities exchanges and file reports with the SEC.   No procedure exists under English or Dutch law to force the Shell Transport and Royal Dutch directors and the Shell Group executives to comply with Sarbanes-Oxley or to remedy their non-compliance with that Act or the harm that their misconduct has caused Shell Transport and Royal Dutch.   Sarbanes-Oxley embodies and expresses a strong policy of

the United States and its states to require public corporations which list their securities on U.S. exchanges and have shareholders in the U.S. to have enhanced and effective internal accounting and disclosure controls to assure honest accounting and truthful disclosure by corporate fiduciaries and the protection of the corporation and its shareholders from the harm and damage that inevitably result from dishonest accounting, inadequate controls and false and misleading statements to shareholders and investors.

61.  Each Individual Director, including each director of Shell Transport and Royal Dutch, has minimum contacts with the U.S. and with New Jersey, as they either reside here or have frequently traveled here on Shell Group business and otherwise, or have caused the distribution of false and misleading reports and statements to Shell Group shareholders in New Jersey.

(a)  Royal Dutch and Shell Transport each have shares trading on the NYSE.  As of December 31, 2002, 19% of the Shell Group's shares (or ADRs) were held by U.S. investors, either in the form of ADRs or as direct ordinary share shareholdings.  Both Shell Transport and Royal Dutch file periodic reports with the SEC, which reports are authorized by the directors of Shell Transport and Royal Dutch and directly impact the trading prices and value of the publicly traded securities of Shell Transport and Royal Dutch.

(b)  A significant proportion of the Shell Group's E&P expenditures are undertaken in the United States, including $2.015 billion of the $14.061 billion expended in 2002, $2.009 billion of

the $7.332 billion expended in 2001, and $1.257 billion of the $4.554 billion expended in 2000.  During 2002 alone, the Shell Group was producing 442,000 barrels of oil a day in the U.S. versus the 411,000 barrels a day it was producing in the U.K. and the Netherlands combined.  At December 31, 2002, 15,686 of the Shell Group's 23,972 gross productive oil wells were located in the United States.

(c)  The Shell Group's major oil and gas interests in the U.S. are held in the Shell Group's wholly-owned U.S. subsidiary, Shell Oil Company, which produces crude oil, natural gas and natural gas liquids principally in the Gulf of Mexico, California, Texas, Wyoming and Michigan.

(d)  The Shell Group's oil refinery activities are carried out in the United States through various Shell Oil Company subsidiaries, including the Shell Group's 44% interest in Equilon Enterprises LLC (doing business as Shell Oil Products US), a 50% interest in Motiva Enterprises LLC, and a 50% interest in the Deer Park Refining Limited Partnership, which collectively control an approximate 15% share of the U.S. gasoline market.  Shell Oil Products US and Motiva also have rights to use the "Texaco" brand on refined oil product sales and the Texaco sites are being re-branded to Shell.  With the acquisition of the Pennzoil-Quaker State Company in October 2002, the Shell Group became the leader in both passenger car motor oil and diesel engine oil in the U.S.  Of the 4.084 million barrels of oil the Shell Group's refineries took

in per day in 2002, a full 1.064 million were taken in the U.S. alone, and 1.075 million of the Shell Group's 4.387 million barrels per day of operable crude oil distillation capacity is in the U.S. Of the 3.881 million barrels of oil the Shell Group processed per day in 2002, 996,000 barrels were processed in the United States.

(e)   The Shell Group also has significant chemical sales in the U.S. as well.  Shell Chemical LP (99.1% owned by the Shell Group) has manufacturing facilities located at Mobile, Alabama; Martinez, California; St. Rose, Geismar and Norco, Louisiana; and Deer Park, Texas.  In 2002, the U.S. was the Shell Group's largest chemical products market, with a full $4.7 billion of its $11.490 billion in revenues being made in the U.S.

(f)   The Shell Group's reporting requirement for its oil and gas reserves are dictated by U.S. GAAP and the SEC.  Both Shell Transport and Royal Dutch represent that their financial statements are audited in accordance with U.S. GAAS and presented in conformity with U.S. GAAP.  Both Shell Transport and Royal Dutch and their officers and directors are subject to the unique requirements of the Sarbanes-Oxley Act, which was enacted by the U.S. Congress in 2002 to try to halt or avoid the kind of misconduct alleged here.

