pay scheme that he knew or should have known was incentivizing the Shell Group executives to overstate reserve replacement rates. Kerr also reviewed and authorized the filing of the 2002 report on Form 20-F, knew it to be false or recklessly disregarded its truth or falsity, and thus was an active and knowing participant in the wrongdoing.

93. Defendant Wim Kok ("Kok") is a Dutch citizen. He has been since July 1, 2003, a member of the Royal Dutch Board. Having been **appointed** by Watts in July 2003, Kok has never stood for election by the companies' shareholders.

94. Defendant Jonkheer Aarnout Loudon ("Loudon") is a Dutch citizen. He was at all relevant times a member of the Royal Dutch Board, having been appointed in 1997. As Chairman of the Remuneration Committee, Loudon authorized the executive pay scheme that he knew or should have known was incentivizing executives of the Shell Group to overstate reserve replacement rates. Loudon reviewed and authorized the filing of the 1998-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.

95. Defendant Hubert Markl ("Markl") is a German citizen. He has been a member of the Royal Dutch Board since 2002. As a member of the Remuneration Committee, Markl authorized the perverse executive pay scheme that he knew or should have known was incentivizing executives of the Shell Group to overstate reserve

- 69 -

replacement rates. Markl also reviewed and authorized the filing of the 2002 report on Form 20-F, knew it to be false or recklessly disregarded its truth or falsity, and thus was an active and knowing participant in the wrongdoing.

96. Defendant Jan Timmer ("Timmer") is a Dutch citizen. He served as a member of the Royal Dutch Board from 1996 to 2003 and as a member of the Advisory Committee of KPMG. Timmer reviewed and authorized the filing of the 1998-2002 reports on Form 20-F, knew them to be false or recklessly disregarded their truth or falsity, and thus was an active and knowing participant in the wrongdoing.

97. Defendant Robbert van der Vlist ("van der Vlist") is a Dutch citizen. He served as Royal Dutch's General Attorney during the relevant period and signed the false and misleading reports on Form 20-F for fiscal years 1998-2001.

98. Defendant PricewaterhouseCoopers International Limited, headquartered in New York City, New York, is a professional services organization with member firms around the world, including members in the United States and New Jersey. Defendants PricewaterhouseCoopers LLP (U.K.) and PricewaterhouseCoopers LLP (U.S.A.) are part of PricewaterhouseCoopers International Limited (collectively with PricewaterhouseCoopers International Limited "PWC"). The leadership structure of PWC is centralized with a global Chief Executive Officer and a global Board of Directors. The Board of Directors of PWC is the highest governing body of the worldwide organization.

99.  According to PWC's Web site, the global member firms of PWC use "common resources, methodologies, knowledge and expertise. In return, they are bound to abide by certain common policies and to maintain the standards of the global network as formulated by the CEO of PricewaterhouseCoopers International Limited and approved by its Global Board."

100. PWC's Chief Executive Officer, Samuel A. DiPiazza Jr., resides and works in New York City at the Company's global headquarters.  PWC's General Counsel, Lawrence W. Keeshan, is based in San Francisco, California.  The head of PWC's global Assurance and Advisory divisions, Gerald M. Ward and J. Frank Brown, are also based in New York City.  Seven of the 18 members of PWC's global board of directors are citizens of and reside in the United States, including Samuel A. DiPiazza, Jr. (New York), John J. Barry (New York), Jay D. Brodish (New York), Keith D. Levingston (Washington, DC), Dennis J. Lubozynski (Connecticut), Donald A. McGovern (California), and Walter G. Ricciardi (New York).  Of the other global board members, only one resides in London and one resides in Amsterdam, with the remainder residing in Paris, Johannesburg, Manchester, Melbourne, São Paulo, Basel, Frankfurt, Toronto, Dublin, and Hong Kong.

101. According to PWC's Global Annual Review, the PWC Board of Directors manages the global network through a global deployment programme, a shared code of conduct, and knowledge management and communications technologies:

- 71 -

(a)   The Annual Review describes the Global Deployment Programme as follows:

> PwC has one of the largest global deployment programmes of its type in the world. The programme supports three types of deployment:
>
> - Long-term assignments of more than one year that are of strategic importance to the work of our organisation
>
> - Short-term tactical or strategic assignments
>
> - Tactical deployment for purposes of individual professional development
>
> \*     \*     \*
>
> More than 1,000 partners and staff are currently on long-term placements designated as strategically important for client service or for strengthening PwC's global network. A third of these individuals are working on our major client accounts. In total, some 2,300 partners and staff — nearly 2 percent of the workforce of PwC firms in aggregate — are involved in assignments ranging from six months to five years in 76 countries. During 2003, we significantly increased short-term assignments in order to give more people the opportunity to build their international experience and to help clients respond to recent regulatory changes in the US.

(b)   The Annual Review also contains the PWC Code of Conduct and states that

> in September 2002 we launched our globally shared Code of Conduct. This written code is the most comprehensive in our industry.   Based on our values of excellence, teamwork and leadership, it offers a broad range of guidance about standards of integrity and business conduct, covering such issues as confidentiality, independence, risk management, respect and corporate citizenship.

(c)   PWC's   "Knowledge   Sharing   and   Communications Technology" provides a variety of IT technologies which keep its worldwide partners connected.

