143. On February 6, 2003, in London, and on February 7, 2003, in New York, Watts, van der Veer, Skinner, van de Vijver, Brinded and Boynton made a presentation to investors, including Shell Transport and Royal Dutch shareholders, concerning the 4thQ 2002 and 2002 results of Shell Transport, Royal Dutch and the Shell Group. The presentation included the following:



In line with our strategic direction, the Exploration and Production business is delivering robust profitability today, while investing in tomorrow's projects

We are delivering on returns and operating costs while maintaining production growth.

We continue to upgrade our portfolio and to create/develop legacy projects to grow value into the future.

2002 was a year of all round delivery.

Including portfolio changes we replaced 117% of our reserves ... 50% organically.

And we had continued exploration success ... with significant discoveries in several core areas.

144. The growth in "proved" reserves reported by the Shell Group due to defendants' fraudulent misconduct are set forth below:



We expect to continue growing our reserves base.

In 2002 we had a one-year reserves replacement of 117%, including Enterprise ... 50% on an organic basis.

Proved organic oil replacement was 108%, continuing our consistent ability to replace oil production.

We made no net organic addition to gas reserves, which tend to come in large infrequent lumps with new licences and project approvals. Our gas reserves life of 15.5 years remains one of the highest in the industry and we expect to make substantial additions in coming years.

In the US ... one of our core areas ... we replaced 136% of production organically.

We evaluate over a long-term period ... typically on a 5-year basis in line with our exploration and development cycle ... and plan our business on both proved and probable reserves.

On a 5-year average up to the end of 2002 our proved replacement ratio was 109% ... including probable reserves it was 144%.

|      | Proved Crude Oil & Natural Gas Liquids Reserves (billions of barrels) | Proved Natural Gas Reserves (billions of boe) | Total Proved Reserves (billions of boe) | Number of Years of Current Production Reflected in Proved Reserves | Future Cash Inflows (billions of dollars) |
|------|------|------|------|------|------|
| 1997 | 9.681 | 9.678 | 19.359 | 14.5 | $249.320 |
| 1998 | 10.031 | 10.456 | 20.487 | 15.3 | $184.345 |
| 1999 | 9.775 | 10.093 | 19.868 | 14.9 | $271.627 |
| 2000 | 9.751 | 9.704 | 19.455 | 14.4 | $295.729 |
| 2001 | 9.469 | 9.626 | 19.095 | 13.9 | $234.175 |
| 2002 | 10.133 | 9.213 | 19.346 | 13.3 | $329.034 |

145.  PWC issued unqualified audit reports on Shell Tranport's 1998-2002 financial statements.   KPMG issued unqualified audit reports on Royal Dutch's 1998-2002 financial statements.   PWC and KPMG jointly issued unqualified audit reports on the Shell Group's 1998-2002 financial statements.   Each of these opinions represented that:

- The audits had been conducted in accordance with auditing standards generally accepted in the United States.

- The audits provided a reasonable basis for the accountants' opinions.

- Those financial statements presented fairly, in all material respects, the financial position of the Shell Group, Shell Transport and Royal Dutch as of December 31, 1998-2002, and the results of their operations and their cash flows for each of those years in accordance with GAAP in the Netherlands and the United States.

146. However, during 1998-2003, the internal situation with respect to the Shell Group's proved oil and gas reserves consistently worsened. The discrepancy between the publicly represented proved reserves and the actual proved reserves increased every year. And the pressure on the directors and managers of these companies to continue to conceal their falsification of these reserves and the true situation known to them from their access to confidential corporate information – and its variance from the Shell Group's public representations – increased with each passing quarter.

147. After a huge wave of revelations of financial scandals of immense proportions engulfed the U.S. securities markets in 2000-2001, in 2002, a newly invigorated SEC privately notified the Shell Group and other oil companies that it was conducting an inquiry into the treatment of their oil reserves in the Gulf of Mexico as proved. This indication of increased regulatory scrutiny into proved reserves by the SEC, coupled with the SEC's increased investigatory and enforcement activity generally regarding public company financial fraud in 2001-2002, caused enormous concern inside the Shell Group. The massive, multi-year falsification of the Shell Group's proved oil and gas reserves and financial statements was in real danger of being discovered.

148. The top executives of the Shell Group feuded bitterly over how to conceal the evidence that the Shell Group had greatly exaggerated its proved oil and natural gas reserves. E-mails and

private notes exchanged between executives at the very top echelons of the Shell Group show they were aware of these serious reserve-accounting abuses for years. In a personal "Note to File" marked "*strictly confidential*," dated September 2002, van de Vijver admitted "*that both reserves replacement and production growth were inflated*." An internal investigation after the January 2004 revelations blamed Watts and van de Vijver, stating they "*were alert to the difference between the information concerning reserves that had been transmitted to the public ... and the information known to some members of management*."

149. Shell Group managers repeatedly produced reports detailing the overstated reserve bookings, and repeatedly brought their concerns to van de Vijver. In February 2002, van de Vijver forwarded a memo to one of the Shell Group's top management committees detailing potential reserve overbookings of 2.3 million barrels of oil.

150. In July 2002, another presentation was made to the management committee which further detailed non-compliance with SEC rules regarding reserves booking, but no action was taken. The July report was an attempt to "*play for time*" in hopes that some development would "*justify, or mitigate, the existing reserve exposures*," the internal investigation concluded.

151. On September 2, 2002, in a note to the same committee – with a copy to CFO Boynton – van de Vijver described "dilemmas" facing E&P: "Given the external visibility of our issues ... the

market can only be 'fooled' if 1) credibility of the company is high; 2) medium and long-term portfolio refreshment is real and/or 3) positive trends can be shown on key indicators." The memo continued: "*We are struggling on all key criteria.*"

152. Later, van de Vijver complained to Watts: "*I am becoming sick and tired about lying about the extent of our reserves issues and the downward revisions that need to be done because of far too aggressive/optimistic bookings.*" In another note to senior Shell Transport executives, van de Vijver again warned of the trouble executives were confronting in trying to keep the market "*fooled.*"

153. In a December 2002 memo, van de Vijver's staff presented a "script" for van de Vijver to disclose immediately that it knew its booked reserves were wrong and that non-disclosure was a serious violation of U.S. securities laws. That same day, van de Vijver e-mailed one of the script's authors, Coopman, head of finance for E&P: "*This is absolute dynamite, not at all what I expected and needs to be destroyed.*" Documents show that the Boards of Shell Transport and Royal Dutch, *i.e.*, the Shell Group, were told about the shortfall by van de Vijver. Van de Vijver sent memos to express concern that the Shell Group's reporting of its reserves was "*no longer fully aligned*" with SEC rules.

154. In January 2004, with mounting SEC scrutiny and the arrival of yet another year-end which would now require the largest falsification of proved reserves to date if the scheme was to continue, defendants' course of conduct to defraud the Shell

- 113 -

Group's stockholders came apart — in one of the most startling exposés of fiduciary wrongdoing in recent years. In a series of revelations, between January 2004 and April 2004, the Shell Group admitted it had improperly classified as proved oil and gas reserves almost 4.5 billion barrels, thus reducing the Shell Group's proved oil reserves by over 22% and its forecasted future cash flows by over $100 billion.