62.  Plaintiffs UNITE National Retirement Fund and Plumbers and Pipefitters National Pension Fund are pension trust funds with beneficiaries who are citizens of and who reside in the states of New Jersey, Massachusetts, Connecticut and Washington D.C.  One

- 47 -

trustee of plaintiff Plumbers and Pipefitters National Pension Fund is a citizen and resident of New Jersey.  Defendants PWC and KPMG also have substantial operations in New Jersey, Connecticut, Massachusetts and Washington D.C. and have partners who are citizens and residents of New Jersey, Connecticut, Massachusetts and Washington D.C.   Defendants Henderson and Ricciardi are citizens of Connecticut; Boynton is a citizen of Massachusetts; and Giusti is a resident of Washington D.C. Because plaintiffs and defendants are both citizens and residents of New Jersey, Massachusetts, Connecticut and Washington D.C. there is no diversity of citizenship for purposes of federal subject matter jurisdiction and this case is not removable to federal court.

### THE PARTIES

63.   (a)   Plaintiff UNITE National Retirement Fund is and was at the time of the commission of the wrongful acts complained of herein, a stockholder of Royal Dutch.  This plaintiff currently owns  65,100  Royal  Dutch  ordinary  shares,  with  a  value  of approximately $3,377,944.

(b)   Plaintiff Plumbers and Pipefitters National Pension Fund is and was at the time of the commission of the wrongful acts complained of herein, a stockholder of Royal Dutch.  This plaintiff has both beneficiaries and Trustees who reside in and are citizens of the state of New Jersey.  This plaintiff currently owns 85,727 Royal  Dutch  ordinary  shares  with  a  value  of  approximately $4,448,249.

- 48 -

64. Nominal Party Royal Dutch Petroleum Company ("Royal Dutch") has ADRs and common stock trading on the NYSE. It is one of the parent companies of the Shell Group, owning 60%. Royal Dutch is entitled to have its nominees elected as a majority of the members of the Boards of Directors of the two Shell Group Holding Companies (Shell Petroleum N.V. and The Shell Petroleum Company Ltd.).

65. Nominal Party Shell Transport has ADRs trading on the NYSE and common shares on other exchanges. It is one of the parent companies of the Shell Group, owning 40%. Shell Transport is entitled to have its nominees elected as the balance of the members of the Boards of Directors of the two Group Holding Companies (Shell Petroleum N.V. and The Shell Petroleum Company Ltd.) (to which boards Royal Dutch appoints the majority of members).

**The Individual Defendants**

66. The parties detailed below in ¶¶72-97, were directors of Shell Transport or Royal Dutch or officers of the Shell Group as indicated and are referred to collectively herein as the "Individual Defendants." The Individual Defendants described below at ¶¶76 and 78-95, include all the directors of the Royal Dutch Supervisory Board and Board of Management and all the members of the Shell Transport Board of Directors (collectively, the "Boards"), as of the date of the filing of this Complaint. These directors are referred to collectively herein as the "Director Defendants." The members of the Board of Management of Royal Dutch

- 49 -

and the Managing Directors of Shell (collectively, the "Managing Directors") are also members of the Presidium of the Board of Directors of Shell Petroleum N.V. and Managing Directors of the Shell Petroleum Company Limited (collectively, the "Group Managing Directors"). The Managing Directors are appointed by the Boards to a joint committee known as the Committee of Managing Directors.