102. In his letter introducing PWC's Global Annual Review, Samuel   A.   DiPiazza   Jr.,   Chief   Executive   Officer   of PricewaterhouseCoopers International Limited, states:

> *PricewaterhouseCoopers has drawn together as a global organisation* through our shared values and standards of excellence – our common strategies to develop services and delivery methods that fully meet client needs. Those precepts enable us to do what we do best as a global organisation. They enable us to build networks of highly skilled professionals around clients and provide them with the benefit of PwC's collective knowledge and resources. And they enable us to match the best teams and solutions to the issues our clients face.

> Having highly skilled people of integrity is crucial to providing high-quality service. We remain committed to our people and our values: excellence, teamwork and leadership. *Our global connectivity enables our people to consult with one another and to search for better answers across national borders and across our organisation.* This is our work style, and it is an effective one.

> *Being a connected organisation also means we share worldwide an inclusive commitment to the development and recognition of our people.*

103. PWC's   Global   Annual   Review   also   provides   that "PricewaterhouseCoopers is a *truly global organisation* with member firm offices in 768 cities in 139 countries," and reports revenue for the global organisation on a combined basis: "On the basis of international financial reporting standards (IFRS), fiscal year 2003 net revenues of PricewaterhouseCoopers firms were $14.7 billion, of which $14.5 billion came from continuing operations."

104. PWC was engaged by the Shell Group and Shell Transport to provide independent auditing and/or consulting services to the Shell Group and Shell Transport, including the preparation, examination and/or review of Shell Transport's and the Shell Group's consolidated financial statements for FY 1998-FY 2002, which financial statements were disseminated to investors in the United States. PWC was engaged to and performed these services so that the Shell Group's and Shell Transport's financial statements would be presented to, reviewed and relied upon by securities purchasers, governmental agencies, the investing public and members of the financial community. As a result of the services it rendered to the Shell Group and Shell Transport, PWC's representatives were frequently present at the Shell Group's and Shell Transport's corporate headquarters and financial offices between 1998 and 2002 and had continual access to the Shell Group's and Shell Transport's confidential corporate financial and business information, including the Shell Group's and Shell Transport's true financial condition, financial statements and reserve reporting problems, which information PWC was aware of and/or negligently disregarded. PWC actively participated in the presentation, review and issuance of the Shell Group's and Shell Transport's false financial statements.

105. Defendant KPMG LLP, headquartered in New York, New York, is part of the professional services organization of defendant KPMG International, which has member firms around the world, including

members in the United States and New Jersey and defendant KPMG Accountants N.V. (collectively "KPMG").

106. KPMG's Web site states it is "a Swiss cooperative of which all KPMG firms are members," but markets itself as a single "global network of member firms," promising that: "With a global approach to service delivery, KPMG responds to clients' complex business challenges with services that span industry sectors and national boundaries." KPMG's Web site also states that "Nearly 100,000 KPMG professionals in member firms worldwide collaborate across industry, service and national boundaries to deliver professional services in 150 countries." In fact, KPMG markets itself as a single global organization:

> In a global marketplace distinguished by remarkable growth and consolidation, companies face a host of new challenges in today's economy. KPMG helps clients successfully respond to changing opportunities by providing professional services, wherever and whenever they're needed.

107. KPMG also reports revenue for the organization on a combined basis, with its Web site stating that,

> In 2002, KPMG achieved revenues of US$10.72 billion, an increase of 3.9 percent in U.S. dollars compared with a year ago, driven by strong performances across all functional businesses. KPMG member firms achieved strong results despite the continued global economic decline, widespread upheaval in the industry and a difficult market environment. KPMG remains committed to offering a complementary range of multi-disciplinary skills including Assurance, FAS, Tax and Legal services to clients, which continue to leverage KPMG's in-depth knowledge of their business strategies, cultures, financial plans, control environments and business risks. Nearly 100,000 KPMG professionals in member firms worldwide collaborate across industry, service and

national boundaries to deliver professional services in 150 countries.

108. KPMG was engaged by the Shell Group and Royal Dutch to provide independent auditing and/or consulting services to the Shell Group and Royal Dutch, including the preparation, examination and/or review of Royal Dutch's and the Shell Group's consolidated financial statements for FY 1998-FY 2002, which financial statements were disseminated to investors in the United States. KPMG was engaged to and performed these services so that the Shell Group's and Royal Dutch's financial statements would be presented to, reviewed and relied upon by securities purchasers, governmental agencies, the investing public and members of the financial community. As a result of the services it rendered to the Shell Group and Royal Dutch, KPMG's representatives were frequently present at the Shell Group's and Royal Dutch's corporate headquarters and financial offices between 1998 and 2002 and had continual access to the Shell Group's and Royal Dutch's confidential corporate financial and business information, including the Shell Group's and Royal Dutch's true financial condition, financial statements and reserve reporting problems which information KPMG was aware of and/or negligently disregarded. KPMG actively participated in the presentation, review and issuance of the Shell Group's and Royal Dutch's false financial statements.