155. The magnitude of these reductions was staggering. Between 1997-2002, the Shell Group had reported to its shareholders the achievement of a 105% reserve replacement ratio. However, now that the truth is known and the almost 4.5 billion barrels of claimed "proved" reserves have been eliminated, *the Shell Group's actual reserve replacement ratio during that period was a pitiful 57%*! According to press reports, during 1998-2002, the Shell Group reported Finding and Development "costs of about $4.27 per barrel." Based upon the true facts and the elimination of the Shell Group's billions of barrels of bogus "proved" reserves, the Shell Group's actual per-barrel Finding and Development costs *are an astonishing $7.90 per barrel, exposing bare for all to see the miserable failure of the Shell Group's Boards and managers in recent years*! As a result of these startling reserve eliminations, the Shell Group now has only 10.2 years of reserves compared to production requirements, two to three years less than its peer competitor companies have and well below the over 13 years it had represented

to Shell Transport and Royal Dutch shareholders. And the Shell Group's future cash flows have been slashed by over $100 billion!

156. After its reserves downgrades, the Shell Group badly lags behind its peers in a number of measures:

Reserve replacement ratio: The rate at which reserves are found to replace production, between 2001 and 2003:

| BP | 155% |
|---|---|
| Total | 118% |
| Chevron/Texaco | 112% |
| Exxon/Mobil | 109% |
| Shell | 61% |

Reserve life: The time it would take to deplete existing reserves at current production rates:

| BP | 14.1 years |
|---|---|
| Exxon/Mobil | 13.5 years |
| Chevron/Texaco | 13.0 years |
| Total | 12.3 years |
| Shell | 10.2 years |

157. The Shell Group has also admitted that it will restate its financial statements going back several years and has delayed publication of its 2003 Annual Report to Shareholders. And now that the truth is known and the ability of the Shell Group's insiders to continue their scheme to falsify the Shell Group's proved reserves has come to an end, it is likely that the Shell Group's oil production, proved reserve levels and reserve replacement ratio will fall even further during 2004-2005, further impairing its financial and competitive position.

158. Upon the first of these shocking revelations in January 2004, Shell Transport's ADRs on the NYSE fell to below $40 per ADR from $46 per ADR on January 6, 2004. Shell Transport's stock on

the London Exchange fell from 401.25p to 371.25p.  Royal Dutch's
ADRs on the NYSE fell from $52.70 to below $47 per share.  As the
revelations continued, the stocks fell further and *billions of the
Shell Group shareholders' market capitalization vanished.*

159. The reaction of investors and analysts to these
"*shocking*" revelations was swift and unforgiving.  According to
press reports, investors were "*blind-sided*" by the "*bombshell*"
revelations of the "*staggering*" restatements of Shell's proved
reserves.  The Shell Group's reputation and standing in the
investment communities was severely damaged.  Morgan Stanley said:
"The shares have come down 20% in the past six weeks and *that is
all to do with credibility.  While investors have seen Shell as the
most conservative of companies, it turns out that it is not what we
thought.  The market is traumatised and shocked.*"

160. While the full details of the actual extent of the
manipulation of the Shell Group's proved oil reserves by defendants
is still being concealed by the Boards of the two companies in
order to limit their own personal exposure to liability for their
participation in this fiasco, from what has become known to date,
it is evident that the reserve misclassifications were not the
result of inadvertence, oversight or intervening changed
circumstances beyond the Shell Group's control, but rather, of the
deliberate misconduct and fraudulent actions of the Shell Group's
top insiders, executives and the Boards of the two companies.  This
is not a situation where the reserves were originally properly

booked as proved and the re-classification was required by a later change in the rules or other extraneous factors. Van de Vijver e-mailed a colleague:

> *[W]e are heading towards a watershed reputational disaster* ... the problem was created in the 90's and foremost in 97-00 and any clean-up must reflect that.... *I will not accept cover-up stories that it was Ok th[e]n but not OK with the better understanding of SEC rules now and that it took us 2-1/2 years to come to the right answer.*

161. The Shell Group's guidelines on accounting for natural gas reserves were deliberately altered and relaxed in the mid-1990s. This helped allow the Shell Group to overstate or prematurely book reserves in two big natural gas fields in Australia and Norway as proved. The Shell Group's actions involving natural gas fields in Norway and Australia show the Shell Group was inconsistent with its partners in booking proved reserves. Other guidelines – for booking crude oil reserves – were similarly relaxed. The guidelines were relaxed because the Shell Group was facing intense pressure from investors and analysts to keep up with its peers in finding new reserves of crude oil and natural gas.

162. The directors and officers of the two companies (and their outside auditors) pursued a fraudulent course of conduct and scheme, aiding and abetting one another, to conceal the increasingly serious failures of the Shell Group in locating proved oil and gas reserves by misrepresenting the success of the Shell Group in replacing its proved reserves. The Shell Group insiders

- 117 -

created a so-called "Leadership and Performance Group" ("LEAP") to create more proved reserves.  LEAP secretly changed the internal rules the Shell Group used to classify reserves as proved, or disregarded those rules, so they could create millions of barrels of proved reserves *not* because of successful new discoveries, but because they manipulated and abused oil and gas reserve criteria to re-classify old oil and gas deposits, promoting them to proved or maintaining them in that status when, in fact, they were not proved.  For instance, the Shell Group secretly dropped the requirement that proved developed reserves can exist only when the money to do the drilling has been appropriated or allocated.  By these manipulations, defendants reversed the Shell Group's trend of declining proved reserves and enabled it to report to Shell Transport and Royal Dutch shareholders that it was replacing proved reserves as fast as it was pumping them out of the ground, reporting billions of boe of new proved reserves during 1998-2002, which defendants represented would yield over $100 billion in future cash flows to the Shell Group.

163.  In the early 1990s, the Shell Group's reserve booking guidelines allowed executives to book proved natural gas reserves only if the Shell Group had signed a sales contract for the gas.  In the mid-1990s however, the Shell Group loosened the rules to allow gas reserve bookings with only a "reasonable expectation" of an available market.  At the Gorgon field in northwestern Australia, the Shell Group began booking gas reserves in 1997, even

though a final investment decision at the Shell Group had not been made and no sales contracts for that gas had been signed.   The Gorgon reserves totaled some 557 million boe.

164. In order to book the gas reserves at the Gorgan gas fields in Australia, the Shell Group insiders caused the Shell Group to use the subterfuge of a reserve "revision" as opposed to a "new discovery," so as to attract less attention.   However, the Shell Group's partners in the Gorgon gas field, Chevron/Texaco and Exxon/Mobil, **never booked any proved reserves from Gorgon, as they were complying with industry standards and SEC requirements**.   The fraudulent classification of Gorgan gas reserves as proved came amid a track record of disaster and miscalculation by the Shell Group in Australia.   For instance, the Shell Group had once described the Cornea gas field in Australia as a **"massive find,"** only to discard it later on.   And with regard to the Shell Group's Greater Sunrise project north of Darwin on the Timor Sea, the Shell Group had categorized reserves as "proved" when, in fact, it knew because of ongoing protracted disputes with its partner in developing that field, Conoco/Phillips, that it was unable to commercially develop the reserves there because, *inter alia*, it failed to locate reliable customers willing to accept sufficient quantities of production from that field to justify its development and did not have a way to deliver the product to any customers that could be found.