67. The Individual Defendants detailed below in ¶¶82-83, 85, 87-88, and 96 served on the Shell Group's Audit Committee as indicated between 1998-2004. The Audit Committee members had important responsibilities which required them to be well informed about the day-to-day operations of the companies. Particularly, in their capacity as a committee of the Shell Transport and Royal Dutch Boards, the Audit Committee members were directly responsible for: (i) providing quarterly and annual financial updates to the Boards; (ii) ensuring the effectiveness of risk management processes and the companies' internal disclosure, financial and accounting controls; (iii) reviewing and authorizing the companies' financial accounts and reports; and (iv) selecting and overseeing the selection and work of the companies' independent auditors. The Audit Committee selected and engaged PWC and KPMG, whose responsibility it was to audit the financial statements of the Shell Group. Rather than honestly and competently fulfilling their important duties, the members of the Audit Committee actively participated in, knowingly encouraged or recklessly disregarded the wrongful acts or omissions complained of herein (including

permitting a system of weak and defective internal disclosure, financial and accounting controls, understaffing of the internal oil and gas reserves audit function, and not requiring the Shell Group CFO personally to oversee and take direct responsibility for the reserve-booking process) and thus personally participated in the wrongdoing alleged herein.

68. The Individual Defendants named in ¶¶81-82, 84-85, 88, 90-91 and 94 served on the Shell Group's Remuneration and Succession Review Committee ("Remuneration Committee") as indicated between 1998 and 2004. The Remuneration Committee members authorize the succession to the positions of Group Managing Directors and establish the compensation of the Group Managing Directors. They participated in or knowingly encouraged or approved many of the wrongful acts or omissions complained of herein (including knowingly encouraging the reserve overstatements by counting as a significant factor in determining, via the so-called "scorecard" executive compensation, the Managing Directors' ability to increase reserve replacements in absolute amounts and also relative to the Shell Group's peer competition), and/or breached their fiduciary duties to the Shell Group by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions, and thus personally participated in the wrongdoing alleged herein. The members of the Remuneration Committee knew that the "scorecard" executive compensation system they established, oversaw and continued to use was inherently flawed and

- 51 -

had significant conflicts that incentivized the Managing Directors to falsify (inflate) the Shell Group's proved reserves.  In fact, Anton Boren-Dregt, a senior reserves auditor at the Shell Group, warned strongly against any use of reserves-related considerations in the performance assessment of management in a speech to the Society of Petroleum Engineers in September 2002.  As one insider put it, under this perverse compensation system, "**We went into a cycle of rewarding promise, rather than rewarding performance, and that is deadly for any company.**"

69.   The Individual Defendants named in ¶¶78, 82, 84, 89-90, 94 and 96 served on the Shell Group's Social Responsibility Committee as indicated between 1998 and 2004.   The Social Responsibility Committee members were specifically charged with reviewing the companies' conduct and ensuring the companies' compliance with the Shell Group's Statement of General Business Principles, including duties: (i) "[t]o shareholders ...[t]o protect shareholders' investment ..."; (ii) "[t]o society ... [t]o conduct business as responsible corporate members of society, [and] to observe the laws of the countries in which they operate ..."; (iii) to "insist on honesty, integrity and fairness in all aspects of their business," and (iv) to provide "comprehensive corporate information programmes and provide full relevant information about" the companies' activities.  Rather than fulfill their fiduciary duties the Social Responsibility Committee members owed to the Shell Group and its shareholders, they participated in or knowingly

encouraged or approved many of the wrongful acts or omissions complained of herein and/or breached their fiduciary duties to the Shell Group by purposefully, recklessly and/or negligently disregarding the wrongful acts or omissions, and thus personally participated in the wrongdoing alleged herein.

70. The following Individual Defendants sat on the Audit, Remuneration, and Social Responsibility Committees as indicated during the relevant period:

### As of 3/97

|  | Audit Committee | Remuneration and Succession Review Committee | Social Responsibility Committee |
|---|---|---|---|
| Jan Timmer | x |  |  |
| Lord Oxburgh |  | x |  |

### As of 3/98

|  | Audit Committee | Remuneration and Succession Review Committee | Social Responsibility Committee |
|---|---|---|---|
| Aad Jacobs | x |  |  |
| Jan Timmer | x |  | x |
| Jonkeer Loudon |  | x | x |
| Lord Oxburgh |  | x | x |
| Henny de Ruiter |  |  | x |
| Teymour Alireza |  |  | x |

### As of 3/99

|  | Audit Committee | Remuneration and Succession Review Committee | Social Responsibility Committee |
|---|---|---|---|
| Aad Jacobs | x |  |  |
| Jan Timmer | x |  | x |
| Jonkeer Loudon |  | x | x |
| Lord Oxburgh |  | x | x |
| Henny de Ruiter |  |  | x |
| Teymour Alireza |  |  | x |