109. Defendant PWC issued unqualified audit reports on Shell Transport's 1998-2002 financial statements. Defendant KPMG issued

unqualified audit reports on Royal Dutch's 1998-2002 financial statements.  PWC and KPMG jointly issued unqualified audit reports on the Shell Group's 1998-2002 financial statements.  Examples of these opinions are set forth below:

Royal Dutch/Shell Group of Companies

\*     \*     \*

We have audited the Financial Statements appearing on pages G2 to G33 of the Royal Dutch/Shell Group of Companies for the years 2002, 2001 and 2000.  The preparation of Financial Statements is the responsibility of the management.  Our responsibility is to express an opinion on the Financial Statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in the Netherlands and the United States.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the Financial Statements are free of material misstatement.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Financial Statements.  An audit also includes assessing the accounting principles used and significant estimates made by the management in the preparation of Financial Statements, as well as evaluating the overall Financial Statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the Financial Statements referred to above present fairly, in all material respects, the financial position of the Royal Dutch/Shell Group of Companies at December 31, 2002 and 2001 and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2002 in accordance with the generally accepted accounting principles in the Netherlands and the United States.

KPMG Accountants N.V.

KPMG Accountants N.V., The Hague

PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP, London - March 5, 2003

\*       \*       \*

To:   The "Shell" Transport Company, Public Limited Company

We have audited the Financial Statements of The "Shell" Transport and Trading Company, Public Limited Company for the years 2001, 2000 and 1999 appearing on pages S2-S8. The preparation of the Financial Statements is the responsibility of the Company's Directors. Our responsibility is to express an opinion on Financial Statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the Financial Statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Financial Statements. An audit also includes assessing the accounting principles used and significant estimates made by the Company's Directors in the preparation of Financial Statements, as well as evaluating the overall Financial Statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the Financial Statements referred to above present fairly, in all material respects, the financial position of The "Shell" Transport and Trading Company, Public Limited Company at December 31, 2001 and 2000, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2001 in conformity with the accounting principles described in Note 1 on page S4.

PricewaterhouseCoopers, London

March 14, 2002

\*       \*       \*

To:  Royal Dutch Petroleum Company

    We have audited the Financial Statements of the
Royal Dutch Petroleum Company for the years 2001, 2000
and 1999 appearing on pages R2-R6.  The preparation of
these Financial Statements is the responsibility of the
Board of Management.  Our responsibility is to express an
opinion on Financial Statements based on our audits.

    We conducted our audits in accordance with auditing
standards generally accepted in the United States.  Those
standards require that we plan and perform the audits to
obtain reasonable assurance about whether the Financial
Statements are free of material misstatement.  An audit
includes examining, on a test basis, evidence supporting
the amounts and disclosures in the Financial Statements.
An audit also includes assessing the accounting
principles used and significant estimates made by the
Board of Management in the preparation of Financial
Statements, as well as evaluating the overall Financial
Statement presentation.  We believe that our audits
provide a reasonable basis for our opinion.

    In our opinion, the Financial Statements referred to
above present fairly, in all material respects, the
financial position of the Royal Dutch Petroleum Company
at December 31, 2001 and 2000, and the results of its
operations and its cash flows for each of the three years
in the period ended December 31, 2001 in accordance with
the accounting policies described on page R3.

                        *     *     *

KPMG Accountants N.V.

March 13, 2002

The opinions on the 1998-2001 financial statements were the same in

all material respects.

### THE INDIVIDUAL DEFENDANTS' DUTIES

    110.  Each officer and director of Shell Transport, Royal Dutch

and the Shell Group owed the companies and the Shell Transport and

Royal Dutch shareholders the duty to exercise a high degree of

care, loyalty and diligence in the management and administration of

the affairs of the companies, as well as in the use and preservation of their property and assets. The conduct of Shell Transport's and Royal Dutch's directors and officers complained of herein involves fraudulent misconduct — a knowing, intentional and culpable violation of their obligations as directors of Shell Transport and Royal Dutch, and the absence of good faith on their part for their duties to the companies and their shareholders. The misconduct of the Shell Group's officers (managing directors) has been ratified by Shell Transport's and Royal Dutch's Boards, which have failed to take any legal action on behalf of the companies against them.

111. By reason of their positions as officers, directors and/or fiduciaries of Shell Transport and Royal Dutch and because of their ability to control the business and corporate affairs of Shell Transport and Royal Dutch, the Individual Defendants owed Shell Transport and Royal Dutch and their shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Shell Transport and Royal Dutch in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Shell Transport and Royal Dutch and their shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of publicly held companies, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect

to the companies' operations, projections and forecasts, so as to (i) fulfill their duty of candor and honesty to the existing shareholders of Shell Transport and Royal Dutch; and (ii) so that the market prices of both companies' stocks and ADRs would be based on truthful and accurate information.

112. The Individual Defendants, because of their positions of control and authority as directors or officers of Shell Transport and Royal Dutch, were able to and did, directly and indirectly, control the wrongful acts complained of herein, including Shell Transport and Royal Dutch's violations of the U.S. securities laws, international law, as well as the contents of the various public statements issued by the companies to their shareholders and to the investment community.  Because of their executive and directorial positions with Shell Transport and Royal Dutch, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, oil reserves and future business prospects of Shell Transport and Royal Dutch and were required to disclose them promptly and accurately to their shareholders and the financial markets but did not do so.