165. The Shell Group's reserve manipulation at Ormen Lange, an offshore gas field in northern Norway, underscores how fraudulent the Shell Group's booking standards were. The Shell Group began booking reserves at the Norwegian field in 1999, years before the Shell Group and its partner companies (Norsk Hydro ASA, Statoil ASA, BP PLC and Exxon/Mobil) at the site worked out difficult technical and marketing hurdles on the project. When the Shell Group booked Ormen Lange reserves in 1999 as proved, the consortium partners had drilled just two exploration wells and done some preliminary feasibility studies. The Shell Group and its partners struggled with the tremendous technical challenges of drilling a field in the deep Norwegian waters. Subzero temperatures could freeze pipes at the site, where 8,000 years ago a giant "submarine slide" had dumped sediment equivalent in mass to Iceland on the sea floor. The slide caused a tsunami that spread debris across the seabed as far as England and wiped out many of the early settlers of Norway's western coast.

166. The Shell Group's oil reserves in Nigeria was another area of fraud and abuse. The Shell Group's Nigerian oil fields were one of the biggest sources of overstated reserves. The Shell Group has now eliminated 1.5 billion barrels of proved reserves in Nigeria, compared to a total of previously claimed proved reserves of 2.5 billion barrels — *a 60% reduction*! Shell Group executives have known for years that a significant portion of the Shell Group's claimed proved reserves in Nigeria could not be

commercially developed in the applicable license period, in part because of political unrest and environmental problems which blocked development of a significant portion of the claimed reserves in the Niger River delta area. The Shell Group was over-classifying its reserves in Nigeria as proved, not only for its own benefit but to accommodate pressures from what the Shell Group referred to internally as its "host country." Nigeria is Africa's most populous nation, the world's seventh largest oil producer and a member of OPEC. Over 90% of Nigeria's export revenues come from oil exports — about $17 billion per year. Nigeria has been desperate to obtain larger oil exporting revenues for its country but can do so only if it can achieve a higher export and production quota from OPEC. This, in turn, depends upon Nigeria demonstrating that it has proved oil reserves of a size that are sufficient to justify a major increase in its production and export quota. So the Shell Group was to receive a multi-hundred-million dollar bonus payment from Nigeria if its proved reserves were at a certain level.

167. Thus, the Shell Group's top executives conspired with the Nigerian government to take mutually beneficial steps to try to maximize the claimed proved reserves of the Shell Group, and therefore Nigeria, in Nigeria. The Shell Group and Nigeria faced a serious problem in Nigeria, in that the indigenous population in the Niger River area was adamantly opposed to the destruction of its culture and way of life and the environmental damage which

would result from the type of massive development for oil production which Nigeria and the Shell Group wanted to undertake in its ancestral homeland. As a result, the local population resisted attempts to proceed with oil development in that area, actions which, if continued and successful (as they were), would disqualify any oil reserves in the area from being treated as proved because they could not be commercially exploited in a reasonable period of time, including the Shell Group's Nigerian license period.  In order to try to avoid this outcome, Nigeria and the Shell Group cooperated to violate the rights of these local peoples in actions which have been condemned by international human rights organizations.  The Shell Group colluded with Nigeria's military dictatorship, which cracked down hard on the Ogoni. *One series of raids on Ogoni villages  left 750 people dead and 30,000 homeless.* This resulted in a class action suit against the Shell Group here in the U.S., which is costing the Shell Group millions of dollars to defend and could potentially result in billions of dollars of liability to the Shell Group.  The internal investigation concluded that, by early 2000, it was clear to the Shell Group's exploration and production arm – then headed by Watts – that the Nigerian reserves "*could not be produced as originally projected or within its current license periods.*"

168. With respect to these oil reserves, a limited internal investigation undertaken by the Shell Group, concluded:

*Australia (Gorgon)*. As of December 31, 1997, the Group booked over 500 million boe of Gorgon gas reserves as proved.... *From its inception, the Gorgon "proved" reserves did not meet the overriding SEC standard of "reasonable certainty."* There is no written audit trail indicating who made the decision to categorize Gorgon reserves as proved, or the basis of that decision. Sir Philip [Watts] ... reports no recollection of the Gorgon booking, notwithstanding its size and impact on [proved reserves] for 1997.... Gorgon had long *"stuck out like a sore thumb,"* but, at over 500 million boe, debooking of the reserve was *"too big to swallow."*

*Oman*. Proved reserves were increased in 2000 in response to *"top down"* encouragement from Shell executives to bring its proved reserves of mature fields in line with its expectation reserves. Insufficient technical work was done to support this increase. *When serious production declines were suffered thereafter, these increased reserves were maintained based upon aspirational production targets.* It is clear that various members of management at EP, including Mr. van de Vijver, were aware of this situation since late 2001, when the production problems increased and Shell agreed to make a $30 million "down payment" (in the form of a deduction against its 2001 net reward) in partial payment for an inchoate debooking of expectation reserves.

*Nigeria*. Shell accumulated over the 1990s ... very large volumes of proved oil reserves.... *[H]owever, ... [these] substantial proved reserves could not be produced as originally projected or within [Shell's] current license periods.* Rather than de-book reserves, [they were retained and] an effort was undertaken to "manage" the problem through a "moratorium" on new oil and gas additions in the hope that SPDC's production levels [in Nigeria] would increase dramatically to support its reported reserves. This solution remained in place for the next several years, until January, 2004, notwithstanding the knowledge of [Shell's executives] that, in fact, production was not increasing to a level which could support the booked proved reserves.

*Brunei*. *The large volume of [proved reserves] were either uneconomic to develop or had been booked well ahead of any final investment decision or analogous financial commitment being made ....*

- 123 -

169. The fraudulent booking of "proved" reserves was only possible because of gross deficiencies in the Shell Group's internal controls. For example, the internal reserves audit function was understaffed by undertrained personnel. *This function was performed by a single, part-time, former Shell employee; his cycle of field audits was once every four years; he was provided with virtually no instruction concerning regulatory requirements or the role of an independent auditor and no internal legal liaison. And, when this person did raise questions or concerns regarding certain reserves categorized as "proved," he was brushed aside by senior executives and he had no way to challenge them. In fact, he has stated that had he attempted to have the executive decisions reviewed or amended he was made to understand he would have been fired!*

170. The Shell Group's internal controls were grossly insufficient to assure proper booking of reserves. In addition to the woefully deficient internal oil/gas reserves, audit and review procedures, the Shell Group's structural and control deficiencies also included:

- The Shell Group's written guidelines for proved reserves did not ensure regulatory compliance.

- The roles and responsibilities of the Shell Group personnel involved in proved reserves on compliance responsibility were ill-defined and confused.

- Consideration of meeting reserve replacement targets was part of the management and executive compensation "scorecard."

- There was not a formal review on an annual basis by the CMD and the GAC of the Shell Group's proved reserve positions.

- The reporting structure did not require that the CFOs of the Shell Group's business units report directly to the Shell Group's CFO.

- The role of the Shell Group's legal director was insufficiently integrated with the CMD, the Boards and Conference to ensure compliance with all regulatory obligations.