- 53 -

### As of 3/00

|  | Audit Committee | Remuneration and Succession Review Committee | Social Responsibility Committee |
|---|---|---|---|
| Aad Jacobs | x | x |  |
| Jan Timmer | x |  | x |
| Jonkeer Loudon |  | x | x |
| Lord Oxburgh |  | x |  |
| Henny de Ruiter |  |  | x |
| Eileen Buttle |  |  | x |

### As of 3/01

|  | Audit Committee | Remuneration and Succession Review Committee | Social Responsibility Committee |
|---|---|---|---|
| Aad Jacobs | x |  |  |
| Henny de Ruiter | x |  |  |
| Jan Timmer | x |  |  |
| Jonkheer Loudon |  | x | x |
| Eileen Buttle |  | x | x |
| Lord Oxburgh |  | x | x |
| Teymour Alireza |  |  |  |

### As of 3/02

|  | Audit Committee | Remuneration and Succession Review Committee | Social Responsibility Committee |
|---|---|---|---|
| Aad Jacobs | x |  |  |
| Henny de Ruiter | x |  |  |
| Luis Giusti | x |  |  |
| Jan Timmer | x |  | x |
| Jonkheer Loudon |  | x | x |
| Nina Henderson |  | x |  |
| Peter Job |  | x |  |
| Mark Moody-Stuart |  | x |  |
| Maarten van den Bergh |  |  | x |
| Teymour Alireza |  |  | x |
| Eileen Buttle |  |  | x |
| Lord Oxburgh |  |  | x |

### As of 3/03

|  | Audit Committee | Remuneration and Succession Review Committee | Social Responsibility Committee |
|---|---|---|---|
| Aad Jacobs | x |  |  |

| | Audit Committee | Remuneration and Succession Review Committee | Social Responsibility Committee |
|---|---|---|---|
| Henny de Ruiter | X | X | |
| Jan Timmer | X | | X |
| Peter Burt | X | | |
| Luis Giusti | X | | |
| Nina Henderson | X | X | |
| Jonkheer Loudon | | X | X |
| Peter Job | | X | |
| Mark Moody-Stuart | | X | |
| Maarten van den Bergh | | | X |
| Teymour Alireza | | | X |
| Eileen Buttle | | | X |
| Lord Oxburgh | | | X |

71. Defendants Watts, van de Vijver, van der Veer, Boynton, Coopman, van den Bergh, Skinner, Routs and Brinded, as Managing Directors of Royal Dutch or Shell Transport, the companies' Director of Finance, and/or the CFO of E&P during the relevant period, were also subject to the Shell Group's "Code of Ethics ("COE") for Principle Executive Officers and Senior Financial Officers of the Royal Dutch/Shell Group of Companies" (collectively, the "COE Addressees"). COE Addressees were required to: (A) "act in accordance with the highest standards of honesty, integrity and fairness and expect the same in their relationships with others while maintaining a work and business climate fostering such standards;" (B) "excuse [themselves] from making any decision about an issue at hand in which a conflict of interests arises or could arise and in such event, disclose in writing the relevant facts ... to: (a) the chairman of the Group Audit Committee in the case of: (i) the Managing Directors of Royal Dutch, (ii) the Managing Directors of Shell Transport, (iii) the Director of

- 55 -

Finance, (iv) the Group Chief Internal Auditor and (v) the Group Controller, and (b) to the Group Controller, in the case of any other COE Addressee;" and (C) "report any breach [of the Code] in writing to: (a) the chairman of the Group Audit Committee in the case of: (i) the Managing Directors of Royal Dutch, (ii) the Managing Directors of Shell Transport, (iii) the Director of Finance, (iv) the Group Controller and (v) the Group Chief Internal Auditor, and (b) the Group Controller in the case of any other COE Addressee." Each of these defendants violated the COE as alleged herein, while the Boards of Shell Transport and Royal Dutch failed to oversee and enforce the COE.