113. To discharge their duties, the directors of Shell Transport and Royal Dutch were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Shell Transport and Royal Dutch.  By virtue of such duties, the officers and

directors of Shell Transport and Royal Dutch were required, among other things, to:

(a) manage, conduct, supervise and direct the business affairs of Shell Transport and Royal Dutch in accordance with law (including the U.S. securities laws and the Sarbanes-Oxley Act), government rules and regulations and the charter and bylaws of Shell Transport and Royal Dutch;

(b) neither violate nor knowingly permit any officer, director or employee of Shell Transport and Royal Dutch to violate applicable laws, rules and regulations;

(c) remain informed as to the status of Shell Transport's and Royal Dutch's operations, including its oil and gas reserves, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to their shareholders;

(d) establish and maintain systematic and accurate records and reports of the business and affairs of Shell Transport and Royal Dutch and procedures for the reporting of the business and affairs to the Boards of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)  maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Shell Transport's and Royal Dutch's financial statements and those of the Shell Group – including their oil reserves and other financial information – would be accurate and the actions of their directors would be in accordance with all applicable laws;

(f)  exercise reasonable control and supervision over the public statements to the securities markets and trading in Shell Transport and Royal Dutch stock by the officers and employees of Shell Transport and Royal Dutch; and

(g)  supervise the preparation and filing of any financial reports or other information required by law from Shell Transport and Royal Dutch and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Shell Transport and Royal Dutch and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

114. During all times relevant hereto, each of the defendants occupied positions with Shell Transport and Royal Dutch or were associated with the companies in such a manner as to make them privy to confidential and proprietary information concerning Shell Transport and Royal Dutch and their operations, finances, oil reserves and financial condition. Because of these positions and such access, each of the defendants knew that the true facts specified herein regarding the oil reserves had not been disclosed

to and were being concealed from their shareholders and the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Shell Transport and Royal Dutch and to take any and all action necessary to ensure that the officers and directors of Shell Transport and Royal Dutch do not act upon such privileged non-public information in a manner which caused the companies to violate the law. Because of the Individual Defendants' positions, they knew the adverse non-public information about Shell Transport and Royal Dutch's operations, oil reserves and finances, as well as its accounting practices, markets and business prospects via access to internal corporate documents (including Shell Transport's and Royal Dutch's financial statements, operating plans, budgets and forecasts and reports of actual operations), conversations and connections with other corporate officers and employees, and attendance at management and Board of Directors' meetings and committees thereof via reports and other information provided to them in connection therewith. Each of the Individual Defendants participated in the issuance and/or review of false and/or misleading statements, including the preparation of false and/or misleading press releases, SEC filings and reports to Shell Transport and Royal Dutch shareholders and ADR holders.

## CONCERTED ACTION ALLEGATIONS

115. Defendants schemed, pursued a common course of conduct, acted in concert with, conspired with and aided and abetted one another to accomplish the wrongs complained of herein.  The members of the Board of Royal Dutch aided and abetted the violations of duty and law by the members of the Shell Transport Board, and vice-versa.

## DERIVATIVE ALLEGATIONS - FUTILITY OF DEMAND

116. Plaintiffs bring this action derivatively in the right and for the benefit of Shell Transport and Royal Dutch to redress damage suffered and to be suffered by Royal Dutch and Shell Transport as a direct result of defendants' breaches of fiduciary duty, corporate mismanagement, unjust enrichment, abuse of control and fraud.  This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have.  Plaintiffs will adequately and fairly represent the interests of Royal Dutch and Shell Transport and their shareholders in enforcing and prosecuting their rights.

117. As a result of this debacle, the directors of Shell Transport and Royal Dutch were forced to undertake an internal investigation into these matters.  However, in order to assure that the investigation would not be able to conclude that the directors themselves had been involved in or were aware of the wrongdoing, they specifically and improperly limited the scope of the internal investigation to the involvement of members of management in the

wrongdoing, so as to limit the charter of the investigators, such that they could not investigate the involvement and knowledge of the Boards. Further to this end, the directors of the companies imposed an unreasonable time deadline on the internal investigation, so that the investigating parties would not have sufficient time to review all the relevant documentation or interview all the knowledgeable parties to secure a full factual understanding of the scope of the wrongdoing inside the companies and the knowledge of and involvement of the directors therein. Also, they directed that the investigation not require testimony be given under oath.

118. Even so, and despite their efforts to constrict the investigation, the directors were very unhappy with the investigation's unflattering conclusions, and the Shell Transport and Royal Dutch directors attempted to block its findings to avoid accepting the full report. The Shell Group's outside attorneys insisted the Shell Group had to accept the report in its entirety. After the release of the report, the directors of Shell Transport and Royal Dutch distorted the internal investigation report, ignoring evidence of an endemic, cultural problem. Lord Oxburgh, the new Chairman of Shell Transport, blamed the reserves debacle on *"personal" or "human failings"* rather than any *"structural or control deficiencies."* The directors are seeking to undermine the status of the report in its dealing with the regulators who are investigating the Shell Group's misreporting of reserves. Oxburgh

- 86 -

has also belittled the incriminating e-mails unearthed by the internal investigation as *"ill-considered, hyperbolic e-mail chatter"*!