- The line responsibilities and compliance training for reserve reporting from local reservoir engineers upwards were inadequate.

- The Shell Group did not have or enforce a culture of compliance that, regardless of business concerns, all decisions were to be made to ensure compliance with regulatory and fiduciary obligations. Management and employees were not trained or instructed to recognize that their conduct was required to be in accord with the highest ethical and legal standards.

- The Shell Group's guidelines blurred the distinction between reserves reporting for internal decision-making and the requirements for regulatory reporting of proved reserves.

- The Shell Group's guidelines were slow to incorporate SEC staff interpretations and, while reflecting an increased awareness of SEC rules, occasionally adopted an expedient of partial compliance.

- The Shell Group's guidelines did not require upper level management employees to review existing bookings for continued compliance and did not adequately address the need for debooking.

- The Shell Group's guidelines were not clearly and succinctly written or organized to offer useful guidance to reservoir engineers.

171. On March 31, 2003, van der Veer and Watts, as the President and Managing Director of Royal Dutch and Chairman and Managing Director of Shell Transport, respectively, and Boynton, as

director of Finance of both companies, signed and filed the following certification on behalf of themselves and their companies with the SEC relating to the companies' joint report on Form 20-F:

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the period presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the issuer and have:

(a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

(c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a) all significant deficiencies in the design ors operation of internal controls which could adversely

– 126 –

affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

These representations were all false.

172. Shell Transport and Royal Dutch insiders are not required to file "Form 4s" with the SEC disclosing their transactions in the stock of Shell Transport or Royal Dutch. Thus, it is impossible, without discovery, to determine if those insiders sold off Shell Transport or Royal Dutch stock at inflated prices while they were fraudulently falsifying the Shell Group's proved oil reserves and financial statements. However, public reports indicate that regulatory authorities have discovered such insider trading and are investigating it. In fact, as detailed in ¶¶72, 74, 76-77 and 81, many Individual Defendants reported receiving proceeds from the exercise of stock options as a part of their compensation package. To the extent such insider trading occurred, Shell Transport and/or Royal Dutch are entitled to the disgorgement of any profits obtained by such insiders.

173. Shell Transport and Royal Dutch have been badly damaged by defendants' fraudulent misconduct. Defrauded investors have sued the two public companies in massive class action suits in the U.S. which expose the companies to billions of dollars of damage and will cost many millions of dollars to defend. In addition, the companies are being subjected to several governmental and regulatory investigations, including investigations by the SEC and the DOJ which will cost millions to defend and will likely result in large fines and/or penalties. The credit rating agencies – Standard & Poor's, Fitch and Moody's – have all downgraded Shell's credit rating, taking it out of the coveted "AAA" category. Also because of the damage to the Shell Group's reputation and goodwill, the stocks of the two public companies currently trade at a substantial discount – about 20% – to the stocks of their peer group competitor companies and are likely to suffer from what is known as the "liar's discount" going forward. Finally, the revelations that a substantial part of the proved reserve overstatement came from the Shell Group's operations in Nigeria will further damage the Shell Group by greatly increasing its exposure to liability in a class action suit brought on behalf of the indigenous population in Nigeria for human rights violations – alleging that the Shell Group and the Nigerian government abused the rights of and killed hundreds of the indigenous peoples in Nigeria who were living in oil exploration areas where the Shell Group and the Nigerian government were desperate to justify the

- 128 -

reserves as proved, to suppress their resistance to oil development activities, but could not properly do so because of an inability to develop those reserves due to the indigenous population's resistance to the destruction of its traditional way of life and the horrible environmental damage being inflicted on its living areas and land by the Shell Group and Nigeria in an effort to develop those reserves.

174. While the Shell Group and its public shareholders have suffered great damage and losses due to the deceit and deception committed by its insiders and the directorial oversight failings by the Shell Transport and Royal Dutch Boards, the insiders and directors of these two public companies have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. The managers of the Shell Group pocketed millions of dollars in salaries, bonuses and insider trading proceeds which would have been denied them had the truth been disclosed. These individuals have pocketed millions and millions of dollars in salaries and bonus compensation as a result of their deceptive activities and the few individual officers who have been fired as scapegoats by the Boards wishing to cover up their own participation and wrongdoing have left with millions of dollars in unjustly obtained compensation and bonuses. As a result of their concealments and falsifications, the directors of Shell Transport and the top managers of the Shell Group held onto their positions of power, prestige and profit at the two companies. The

directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors of one of the largest oil and gas companies in the world.

## ALLEGATIONS AGAINST PWC AND KPMG FOR PROFESSIONAL MALPRACTICE AND NEGLIGENCE AND FOR AIDING AND ABETTING THE INDIVIDUAL DEFENDANTS' VIOLATIONS OF LAW

175. The Shell Group is one of PWC's and KPMG's oldest clients.  They provided accounting and auditing services to Shell Transport, Royal Dutch and the Shell Group in addition to giving them accounting advice and consultation regarding the Shell Group's annual and quarterly reports filed with the SEC during 1998-2002, which falsely overstated the Shell Group's proved oil and gas reserves by 20%.  To ensure PWC's and KPMG's loyalty, the Shell Group also engaged PWC and KPMG to provide lucrative auditing and consulting services.  PWC and KPMG examined and opined on the financial statements of Shell Transport, Royal Dutch and the Shell Group, which PWC and KPMG helped prepare and which PWC and KPMG knew would be used, in whole or in part, to prepare the reported 1998-2002 annual and quarterly financial results and financial statements of Shell Transport, Royal Dutch and the Shell Group, and SEC filings and presentations to Shell Transport and Royal Dutch shareholders.  PWC and KPMG also provided personal tax and consulting services to several of the Individual Defendants.

176. PWC and KPMG enjoyed a lucrative, long-standing business relationship with the Shell Group's senior management for which it

- 130 -

has received tens of millions of dollars.  For 2000-2002, PWC and KPMG received $60 million in audit fees and $114 million in fees for non-audit services.  PWC and KPMG partners responsible for the Shell Group engagement were particularly motivated to appease Watts and the other Individual Defendants because their remuneration was closely tied to the fees generated from the Shell Group. Maintaining the client relationship was highly dependent on the Individual Defendants, particularly the Shell Group's top executives, Watts, van der Veer and Boynton, and PWC and KPMG compromised themselves to maintain this relationship.

177.  In connection with their audit and review of the Shell Group's finances and operations, PWC and KPMG had virtually limitless access to information in the companies' books and records:

- PWC and KPMG were present at the Shell Group's headquarters and key operating divisions frequently between 1997 and 2004.

- PWC and KPMG regularly communicated with the Individual Defendants, including Watts, van der Veer, Boynton, Coopman and van de Vijver, via face-to-face meetings and telephone calls.

- PWC and KPMG had frequent conversations with the Shell Group management and employees about the Company's operations and financial statements.

- PWC and KPMG audited and reviewed the Shell Transport, Royal Dutch and Shell Group's 1998-2003 reports on Form 20-F and their financial statements and knew or should have known that those reports and the financial statements contained therein were not accurate or prepared in compliance with GAAP or GAAS.