72. Defendant Philip Watts ("Watts") is a British citizen. He had served as a Director and as a Managing Director of Shell Transport since 1997, as Shell Transport's Chairman and as Chairman of the CMD since 2001, and as a Group Managing Director since 1997, until his termination on March 19, 2004. Watts joined the Shell Group as a seismologist in 1969 and held positions in Asia Pacific and Europe leading to Exploration Director Shell-U.K. from 1983 to 1985; head of various E&P functions in The Hague from 1985 to 1991; Chairman and Managing Director in Nigeria from 1991 to 1994, Regional Coordinator Europe from 1994 from 1995; Director Planning, Environment and External Affairs, Shell International from 1996 to 1997; and as CEO of the Shell Group's E&P division from 1997 to 2001. Watts signed the annual reports on Form 20-F filed with the SEC for 2001-2002 and falsely certified the 2002 20-F (including

the financial statements and reports) of Shell Transport and the Shell Group, pursuant to the Sarbanes-Oxley Act. Watts also reviewed and authorized the filing of the 1998-2000 reports on Form 20-F and knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing. Watts also personally participated in the human rights violations in Nigeria. Despite the Shell Group's actual poor performance, due in large part to reserve replacement credits on his compensation scorecard, Watts' salary more than doubled between 1999 and 2002, and in 2003, Watts received a 55% pay raise, increasing his base salary to £1.8 million:

| £ | 2002 | 2001 | 2000 | 1999 |
|---|---|---|---|---|
| Salaries | 745,969 | 607,398 | 496,302 | 472,622 |
| Car Benefit | 21,922 | 20,089 | 17,323 | 17,275 |
| Incentive Compensation | 874,000 | 455,000 | 225,000 | 218,250 |
| Deferred bonus plan adjustment | 152,069 | 75,834 | ~ | ~ |
| Gains on Exercise of Stock Options | 8,238 | 508,167 | 134,400 | 112,200 |
| Total | 1,802,198 | 1,666,488 | 873,025 | 820,347 |

Upon his termination, instead of being forced to return any of his ill-gotten gains, improper bonuses, or any proceeds from the sale of stock at inflated prices, Watts received a severance package which included three months' salary, or £450,000.

73. Defendant Judy Boynton ("Boynton") is a U.S. citizen and resident of Massachusetts. She served as the Shell Group's Chief Financial Officer ("CFO") since 2001 and as a Shell Transport Director and a Group Managing Director since 2003, and a member of

the CMD from 2000 until she was removed from those positions on April 19, 2004. Boynton was responsible for preparing the Shell Group's financial statements filed with the SEC and disseminated to the shareholders of Shell Transport and Royal Dutch and the public. Boynton was also responsible for overseeing the Shell Group's internal disclosure and financial controls to ensure that they were adequate and complied with Sarbanes-Oxley, so that the Shell Group's financial data was accurately compiled, computed and reported and the Shell Group's assets were safeguarded. Boynton (i) was aware of the reserve overbooking fraud for at least two years before it was disclosed but did nothing to correct or disclose it; (ii) was aware of and permitted material deficiencies in the Shell Group's internal financial and accounting controls and its understaffed and under-trained internal oil and gas reserves review, challenge and audit functions; and (iii) compromised the compliance role of the Shell Group's finance function by not requiring the CFOs of the Shell Group's business units to report directly to her. Boynton falsely certified the Shell Group's Form 20-F for fiscal year 2002 pursuant to the Sarbanes-Oxley Act. Boynton has not been required to return any of her incentive compensation, bonuses, or to disgorge any insider trading proceeds.

74. Defendant Walter van de Vijver ("van de Vijver") is a Dutch citizen. He served as a Director of Royal Dutch, the CEO of the Shell Group's E&P unit, a Managing Director of Royal Dutch, a Group Managing Director, and a member of the CMD from 2001 until