119. As a result of the action of the Shell Transport and Royal Dutch directors, the internal investigation report focused on the wrongdoing of the Shell Group's top managers, including Watts, the Chairman of the Board of Shell Transport, van de Vijver, head of E&P of the Shell Group, Boynton, CFO or Finance Chief of the Shell Group, and Coopman, the CFO of the E&P unit of the Shell Group. Because the report concluded that all of these individuals knew of the fraudulent inflation of the Shell Group's reported proved oil reserves or were certainly in a position to know of this and present it, the Boards were forced to push these individuals out. However, they have permitted these individuals to retain millions of dollars in salaries, bonus compensation and insider-trading proceeds which they should not be permitted to retain, but have done this as a pay-off to them in an effort to get these individuals not to point the finger at the Boards. In fact, the Shell Transport and Royal Dutch Boards are engaged in a massive cover-up of their own abdication of their fiduciary responsibilities to oversee and manage these enterprises and ensure their compliance with, *inter alia*, the U.S. securities laws, in order to avoid their own personal liability and personal accountability for what has gone on.

120. As part of this cover-up, even though the internal investigation report itself stresses that it is incomplete, that the investigators were forced to work under undue time constraints, to accept testimony not taken under oath and to forego reviewing large amounts of potentially relevant documents, the Boards have proclaimed that they have *"complete confidence"* in the remaining managers of the Shell Group and **have even gone so far as to elevate van der Veer to be Chairman of the Committee of Managing Directors of the Shell Group**, even though there is significant evidence in the internal investigation report and elsewhere that van der Veer was deeply involved in the fraudulent inflation of the Shell Group's proved oil reserves and resulting falsification of its financial statements. Jacobs, Chairman of the Shell Group's Audit Committee, has said that the Committee *"recommended to the boards ... that they should feel confident in relying on the representations of the group's current senior management,"* even though van der Veer – the new Chairman of the CMD – was clearly implicated in the reserve wrongdoing, as he was the Vice-Chairman of the CMD throughout the time period of falsification.

121. Jacobs also publicly sided with management after the majority of the reserve overstatements were revealed to the public in January 2004, stating to the *Daily Telegraph* on March 10, 2004, that "Shell's existing management was not to blame" for the reserves debacle and that his Audit Committee had *"recommended to the boards and external auditors that they should feel confident in*

- 88 -

*relying on the representations of the group's current senior management."*

122. The Sarbanes-Oxley Act placed significant additional responsibilities on the Boards of Directors of public companies subject to the Act, like Shell Transport and Royal Dutch, to improved corporate financial, accounting and internal controls to improve corporate financial responsibility and disclosure. This law was a disaster for the Shell Transport and Royal Dutch Boards, as, despite their public posture of concern over good corporate governance, controls, disclosure and integrity, they were sitting atop a massive scheme to inflate their companies' proved oil and gas reserves and reported financial results. Any real compliance with Sarbanes-Oxley would have exposed this scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Boards of Shell Transport and Royal Dutch did not enforce or comply with Sarbanes-Oxley, despite their legal obligation under U.S. law. They will not sue themselves for these failures.

123. Any request or demand upon the Boards of Shell Transport or Royal Dutch that they sue themselves for the damage that their misconduct has caused the two companies would be futile and useless, as it is obvious that they will not do so. In fact, they have not done so. They have also taken steps to avoid any full and unrestricted investigation of *their knowledge* or participation in the scheme to inflate the proved oil reserves and the Shell Group's financial statements, and placed in overall charge of the operation

- 89 -

of the Shell Group an individual who was deeply involved in the wrongdoing. Another reason the directors will not sue themselves is that by suing themselves, these individuals would void any directors' and officers' liability insurance coverage otherwise available to them, as such policies include the so-called "insured vs. insured" exclusion, by which a suit brought by or on behalf of the companies against them would not be covered by the insurance and thus would expose these individuals to ruinous personal liability.

124. While the Shell Group and its public shareholders have suffered great damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of these two public companies have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have pocketed millions and millions of dollars of regular and bonus compensation as a result of their incompetent performance and deceptive activities and the few individual officers who have been fired as scapegoats by the Boards wishing to cover up their own participation and wrongdoing have left with millions and millions of dollars of illegally obtained compensation and bonuses.

125. As a result of their concealments and falsifications, the directors of Shell Transport and Royal Dutch and the managers of the Shell Group held onto their positions of power, prestige and

profit at the two companies.   The managers of the Shell Group pocketed millions of dollars of salaries and bonuses which would have been denied them had the truth been disclosed.  The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors of one of the largest oil and gas companies in the world.

126. The Royal Dutch and Shell Transport Boards are still dominated and controlled by wrongdoers who are covering up their own misconduct and will not take action to protect the interests of Shell Transport or Royal Dutch or their shareholders:

- Despite the fact that van der Veer was a member of the CMD during the relevant period and has acknowledged receiving van de Vijver's memos and other internal materials putting him on notice of the oil reserve overstatements for years, and despite that fact that van der Veer did not require truthful disclosures, the Shell Group's Board elevated him to Chairman of CMD, so that he would protect them.

- The Royal Dutch and Shell Transport Board members decided as a group that van der Veer did not bear responsibility for the reserve overstatements, even though he participated in it and was aware of the wrongdoing.

- Lord Oxburgh, the new Chairman of Shell Transport, said in an interview with *The Wall Street Journal* that CFO Boynton's integrity was determined to be "**unimpeachable**" and defended van der Veer, saying the two Boards supported him fully, even though they are both deeply implicated.   He went even further and said the Shell Transport and Royal Dutch Boards "**unanimously**" and fully supported the current Shell Group managing directors even though several of them were obviously involved in the reserve and financial statement falsifications.