- 131 -

178. PWC and KPMG breached their duty to exercise reasonable care and competence in the course of providing professional accounting and auditing services for Shell Transport, Royal Dutch and the Shell Group.  PWC and KPMG reviewed the quarterly and year-end results of Shell Transport, Royal Dutch and the Shell Group, advised and/or opined upon the accuracy and bona fides of the Shell Group's financial filings and had intimate knowledge of the nature of the Shell Group's business, including its oil and gas reserves and associated cash flows.

179. PWC and KPMG also attended the meetings of - and advised the members of - the Audit Committee of the Shell Group in connection with the existing internal financial and accounting controls and oil and gas reserves.  As a result of their intimate knowledge of the Shell Group's business, PWC and KPMG knew or should have known about the reserve classification irregularities and improprieties at Shell Transport, Royal Dutch and the Shell Group.

180. PWC and KPMG consented to the inclusion of their unqualified opinions on the Shell Group's FY 1998-2002 financial statements, including their SEC reports on Form 20-F, which reports they knew, or should have known, were materially false.  Despite PWC's and KPMG's breach of their duty to exercise reasonable care and competence in performing their services for Shell Transport, Royal Dutch and the Shell Group by allowing insiders to overstate hydrocarbon reserves, reserve replenishment rates and forecasted

future cash flows, the Boards of Directors, including the members of the Audit Committee, refused to terminate PWC and KPMG as the "independent" auditors.

181. PWC and KPMG knew, or should have known, that the Shell Group's financial statements and associated information were materially false and misleading because, among other things, they were not prepared in accordance with GAAP and included false reports of the Shell Group's hydrocarbon reserves and earnings for 1998-2002. PWC and KPMG also knew, or should have known based on their long-standing relationship with the Shell Group and its senior management, that the false and misleading financial information would be used, in whole or in part, to prepare the Shell Group's publicly reported annual and quarterly financial results and financial statements. Nevertheless, PWC and KPMG provided unqualified opinions that the Shell Group's 1998-2002 financial statements were valid and accurate and thereby aided and abetted the Individual Defendants in breaching their fiduciary duties to the Shell Group.

182. Defendants PWC and KPMG owed a duty to the Shell Group to perform its accounting and auditing services with reasonable care and competence. To discharge its duties, PWC and KPMG were required to adhere to GAAS, which require that:

(a) The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor;

(b)  In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors;

(c)  Due professional care is to be exercised in the performance of the audit and the preparation of the report;

(d)  The work is to be adequately planned and assistants, if any, are to be properly supervised

(e)  A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of the tests to be performed;

(f)  Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;

(g)  Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report; and

(h)  The report shall either contain an expression of an opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

183. Thus, PWC and KPMG owed Shell Transport, Royal Dutch and the Shell Group obligations to act with reasonable care and

competence in the performance of accounting and auditing services for the Shell Group. PWC and KPMG were required to exercise professional skepticism, an attitude that includes a questioning mind, including an increased recognition of the need to corroborate management representations and explanations concerning corporate matters where they had a direct financial interest in exaggeration or falsification.

184. PWC and KPMG represented they performed their audits in accordance with auditing standards in the U.S. As a result, PWC and KPMG were required to perform their audits in conformity with Statement of Accounting Standard ("SAS") No. 82, "Consideration of Fraud in a Financial Statement Audit," which includes auditing for misstatements arising from the misappropriation of assets. PWC and KPMG failed to comply with SAS No. 82 in their audits of the Shell Group's financial statements. During the course of their audits of the Shell Group's financial statements from fiscal 1998-2002, PWC and KPMG knew of or should have discovered the irregularities which caused the Shell Group's earnings to be misstated over several fiscal years. The very risk of fraud was a potential reportable condition which should have been reported to the audit committee and possibly senior management.

185. PWC's and KPMG's failures to adequately perform their audit procedures to identify the improprieties alleged herein and their failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of at

least five years, leading to false and misstated financial statements.

186. The Shell Group has admitted, via the limited internal investigation, that the overstatement in the oil and gas reserves was *only* possible "*because of certain deficiencies in the Company's controls*." PWC and KPMG, as auditors, were obligated to assess the Shell Group's internal disclosure, financial and accounting controls and whether such controls had been placed in operation, were effective and complied with Sarbanes-Oxley, including controls to provide assurance about the safeguarding of assets, financial reporting, operations and compliance with regulations. PWC and KPMG were required to evaluate whether poor controls might lead to or contribute to the risk that fraud might not be detected.

187. Internal controls are essential to a company's financial reporting, as adequately designed internal controls provide a company with reasonable assurance on the reliability of financial reporting, the effectiveness and efficiency of operations, and compliance with applicable laws and regulations. Auditing Standard ("AU") §319.06.   Under auditing standards, as set forth in §319.02:[3]

---

[3]     The original SAS which formed the basis for AU §319 was SAS No. 55, "Consideration of Internal Control in a Financial Statement Audit," issued in 1988.  AU §319 was amended in 1995 by SAS No. 78, which applies to audits of financial statements of periods beginning after January 1, 1997.  This standard applies to PWC's and KPMG's audits conducted pre-2001. AU §319 was further amended

> In all audits, the auditor should obtain an understanding
> of internal control sufficient to plan the audit by
> performing procedures to understand the design of
> controls relevant to an audit of financial statements,
> and whether they have been placed in operation.

188. If an auditor identifies any material weaknesses in a company's internal controls during an audit, then the auditor must communicate these weaknesses to the company's audit committee. AU §325. Further, the auditor should identify any limitations related to the internal control weaknesses in his or her audit opinion in accordance with the procedures proscribed by the professional standards.

189. Finding that certain deficiencies in the Shell Group's controls were at the heart of the reserve crisis, the internal investigation criticized the Shell Group's internal controls, reporting standards and corporate governance. For example, the report indicated that the internal reserves audit function, which consisted of a single, part-time, former Shell employee, was "**understaffed and undertrained**." The investigation further found weaknesses in the finance department's controls. Despite these and other serious deficiencies in the Shell Group's internal controls, PWC and KPMG issued clean audit opinions year after year.

---

by SAS No. 94 issued May 2001 for audits of financial statements for periods beginning after June 30, 2001. This standard applies to PWC's and KPMG's audits conducted in 2002 and thereafter. A key requirement under both standards is that an auditor is obligated to assess the company's internal controls.

190. An auditor has responsibilities with respect to required supplemental information to apply limited procedures to determine whether the supplemental information, like oil and gas reserves and forecasted future cash flow based on those reserves, is in conformance with prescribed guidelines. AU §558. In estimating oil and gas reserves (including proved reserves), information about a company's reserves is considered required supplemental information within the context of AU §558 and thus an auditor is required to perform limited procedures to verify that the reserve information conforms with the applicable guidelines. AU §9558.01-.03.

191. In determining whether the reserve information conforms with accounting principles, the auditor is required to make certain inquiries, as well as to compare the information for consistency. The auditor should make inquiries to determine management's understanding of the specific requirements for disclosure of the reserve information. The auditor should also inquire about the qualifications of the person calculating the reserve estimates, the calculation of the standardized method of discounted future net cash flows and the methods for documenting the information about the company's reserve estimates. The auditor should also compare the following information: (1) the company's reserve estimates with the company's recent production; and (2) the company's reserve quantity information with the corresponding information used for depletion and amortization. And the auditor should question

management about any inconsistencies determined in making theses comparisons.   AU §9558.04-.05.