March 19, 2004. Van de Vijver joined the Shell Group in 1979 as a petroleum engineer and worked in E&P in Qatar, Oman, the U.S., the U.K. and the Netherlands. Van de Vijver served as General Manager of the Brent Business Unit of Shell U.K. E&P in Aberdeen from 1993 to 1997; as CEO of Shell International Gas Ltd. and CEO of Shell Coal International Ltd. in London from 1997 to 1998; and as President and CEO of Shell Exploration & Production Company in the U.S. from 1998 to 2001. Defendant Van der Vijver's compensation was **tripled** between 2001 and 2002:

| £ | 2002 | 2001 |
|---|---|---|
| Salaries | 735,095 | 342,536 |
| Cash Bonus | 902,750 | 221,330 |
| Other Compensation | 1,637,845 | 563,866 |
| Gain on exercise of stock options | 18,091 | 2,162 |
| **Total** | **1,655,936** | **566,028** |

Van de Vijver personally participated in the misconduct alleged herein, including signing the 2002 Form 20-F, despite knowledge it was false and misleading. Van de Vijver also reviewed and authorized the filing of the 2001 report on Form 20-F, knew it to be false or recklessly disregarded its truth or falsity, and thus was an active and knowing participant in the wrongdoing. Upon his termination on March 19, 2004, van de Vijver was not required to return any of his incentive compensation, bonuses, or any insider trading proceeds.

75. Defendant Frank Coopman ("Coopman") is a Dutch citizen. He served as the Chief Financial Officer ("CFO") of the Shell

Group's E&P business unit from 2002 until he was dismissed on April 8, 2004. Prior to becoming CFO of E&P in 2002, Coopman served as the Shell Group's global Finance Controller and before that as CFO of the Oil Products division. Upon his termination, Coopman was not required to relinquish any of his incentive compensation, bonuses, or any insider trading proceeds.

76. Defendant Jeroen van der Veer ("van der Veer") is a Dutch citizen. He was at all relevant times, a Director of Royal Dutch and has served as a Group Managing Director since 1997 and as President of Royal Dutch since 2000. He was promoted to Chairman of the CMD in March 2004. Van der Veer joined the Shell Group in 1971 and held a number of senior management positions around the world, including as President and CEO of Shell Chemical Company in the U.S. from 1995 through 1997. Van der Veer served as the Vice Chairman of the CMD during 1997-2003 and as such personally participated in the misconduct alleged. Van der Veer signed the false and misleading reports on Form 20-F for 2000-2002 and falsely certified the 2002 Form 20-F under the Sarbanes-Oxley Act. Van der Veer also reviewed and authorized the filing of the 1998-1999 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing. Between 2000 and 2002, van der Veer's compensation was more than doubled based in large part on increasing reported reserve replacements:

| £ | 2002 | 2001 | 2000 | 1999 |
|---|------|------|------|------|
| Salaries | 1,013,729 | 923,929 | 824,201 | 706,953 |
| Cash Bonus | 1,230,500 | 619,450 | 398,601 | 325,088 |
| Other Compensation | 4,768 | 4,620 | 4,486 | unknown |
| Gain on exercise of stock options | | 293,440 | 339,600 | unknown |
| Total | 2,248,997 | 1,841,439 | 1,566,888 | 1,032,041 |

77.  Defendant Paul Skinner ("Skinner") is a British citizen. He had served as a Director and as a Managing Director of Shell Transport since 2000, as CEO of Oil Products since 1999 and as a Group Managing Director and a member of the CMD from January 1, 2000 until September 2003.  Skinner also reviewed and authorized the filing of the 2000-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.  Skinner joined the Shell Group in 1963 and served in executive positions in charge of oil products, gas and power, information technology and Shell Capital during his tenure.  Skinner was well compensated, due in large part to the maintenance and/or growth of reserve replacements:

| £ | 2002 | 2001 | 2000 |
|---|---|---|---|
| Salaries | 553,830 | 504,703 | 458,802 |
| Car Benefit | 13,181 | 14,924 | 14,965 |
| Other Benefits | | | 655 |
| Incentive Compensation | 632,500 | 338,000 | 213,750 |
| Deferred Bonus Plan Adjustment | 4,756 | 56,334 | |
| Gains on Exercise of Stock Options | 8,238 | 505,902 | 349,704 |
| Total | 1,212,505 | 1,419,863 | 1,037,876 |