127. Plaintiffs have not made any demand on the present Board of Directors of Royal Dutch or Shell Transport to institute this action because such demand would be a futile and useless act for the foregoing and following reasons:

(a)   The entire Board of Directors of both companies participated in the wrongs complained of, they created and approved, authored and signed and circulated the false and misleading financial statements;

(b)   The acts complained of herein constitute violations of fiduciary duties owed by these Boards of Directors and these acts are incapable of ratification;

(c)   The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Boards of Directors of both companies. Thus, the Boards could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(d)   The acts complained of herein are illegal and fraudulent and thus are acts incapable of ratification;

(e)   In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of both Boards of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the corporation, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which

they would not do.  They therefore would not be able to vigorously prosecute any such action;

(f)  The members of the Royal Dutch and Shell Transport Boards, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Boards and their control of the Shell Group.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal and business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(g)  The Royal Dutch and Shell Transport directors' and officers' liability insurance policies have an "insured vs. insured" exclusion.  Thus, if the directors caused either company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability.  They will not do this to themselves or the officers they hired.  The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the companies.  This derivative suit does not trigger the "insured vs. insured" exclusion, and thus, only this derivative suit can obtain a recovery on the

- 93 -

directors' and officers' liability insurance and benefit the companies.

## SUBSTANTIVE ALLEGATIONS

128. Oil and gas companies – as well as governments and regulatory agencies – generally subdivide the economically recoverable resources estimated to exist in their domains into two basic categories of reserves: "proved reserves" and "other reserves." Within the "other reserves" category, most organizations make a further distinction between "probable reserves" and "possible reserves" (sometimes also referred to, respectively, as inferred and indicated reserves). Within the proved reserves category, a further distinction is made between *developed* and *undeveloped* proved reserves.

129. Reserves categorized as "proved" reserves meet the highest, most stringent of all reserve definitions. According to the Energy Information Administration ("EIA"), created by Congress in 1977 as a statistical agency of the U.S. Department of Energy to provide policy-independent data, forecasts, and analyses, proved reserves are

> those volumes of oil and gas that geological and engineering data demonstrate with reasonable certainty[2]

---

[2]  The EIA further explains that "the term reasonable certainty is intended to express a high degree of confidence that the estimated quantities will be recovered.  When probabilistic methods are used there should be at least a 90% probability that the actual quantities recovered will exceed the estimate."

to be recoverable in future years from known reservoirs under existing economic and operating conditions.

130. This definition is the same as the one mandated by Rule

4-10(a) of Regulation S-X of the Securities Exchange Act of 1934

(17 C.F.R. §210.4-10):

**Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975**

This section prescribes financial accounting and reporting standards for registrants with the Commission engaged in oil and gas producing activities in filings under the federal securities laws and for the preparation of accounts by persons engaged, in whole or in part, in the production of crude oil or natural gas ....

(a)   Definitions.

\*      \*      \*

(2)  **Proved oil and gas reserves.**  Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, *i.e.*, prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided only by contractual arrangements, but not on escalations based upon future conditions.

\*      \*      \*

(3)  **Proved developed oil and gas reserves.**  Proved developed oil and gas reserves are reserves that can be expected to be recovered through existing wells with existing equipment and operating methods. Additional oil and gas expected to be obtained through the application of fluid injection or other improved recovery techniques for supplementing the natural forces and mechanisms of primary recovery should be included as "proved developed reserves" only after testing by a pilot project or after the operation of an installed program has confirmed through production response that increased recovery will be achieved.

- 95 -

(4) **Proved undeveloped reserves.** Proved undeveloped oil and gas reserves are reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage shall be limited to those drilling units offsetting productive units that are reasonably certain of production when drilled. Proved reserves for other undrilled units can be claimed only where it can be demonstrated with certainty that there is continuity of production from the existing; productive formation. Under no circumstances should estimates for proved undeveloped reserves be attributable to any acreage for which an application of fluid injection or other improved recovery technique is contemplated, unless such techniques have been proved effective by actual tests in the area and in the same reservoir.

131. The Shell Group's publicly stated definition of "proved reserves" and "developed proved reserves" – as contained in the report on Form 20-F that defendants filed annually with the SEC, specifically in the subsection of the Form 20-F titled "Critical Accounting Policies" – is identical to the U.S. government's definition:

**Critical Accounting Policies**

\*     \*     \*

**Estimation of oil and gas reserves**

Oil and gas reserves have been estimated in accordance with industry standards and SEC regulations. Proved oil and gas reserves are the estimated quantities of crude oil, natural gas and natural gas liquids that geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions.

\*     \*     \*

Proved developed reserves are those reserves which can be expected to be recovered through existing wells with existing equipment and operating methods.

132. Reserve estimates are a critical component in the evaluation of oil and gas companies and the success of the management and directors of such companies, as *The Wall Street Journal* explained in a pair of articles occasioned by defendants' January 9, 2004 Reserve Reduction ("2004 Reserve Reduction"):

(a) **Shell Cuts Reserve Estimate 20% as SEC Scrutinizes Oil Industry**

January 12, 2004

\*     \*     \*

Royal Dutch/Shell Group's disclosure that it overstated its proven reserves by 20% rattled energy investors and is raising questions about whether the oil industry has inflated a lifeblood measure of its future prospects.