192. If after applying these procedures the auditor has unresolved substantial doubt about the required supplemental information and its adherence to the prescribed guidelines, the auditor should identify this limitation in his or her audit opinion in accordance with the procedures prescribed by the professional standards.   AU §9558.06.   Here, PWC and KPMG issued false clean audit opinions indicating they had no unresolved doubt about the Shell Group's reserve information and its compliance with GAAP.

**ROYAL DUTCH'S AND SHELL TRANSPORT'S
CORPORATE GOVERNANCE FAILURES**

**Corporate Structure**

193. (a)   The corporate structures of Royal Dutch and Shell Transport as described by the two companies are set forth below:

**SHELL TRANSPORT**

The Board of ... "Shell" Transport ... is committed to the highest standards of integrity and transparency in its governance of the Company ....

*      *      *

All Directors are equally accountable at law to the shareholders for the proper conduct of the business.... The ... composition of the Board varies from time to time, but for many years the Board has comprised:

•      at least two Managing Directors of the Company, who were also Group Managing Directors (see below).

•      a Chairman, who was also one of the Managing Directors; and

- 139 -

- a number of non-executive Directors, who constituted the majority of the Board.

\* \* \*

[T]he "Committee of Managing Directors" ... considers and develops objectives and long-term plans of the Royal Dutch/Shell Group .... The members of this Committee are also known as "Group Managing Directors" ....

\* \* \*

The Directors meet regularly as a Board to deal with business requiring Board approval and also hold meetings known as "The Conference" ... with members of the Supervisory and Management Boards of Royal Dutch.

\* \* \*

**The Directors are responsible for Shell Transport's own system of internal control and for reviewing its effectiveness.** The system is designed to manage rather than eliminate the risk of failure to achieve business objectives, and can only provide reasonable and not absolute assurance against misstatement or loss. **Shell Transport's own internal financial controls are the subject of periodic review by the Board in respect of process and effectiveness and this regular review includes consideration of any other business risks including compliance risks.**

The Directors accordingly confirm that there is an ongoing process for identifying, evaluating and managing the significant risks faced by the Company, that it has been in place for the year 2002 and up to the date of approval of the Annual Report and Accounts, and that the process is regularly reviewed by the Board and accords with the guidance for Directors referred to above.

\* \* \*

**ROYAL DUTCH PETROLEUM**

The Supervisory Board and Board of Management of Royal Dutch ... remain committed to upholding the highest standards of integrity and transparency in their governance of the Company.

\* \* \*

- 140 -

Royal Dutch is managed by a Board of Management, consisting of at least two Managing Directors, under the supervision of a Supervisory Board. Managing Directors are appointed by the General Meeting of Shareholders from the persons nominated by the meeting of holders of priority shares.... The Supervisory Board appoints one of the Managing Directors as President, who determines the division of tasks among the Managing Directors and has the casting vote in the event of an equality of votes at a meeting of the Board of Management.

The Managing Directors of Royal Dutch and the Managing Directors of Shell Transport are also members of the Presidium of the Board of Directors of Shell Petroleum N.V. and Managing Directors of The Shell Petroleum Company Limited. As such, they are generally known as Group Managing Directors.

**Supervisory Board**

The Supervisory Board is responsible for supervising the policies of the Board of Management and the general course of business of the Company and the Group and further advises the Board of Management.

\*      \*      \*

**THE SHELL GROUP**

**The Conference**

Meetings of the Conference between the members of the Supervisory Board and the Board of Management of Royal Dutch and the Directors of Shell Transport are held regularly during the year. The purpose of the Conference is to receive information from Group Managing Directors about major developments within the Royal Dutch/Shell Group of Companies and to discuss reviews and reports on the business and plans of the Group. Senior executives of Group companies also attend these meetings of the Conference to present strategic plans and proposals for major projects, giving the Conference frequent opportunities to hear from and put questions to those with first-hand experience of the business, in addition to receiving fully documented reports and proposals.

In particular, the Conference reviews and discusses:

- the strategic direction of the businesses and of the Royal Dutch/Shell Group of Companies;

- the business plans of both the individual businesses and of the Royal Dutch/Shell Group of Companies as a whole;

- major or strategic projects and significant capital items;

- the quarterly and annual financial results of the Royal Dutch/Shell Group of Companies;

- reports of the Group Audit Committee;

- appraisals both of the individual businesses and of the Royal Dutch/Shell Group of Companies as a whole;

- annual or periodic reviews of Group companies' activities within significant countries or regions;

- governance, business risks and internal control of the Royal Dutch/Shell Group of Companies;

- a regular programme of insights and briefings on specific aspects of the Royal Dutch/Shell Group of Companies; and

- any other significant or unusual items on which the Group Managing Directors with to seek advice.

## Joint Committees

The Joint Committees established by the Parent Companies to assist with their respective governance responsibilities are described below.  All three of these Committees are composed of six members, in each case three of whom are appointed by the Supervisory Board of Royal Dutch from among its members and three by the Board of Shell Transport from among its members.

## Group Audit Committee

... Under its terms of reference, the  Committee acts in an advisory capacity to the Boards, providing them with quarterly and annual updates regarding its activities and related recommendations.  The Committee regularly considers the effectiveness of risk management processes and internal control within the Group and reviews the financial accounts and reports of the Royal Dutch/Shell Group of Companies.  The Committee also

considers both internal and external audit reports (including the results of the examination of the Group Financial Statements) and assesses the performance of internal and external audit.

The members appointed by the Supervisory Board of Royal Dutch are Aad Jacobs (Chairman of the Committee), Henny de Ruiter and Jan Timmer; the members appointed by the Board of Shell Transport are Sir Peter Burt, Luis Giusti and Nina Henderson.

(b) The structure of the Shell Group is a historical anomaly, and the Shell Group's failures and missteps, to date, can in large part be attributed to failures in *process and structure*. The structure of The Shell Group has no commercial logic and continues largely because of the self-perpetuating control by insiders who gain personally from its continuance and there is no sufficient process for investors to effectively challenge it. In fact, the dual-board structure effectively dilutes the influence of shareholders on the Shell Group structure and policy-making and frustrates any serious efforts to bring about reform or provide meaningful input on the Shell Group governance. And so, unchallenged, the 60% Dutch/40% British paradigm has informed the Shell Group's culture for almost a century. As a practical matter, the Shell Group governance structure can only be challenged in this shareholders' action brought on behalf of the Shell Group owners – the shareholders of Royal Dutch and Shell Transport.

(c) The Shell Group structure involves inherent inefficiencies and conflicts. These are well described by the unofficial biographer of the Shell Group, Arie de Geus in *The*

*Living Company, Habits for Survival in a Turbulent Business World*
at 191 (Longview, 1997):

> There are thus two parent companies, one Dutch and one British; they continue to exist today, independent of each other yet interlinked, domiciled in two countries, each with a different legal system. The Dutch system is distinctly continental; it was reshaped during the French occupation in Napoleonic times. The British jurisprudence system, accumulated since Saxon days, has never had the benefit of a good spring cleaning. Consequently, in the corporate laws of these two countries, there are some important differences in the composition of corporate boards and their members. The two parent companies *must get along well with each other, because there is no court of justice to which they can refer disputes*.