78.  Defendant Maarten Van den Bergh ("Van den Bergh") is a Dutch citizen.  He has served as a Director of Royal Dutch since 2000.  Van den Bergh served as a Managing Director of Royal Dutch from 1992 to 2000 and as President of Royal Dutch from 1998 to 2000.  Van den Bergh joined the Shell Group in 1968.  Van den Bergh worked in Japan, Venezuela, at the Shell Group's treasury department, and in Indonesia; he was appointed Vice-President of the Pilipinas Shell Petroleum Corporation in 1979; and then held a variety of posts in Thailand and Africa, before becoming a Group Managing Director of the Shell Group in 1992.  From 1998-2000, Van den Bergh served as Vice-Chairman of the CMD and as such personally participated in the misconduct alleged herein.  He signed the false and misleading 1998 and 1999 reports on Form 20-F.  Van den Bergh also reviewed and authorized the filing of the 2000-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.

79.   Defendant Robert J. Routs ("Routs") is a Dutch citizen. Routs has been a Director of Royal Dutch since 2003 and has served as a Managing Director of Royal Dutch since 2003, as CEO of Oil Products since 2002, as the CEO of Chemicals since 2004, as a Group Managing Director and a member of the CMD since 2003.   Routs has been with the Shell Group since 1971 when he joined the E&P group. As a member of the CMD, Routs personally participated in the misconduct alleged.

80.   Defendant Malcolm Brinded ("Brinded") is a British citizen.   He has been since 2002 a Director of Royal Dutch and has served as the CEO of the Shell Group's Gas & Power unit since 2002; CEO of the Shell Group's E&P unit since 2004; a member of the Royal Dutch Board of Management and a member of the CMD since 2002; and was promoted to Vice-Chairman of the CMD in March 2004.   Brinded joined the Shell Group in 1974 and has held various positions around the world, including Country Chair for Shell in the U.K. from 1999 to 2002 and Director of Planning, Environment and External Affairs at Shell International Ltd. from 2001 to 2002. Brinded previously served in Brunei, the Netherlands, Oman and the U.K.   Brinded also reviewed and authorized the filing of the 2002 report on Form 20-F, knew it to be false or recklessly disregarded its truth or falsity, and thus was an active and knowing participant in the wrongdoing.

81.   Defendant Mark Moody-Stuart ("Moody-Stuart") is a British citizen.   He has served as a Director of Shell Transport and as

- 63 -

Shell Transport's Chairman from 1997 to 2001, and as a Group Managing Director and member of the CMD from 1991 to July 2001. Moody-Stuart signed the false and misleading 1998-2000 reports on Form 20-F. Moody-Stuart also reviewed and authorized the filing of the 2001-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing. Moody-Stuart's compensation during the relevant period, and especially during his tenure as the Shell Group's Chairman, was largely dictated by two factors: his ability to show increased reserve replacements and his ability to show competitive financial results vis-à-vis other large oil and gas companies. In order to increase his own pay, Moody-Stuart began manufacturing "reserves" so that he could report increased reserve "replacements." As a result, Moody-Stuart was well compensated during the relevant period:

| £ | 2001 | 2000 | 1999 |
|---|---|---|---|
| Salaries and Fees | 583,401 | 710,427 | 668,822 |
| Incentive Compensation | 232,050 | 321,300 | 301,050 |
| Directors Fees | | | |
| Holding Company Fees | | | |
| Proceeds on Exercise of Stock Options | 639,360 | 892,440 | 811,620 |
| Total | 1,454,811 | 1,924,167 | 1,781,492 |

82. Defendant Henny de Ruiter ("Ruiter") is a Dutch citizen. He was at all relevant times, a member of the Royal Dutch Board and previously served as a Managing Director of Royal Dutch and CEO of E&P from 1983 to 1994. As a former long-term Managing Director,

Ruiter was aware of the reserve overstatement and that the reserve overstatement was precipitated in large part both by Watts', Moody-Stuart's and his own conduct, including his 30% cut in the oil exploration staff and suspension of half of the Shell Group's drilling programs in 1993. Nonetheless, as a member of the Shell Group's Audit Committee, Ruiter authorized the filing and dissemination of the false and misleading reports on Form 20-F from 1998-2002, knew they were false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing. As a member of the Remuneration Committee, Ruiter also authorized the pay scheme that Ruiter knew was incentivizing executives to overstate reserve replacement rates.