Shell, one of the world's largest publicly traded oil concerns, said Friday that it had erroneously overbooked its proven oil and natural gas reserves by the equivalent of 3.9 billion barrels of oil. The oil portion alone, about two-thirds of the revision, represents some $67.5 billion in potential future revenue, assuming moderate oil prices of $25 a barrel. *Reserve calculations, though technical and arcane, drive an oil company's prospects, much like revenue growth drives a technology company's outlook.*

\*     \*     \*

Reserves are at the heart of an oil and gas company because they represent what can be taken from the ground in the future. Since companies must replace the oil and gas they produce each year just to stay even, reserve growth is a crucial indicator of how well a company is doing. If the reserve size falls, the company is less valuable to investors and its stock price will tumble.

(b)  Methods for Citing Oil Reserves Prove Unrefined -
Shell's Restatement Casts A Shadow on How Industry
Measures Its Crude Backlog

January 14, 2000

\*      \*      \*

When investors decide to put money into an energy
producer, one of the first questions they ask is how much
oil and gas does the company have in the ground.

That is why American depositary receipts of Royal
Dutch/Shell Group fell 9% on the New York Stock Exchange
in the three days after it slashed its estimate of oil
reserves by 20%.

133. Thus, the absolute quantity of reserves is a crucial
metric for shareholders in evaluating the quality and success of an
oil/gas company.  However, a number of other metrics relating to
reserves are frequently used by analysts and investors – and
reported by oil/gas companies – for further insight, evaluation and
valuation.  Such other metrics include:

(a)  Reserve Life.  The reserve life metric compares
barrels of proved reserves to annual actual production in order to
answer, in terms of years, how long a company's proved reserves
will last given current production level.  Before the early 2004
Reserve Reduction, the Shell Group's reserve life (based on proved
reserves and production reported for 2002) was approximately 13-
13.5 years; after the 2004 Reserve Reduction it was 10.2 years.
Before the 2004 Reserve Reduction, the Shell Group's reserve life
appeared to place it squarely in the middle of its super-major oil
company peers regarding this metric; after the 2004 Reserve

Reductions, the Shell Group was revealed to lag behind, by a significant margin of 2-4 years, all of its super-major peers.

(b)   **Reserve Replacement Ratio**.  The reserve replacement ratio compares additions to proved reserves to production: in other words, it puts side-by-side oil newly-claimed to be in the ground to oil taken out of the ground.  A reserve replacement ratio of 100% indicates that a company's proved reserves are being replenished at exactly the rate that the company is extracting/producing oil.  A ratio of more than 100% indicates that a company, despite its annual extraction of oil, is actually finding more oil than it produces, and thus adding to its asset base; while a ratio of less than 100% indicates that a company is depleting its proved reserves.  According to an analysis by Freedman Billings Ramsey analysts conducted after the 2004 Reserve Reduction, the Shell Group's originally stated reserves figures allowed it to present a reserve replacement ratio of 105% (around the industry average); but when taking the 2004 Reserve Reduction into account, the Shell Group's reserve/replacement shrank to approximately 57% (both for the six-year and the three-year period ending December 31, 2002), revealing the Shell Group's oil-finding performance to be significantly below most of its super-major peers (Exxon/Mobil, Occidental, Total S.A., Conoco/Phillips and BP all rated between 100% and 170%).  In other words, in early 2004, the Shell Group was transformed from an oil company finding slightly more proved reserves each year than it extracted (and thus

performing at industry levels) into a company able to replace less than two of every three extracted barrels with further proved reserves (thus performing significantly worse than its peers).

      (c)  **Finding and Development Costs/Barrel.** Each year, oil companies classify certain of their costs and expenses as "Finding and Development" costs, *i.e.*, costs relating to the process whose end result, ideally, is the booking of proved reserves and then the extraction and sale of oil or natural gas. Additionally, each year, companies report new additions to their proved reserves.  Comparing the dollars spent to the proved reserves booked gives an indication of the efficiency of a company, of a company's exploration and production efforts, and of a company's spending.  An analysis conducted by Credit Suisse First Boston ("CSFB") analysts after defendants' 2004 Reserve Reduction noted that the bulk of the Shell Group's improper reserves bookings occurred between 1997 and 2000, and that, during that period, the Shell Group had reported "particularly low" Finding & Development costs.  At the time, this made the Shell Group's exploration efforts and capital efficiency appear better than its major peers (BP, Exxon/Mobil, Chevron/Texaco, Total S.A.) during this period. Now, however, it appears that what separated the Shell Group from its competitors was not the efficiency of its Finding & Development spending, but rather the aggressiveness of its reserves booking (which artificially decreased costs per boe merely by increasing claims about the boes "proved").  The CSFB analysis concluded that

– 100 –

the Shell Group's actual costs per barrel – given the 2004 Reserve Reduction – were more than twice what they appeared to be earlier.