194. It is apparent that the structure itself involves human and monetary expense that is not directly related to generating value for owners. Quite the contrary, it appears to create unjustifiable expense.

**Function of the Shell Group**

195. Continuing with de Geus:

> The full boards of both companies meet voluntarily once a month, and they call their meetings the "Conference." *No legally valid decisions that are binding on both companies can be taken during these meetings.* The officers of both companies must hold separate meetings during which they legalize, for each parent company, the decisions at which they have arrived jointly.
>
> From the top of the Shell Group down there is no traditional mechanism to resolve conflict. The Shell Group has no CEO. The chairman of the managing directors is only *primus inter pares*, first among peers. One way or another, the members of the Committee of Managing Directors (CMD) and the two boards of directors have to agree among themselves on solutions that are acceptable to all. In practice, there will not always be real unanimity, but there is no good way to force through a

– 144 –

decision to which one or more of the members are actively opposed.

196. It is too evident to require extended comment that much directorial and management time is consumed with the niceties of negotiating authority and position between the British and Dutch elements.   As has been extensively described herein, these questions are immaterial to the enhancement of shareholder value. Indeed, they are destructive of it.

**The Eleven Supervisory Board and Management Directors of Royal Dutch, in Effect, Control the Shell Group**

197. As the Shell Group's own Web site describes:

Special rights in the Articles of Association regarding control in the Company.  With due observance of the relevant provisions of the Articles of Association, the meeting of holders of priority shares determines the number of Managing Directors and of members of the Supervisory Board and, when the case arises, that meeting decides whether or not to fill a vacancy on the Board of Management or Supervisory Board. The meeting of holders of priority shares is furthermore entitled to make a binding nomination, containing the names of at least two persons, for each appointment of a Managing Director or a member of the Supervisory Board.

... [C]onsent ... is required ... to amend the Articles ... or to dissolve the Company….

Each of the members of the Supervisory Board and the Managing Directors is the holder of six priority shares. The other 1,434 priority shares are held by the Royal Dutch Priority Shares Foundation. The Board of the Foundation consists of all the members of the Supervisory Board and the Managing Directors of the Company.

198. What is clear about the governance structure of the Shell Group is that the eleven incumbent Supervisory and Managing Directors have the exclusive legal authority to nominate their successors.  These same individuals control whether the Articles

- 145 -

are amended or the group is dissolved.    How the Foundation
functions is not disclosed - all shareholders are told that its
Board is comprised of the eleven incumbents with self-perpetuating
power.

199. Royal Dutch has a 60% share of the Shell Group and,
therefore, its directors are in a position to vote a majority of
the shares of the Shell Group companies. Annual Reports refer to
"arrangements" governing the interaction of Royal Dutch and Shell
Transport:

> Royal Dutch and Shell Transport are independent
> companies, each obliged to observe the law and corporate
> practices of their country of incorporation -- the
> Netherlands and the United Kingdom, respectively. Royal
> Dutch and Shell Transport have, over their long
> association, developed a number of special consultative
> arrangements as set out below to assist with the proper
> discharge of their responsibilities to their own
> respective shareholders for stewardship of the Parent
> Companies' interest in the Royal Dutch/Shell Group.

200. The Shell Group provides no detail on the "arrangements
as set out below" - the only information is a schematic chart
showing the parent subsidiary relationship of various group
companies. The Shell Group provides no substantive explanation of
any "arrangements" that exist between Royal Dutch and Shell
Transport.   In the absence of such arrangements, plaintiffs and
shareholders must assume that the Royal Dutch 60% represents actual
and legal control and that the eleven incumbents - on a self
perpetuating basis - control the Shell Group.

**Legal Accountability Is Dispersed and Diluted**

201. Royal Dutch and Shell Transport describe their legal structure:

> It must be recognized, however, that the framework within which the Boards operate is conditioned to some extent by Royal Dutch's unique relationship with Shell Transport, *and this results in some special arrangements which may not be appropriate in other companies*.

202. The companies further explain the existence of joint Board Committees dealing with audit and remuneration matters, a direct violation of the provisions of Sarbanes-Oxley, which requires Audit Committees to be comprised uniquely of "independent directors of *that corporation*." The companies explain:

> The joint arrangements for supervising the governance of the operations of the Royal Dutch/Shell Group of Companies throughout the world are summarized in this statement under the heading "Arrangements with Shell Transport."

203. All that is provided as an example of "arrangements" is a wiring diagram of the various operating companies and no explanation of special operating agreements, if any, or how the Shell Group complies with Sarbanes-Oxley.

204. Accountability within the Shell Group does not rest with an office or body answerable to shareholders. For example, consider the circumstances of the Non-Executive Director of Shell Transport. He attends the Conference, of which there are typically eight a year, at which all group directors, managing directors and supervisory directors, as well as senior executives are present. Presumably, issues are discussed collegially and tentative

decisions are arrived at. To repeat de Geus' characterization: "In practice, there will not always be real unanimity, but there is no good way to force through a decision to which one or more of the members are actively opposed." To put it bluntly, what are the mathematical odds that on all Conference decisions which are required to be considered by the Boards that the independent members of each Board would always agree. The Shell Group provides no details on a mechanism for disagreement, where responsibility lies – and the answer is not immediately available. Opacity – not transparency – is the hall mark of the Shell Group's decision making process.

### The Boards' Refusal to Acknowledge Missteps

> This arrangement has stood unaltered since 1907, subject only to changes of detail, and during this long period the [Shell] Group has grown to be one of the largest global commercial enterprises, *The Supervisory Board and the Board of Management consider that these enduring arrangements between Royal Dutch and Shell Transport have served shareholders well.*

205. In stark contrast to these conclusions of the Royal Dutch Supervisory Board and Board of Management, the Shell Group's corporate governance is not working. This action seeks, *inter alia*, to remedy the severe fiscal and reputational damage caused to the Shell Group by the reserve falsifications which was magnified by the ineptness with which these and other board-level governance problems have been handled and which still plague the Company. In the past decade alone, the Shell Group's reputation has been severely damaged by both plans to dispose of the Company's

chemical-laden Brent Spar oil platform in the North Sea, aborted in the eleventh hour after massive international outcry, and charges that the Company was complicit in the execution of a Nigerian activist.

### FIRST CAUSE OF ACTION

#### Breach of Fiduciary Duty and/or Aiding and Abetting Breach of Fiduciary Duty Against All Individual Defendants

206. Plaintiffs incorporate ¶¶1-205.

207. Each of the Individual Defendants knowingly, willfully, intentionally or recklessly permitted the actions taken to overstate the Shell Group's proved oil and gas reserves in violation of applicable rules, regulations and industry standards, thus falsifying the Shell Group's SEC filings and communications to shareholders and investors, including the Shell Group's financial statements and information. These defendants knew that if they disclosed the true facts concerning the Shell Group's proved oil and gas reserves status and financial condition, they would jeopardize their control over the companies, the remuneration they received and their positions of power, prestige and profit at Shell Transport, Royal Dutch and the Shell Group, while exposing themselves to suits and investigations and the risks of civil liability, criminal prosecution or regulatory action.

208. As officers and directors of publicly held companies, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Shell Transport's, Royal

Dutch's and the Shell Group's operations, financial condition, assets and earnings to their shareholders, as well as the financial markets. The Individual Defendants did not do this. Instead they concealed their wrongdoing and disseminated false and misleading statements and reports about the Shell Group to the Shell Transport and Royal Dutch shareholders.

209. The Individual Defendants, as officers and directors of Shell Transport, Royal Dutch and the Shell Group, participated in the acts of fraud and mismanagement alleged herein - knowingly, willfully, intentionally or recklessly. They thereby breached their fiduciary duties of care, candor, loyalty and disclosure to the Shell Transport and Royal Dutch shareholders. They have thus exposed Shell Transport and Royal Dutch to liability from, *inter alia*, class action suits for violation of the U.S. federal securities laws brought by and on behalf of those persons who purchased Royal Dutch or Shell Transport shares or ADRs between 1/9/99 and 3/17/04, as well as a class action suit on behalf of Nigerian nationals whose legal and human rights they caused the Shell Group to abuse and violate as part of the scheme to overstate the Shell Group's proved oil and gas reserves.

210. The Individual Defendants also each owed a duty to Shell Transport and Royal Dutch to test, oversee and monitor their systems of internal disclosure, financial and accounting controls, governance procedures and disclosure procedures and to ensure that they were functioning in an effective manner and in compliance

with, *inter alia*, the Sarbanes-Oxley Act.  Pursuant to Sarbanes-Oxley, because the Shell Group was required to make an accounting restatement for 2000-2003, due to noncompliance with GAAP and fraud in financial reporting as a result of the misconduct alleged herein, the Individual Defendants who served as CEO or CFO of Shell Transport, Royal Dutch or the Shell Group and each of its operating units, respectively, are required to reimburse the Shell Group for the bonuses and other incentive-based and equity-based compensation received by them from the Shell Group for 2002-2003.

211. Independent of Sarbanes-Oxley, such defendants should be required to disgorge any and all gains unjustly obtained at the expense of the Shell Group and its shareholders by way of their fraudulent conduct and breach of their fiduciary duties.

212. Because Shell Transport and Royal Dutch insiders are not required to file "Form 4s" with the SEC disclosing their personal transactions in the stock of Shell Transport or Royal Dutch, it is impossible, without discovery, to determine if those insiders sold off Shell Transport or Royal Dutch stock at inflated prices while they were fraudulently falsifying the Shell Group's proved oil reserves and financial statements.  However, public reports indicate that regulatory authorities have discovered such insider trading and are investigating it.  To the extent such insider trading occurred during the period of reserve and financial statement falsification, Shell Transport and/or Royal Dutch are entitled to recover any profits obtained by such insiders.

213. The conduct outlined herein was not due to an honest error of judgment, but rather to the defendants' bad faith and was done knowingly, willfully, intentionally or recklessly.

214. By reason of the foregoing, Shell Transport and Royal Dutch have been damaged.

### SECOND CAUSE OF ACTION

### Abuse of Control Against All Individual Defendants

215. Plaintiffs incorporate ¶¶1-214.

216. For the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, Shell Transport, Royal Dutch and the Shell Group, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions, the Individual Defendants employed the alleged scheme. As a part of this scheme, these Individual Defendants actively made and/or participated in the making of or aided and abetted the making or the concealment of, numerous omissions and misrepresentations of facts regarding the Shell Group to shareholders. These representations and statements were untrue and the Individual Defendants did not believe them to be true when made, and knowingly, willfully and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said representations.

217. The Individual Defendants' conduct constituted an abuse of their ability to control and influence Shell Transport, Royal

Dutch and the Shell Group.   By reason of the foregoing, Shell
Transport and Royal Dutch have been damaged.

### THIRD CAUSE OF ACTION

### Gross Mismanagement Against All Individual Defendants

218. Plaintiffs incorporate ¶¶1-217.

219. The Individual Defendants had a duty to Shell Transport
and Royal Dutch and their shareholders to prudently supervise,
manage and control the operations, business and internal financial
accounting and disclosure controls of Shell Transport, Royal Dutch
and the Shell Group.

220. These Individual Defendants by their actions and by
engaging in the fraud described herein, abandoned and abdicated
their responsibilities and duties with regard to prudently managing
the businesses of Shell Transport, Royal Dutch and the Shell Group
in a manner consistent with the duties imposed upon them by law,
including Sarbanes-Oxley.  By committing and concealing this fraud,
the Individual Defendants breached their duties of due care,
diligence and candor in the management and administration of the
Shell Group's affairs and in the use and preservation of the Shell
Group's assets.

221. The Individual Defendants caused Shell Transport and
Royal Dutch to engage in a fraud upon purchasers of their stock and
ADRs on the U.S. and foreign exchanges.  During the course of the
discharge of their duties, these defendants knew or recklessly
disregarded the unreasonable risks and losses associated with their

- 153 -

fraud and misconduct, yet these defendants caused the Shell Group
to engage in this scheme which they knew had an unreasonable risk
of damage to Shell Transport and Royal Dutch, thus breaching their
duties to both companies.   As a result, the Individual Defendants
grossly mismanaged Shell Transport, Royal Dutch and the Shell
Group.

   222. By reason of the foregoing, Shell Transport and Royal
Dutch have been damaged.

### FOURTH CAUSE OF ACTION

### Constructive Fraud Against All Individual Defendants

   223. Plaintiffs incorporate ¶¶1-222.

   224. As corporate fiduciaries, the Individual Defendants owed
to Shell Transport and Royal Dutch and their shareholders a duty of
candor and full accurate disclosure regarding the true state of the
Shell Group's business and assets and their conduct with regard
thereto.

   225. As a result of the conduct complained of, the Individual
Defendants made, or aided and abetted the making of, numerous
misrepresentations to and/or concealed material facts from Shell
Transport and Royal Dutch shareholders despite their duties to,
*inter alia*, disclose the true facts regarding their stewardship of
Shell Transport, Royal Dutch and the Shell Group.  Thus they have
committed constructive fraud and violated their duty of candor.

   226. By reason of the foregoing, Shell Transport and Royal
Dutch have been damaged.

- 154 -

### FIFTH CAUSE OF ACTION

#### Unjust Enrichment Against All Individual Defendants

227. Plaintiffs incorporate ¶¶1-226.

228. As a result of the conduct described above, all the Individual Defendants will be and have been unjustly enriched at the expense of Shell Transport and Royal Dutch, in the form of unjustified salaries, benefits, bonuses, stock options and grants and other emoluments of office.

229. Certain defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up the Director Defendants' complicity in the scheme.

230. All the payments and benefits provided to these defendants were at the expense of Shell Transport and Royal Dutch. Shell Transport and Royal Dutch received no benefit from these payments. They were damaged by such payments.

231. Certain of the Individual Defendants sold Royal Dutch or Shell Transport stock for a profit during the period of deception, misusing confidential non-public corporate information. These defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Shell Transport and Royal Dutch. A constructive trust for the benefit of Shell Transport and Royal Dutch should be imposed thereon.