83. Defendant Luis Giusti ("Giusti") is a Venezuelan citizen, residing in Washington, D.C. He joined the Shell Transport Board in 2000. Giusti began his career in the Venezuelan Shell Oil Company in 1966 and rose up its ranks quickly. As a member of the Audit Committee, Giusti reviewed and authorized the filing and dissemination of the false and misleading reports on Form 20-F for fiscal years 2000-2002, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.

84. Defendant Ronald Oxburgh ("Oxburgh") is a British citizen. He was at all relevant times, a Director of Shell Transport and has served as Shell Transport's Chairman since March 2004. Oxburgh is a geologist by training and experience. As a

member of the Remuneration Committee between 1999 and 2001, Oxburgh authorized the executive pay scheme that he knew was incentivizing the Shell Group executives to overstate reserve replacement rates. Oxburgh also reviewed and authorized the filing of the 1998-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.

85. Defendant Aad Jacobs ("Jacobs") is a Dutch citizen. He has served at all relevant times, as a Director of Royal Dutch and since 2002 as the Chairman of the Royal Dutch Supervisory Board and as Chairman of the Shell Group's Audit Committee. Especially as Chairman of the Audit Committee in 2002, Jacobs reviewed and authorized the filing of the 1998-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.

86. Defendant Lawrence Ricciardi ("Ricciardi") is a U.S. citizen and resident of Connecticut. He has been since 2001 a member of the Royal Dutch Board. As a member of the Audit Committee, Ricciardi authorized the filing and dissemination of the false and misleading reports on Form 20-F in 2001 and 2002, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing. Ricciardi is a senior advisor to the law firm of Jones Day which has represented the Shell Group in numerous transactional matters, receiving millions of dollars in fees.

87.  Defendant Peter Burt ("Burt") is a British citizen.  He has been a Director of Shell Transport since 2002.  As a member of the Audit Committee, Burt reviewed and authorized the filing and dissemination of the false and misleading report on Form 20-F for fiscal 2002, knew it to be false or recklessly disregarded its truth or falsity, and thus was an active and knowing participant in the wrongdoing.

88.  Defendant Mary (Nina) Henderson ("Henderson") is a U.S. citizen and a resident of Connecticut.  She is a Director of Shell Transport, having joined the Board in 2001.  As a member of the Audit Committee, Henderson reviewed and authorized the filing and dissemination of the false and misleading reports on Form 20-F for 2001 and 2002, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.  As a member of Remuneration Committee, Henderson also authorized the executive pay scheme that she knew was incentivizing the Shell Group's executives to overstate reserve replacement rates.

89.  Defendant Teymour Alireza ("Alireza") is a citizen and resident of Saudi Arabia.  He was during all relevant times, a Director of Shell Transport, having been appointed in 1997.  Alireza serves as chairman of Saudi National Pipe Company, as a director of Arabian Gulf Investments and of Riyad Bank Saudi Arabia.  The Shell Group, like all major oil companies, purchases billions of dollars a year in Saudi oil.  *Defendants concede that*

- 67 -

as a middle-eastern businessman engaged in the oil and gas business, Alireza is not "independent of any personal business connection with the Company or companies of the Royal Dutch/Shell Group." Alireza reviewed and authorized the filing of the 1998-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.

90.   Defendant Eileen Buttle ("Buttle") is a British citizen. She was at all relevant times a Director of the Shell Transport Board, having been appointed in 1998.   Buttle reviewed and authorized the filing of the 1998-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.

91.   Defendant Peter Job ("Job") is a British citizen.  He has served as a Director of the Shell Transport Board since 2001.  As a member of the Remuneration Committee, Job authorized the perverse executive pay scheme that he knew or should have known was incentivizing the Shell Group's executives to overstate reserve replacement rates.  Job also reviewed and authorized the filing of the 2001-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.

92.   Defendant John Kerr ("Kerr") is a British citizen.  He has been since 2002 a Director of the Shell Transport Board.  As a member of the Remuneration Committee, Kerr authorized the executive

- 68 -