134. At the outset of 1990s, the Shell Group was one of the biggest integrated energy companies in the world, with billions and billions of barrels of proved oil and gas reserves which covered years and years of projected future production needs and were to provide billions of dollars of future cash flows. In the early 1990s, the Shell Transport and Royal Dutch Boards approved massive cost cuts in an attempt to improve profitability. However, by the last half of the 1990s, due to these massive cost-cutting efforts which had curtailed the Shell Group's exploratory drilling activities, the Shell Group began to encounter serious difficulties in replenishing its proved oil and gas reserves by new discoveries and continuing to show adequate replenishment of such reserves. By 1997-1998, the Shell Group was encountering a crisis from its failure to discover and qualify sufficient amounts of commercially viable oil and gas in the ground. One internal memo noted: *"Our reserves replacement performance over the past few years clearly illustrates the emerging problems with our resource base and is becoming a source of competitive disadvantage."*

135. The Shell Group's top executives and the directors of Shell Transport and Royal Dutch recognized that this failure had grown into such a problem that if it was publicly disclosed, it would expose their own managerial and oversight failures, result in a diminished financial condition of the companies by eliminating

billions of barrels of proved reserves and the future cash flows based on them, require a restatement of their financial statements, hurt the performance of Shell Transport's and Royal Dutch's stocks and ADRs and result in intense pressure from the investment community and Shell Transport and Royal Dutch shareholders for changes – including replacement of the top managers of the Shell Group and the Boards of both companies. Disclosure of the true extent of the growing reserves replacement problem and the steps being taken to conceal it would have been a disaster for the directors and officers of these two companies.

136. An internal presentation in June 2000 warned the Shell Group's top executives that because of prior over-booking of proved reserves, Shell Transport and Royal Dutch risked disappointing financial markets with their overly optimistic assumptions about oil projects. The presentation warned that the Shell Group would be unable to meet its growth targets for oil and gas production. Under the heading "*The Bad News*," – the presentation warned that executives "*run the risk of initiating an over-promise, under-delivery cycle.*" One page of the June 2000 presentation, titled "*Exploration: Overstated Delivery?*," warned that internal estimates for oil production at a number of projects were "*very optimistic and unrelated to historical performances.*" The presentation went on to cite a number of new projects with "*possibly overstated value promises.*" Yet, at the same time, the

Shell Group was publicly portraying the E&P part of its business as poised for continued growth.

137. In April 1999, the Shell Group's top executives made a presentation to large Shell Transport and Royal Dutch shareholders and other institutional investors regarding the Shell Group's E&P business unit. Set forth below are two of the slides they presented:





138. In a December 2000 slideshow for investors presented by Watts, the Shell Group said its E&P business was "*delivering on*

*promises,*" including a commitment to boost annual oil and natural gas output by 5% between 2000-2005.

139. During 1998-2003, the Individual Defendants caused or permitted Shell Transport and Royal Dutch to make false and misleading representations to their shareholders and the investment community as to the state of their proved oil and gas reserves, *ultimately overstating them by over four billion barrels - over 22% - an amount representing over $100 billion in future revenues*! They thus falsified the Shell Group's business success, financial condition, current earnings and future cash flows - inflating the trading prices of Shell Transport and Royal Dutch stocks while holding onto their own positions of power, prestige and profit at the companies and pocketing millions of dollars of salaries and bonuses.

140. During 1998-2003, the Individual Defendants caused the Shell Group to repeatedly assure Shell Transport's and Royal Dutch's shareholders that the Shell Group was succeeding in finding new proved reserves and replacing the existing reserves used up in production. Set forth below are the statements made each year by Shell Transport and Royal Dutch to their shareholders in their joint Annual Report on Form 20-F, filed with the SEC in the U.S.:

1998

Reserves

During 1998 the Group's total proved reserves for oil (including natural gas liquids) and natural gas increased from 19.4 to 20.5 billion barrels of oil

- 104 -

equivalent.   (Definitions of reserves and figures for 1996-1998 are given on pages G-31 to G-33).   The net additions to proved reserves more than replaced the 1998 production, with replacement ratios of some 140% for oil (compared with 130% in 1997) and some 250% for gas (compared with 210% in 1997).

1999

Reserves

The overall 1999 replacement ratio of proved crude oil and natural gas reserves and oil sands stands at 101% (147% excluding 1999 divestments and acquisitions)....
The replacement ratio of the overall 1999 crude oil and natural gas proved reserves (including natural gas liquids, but excluding oil sands) is 102% before and 56% after divestments and acquisitions.

The three-year rolling average replacement ratio for total crude oil and natural gas proved reserves ... stands at 132%, reflecting the fact that oil and gas production over 1997-99 has been more than replaced by net additions over the same period.

2000

Reserves

The proved hydrocarbon reserves replacement ratio for 2000 was 105% ....  Therefore production during the year of 1.4 billion barrels of oil equivalent was more than replaced, including the net effect of divestments and acquisitions, the replacement ratio was 69%.

The three-year rolling average proved hydrocarbon reserves replacement ratio ... stands at 117%.

2001

Reserves

The proved hydrocarbon reserves replacement ratio for 2001 is 74%.   The proved hydrocarbon reserves replacement ratio ... is 52%, and the three-year rolling average ... now stands at 101%.   Proved reserves are equivalent to more than 14 years of current production.

2002

Reserves

The proved hydrocarbon reserves replacement ratio for 2002 was 117% and the five year rolling average ... now stands at 109%.   Excluding the effects of acquisitions and divestments the hydrocarbon reserves replacement ratio for 2002 was 50%.   Proved reserves are equivalent to more than 13 years of current production.

141. In December 1999, the Shell Group's top executives made a presentation to an Investors Relation Conference that included a large number of Shell Transport and Royal Dutch shareholders.   Set forth below are two of the slides they presented:





142. In September 2001, the Shell Group's top executives made a presentation to securities analysts about its E&P businesses. One of the slides used is set forth below:

