**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITE NATIONAL RETIREMENT FUND and PLUMBERS AND PIPEFITTERS NATIONAL PENSION FUND, Derivatively on Behalf of ROYAL DUTCH PETROLEUM COMPANIES and THE "SHELL" TRANSPORT AND TRADING COMPANIES, PLC, <br><br>               Plaintiffs, <br><br> v. <br><br> PHILIP WATTS, JUDY BOYNTON, WALTER VAN DE VIJVER, FRANK COOPMAN, JEROEN VAN DER VEER, PAUL SKINNER, MARTEN VAN DER BERGH, ROBERT J. ROUTS, MALCOLM BRINDED, MARK MOODY-STUART, HENNY DE RUITER, LUIS GIUSTI, RONALD OXBURGH, AAD JACOBS, LAWRENCE RICCIARDI, PETER BURT, MARY (NINA) HENDERSON, TEYMOUR ALIREZA, EILEEN BUTTLE, PETER JOB, JOHN KERR, WIM KOK, JONKHEER AARNOUT LOUDON, HUBERT MARKL, JAN TIMMER, ROBBERT VAN DER LIST, PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED, PRICEWATERHOUSECOOPERS LLP (U.S.), PRICEWATERHOUSECOOPERS LLP (U.K.), KPMG LLP, KPMG INTERNATIONAL, and KPMG ACCOUNTANTS NV, <br><br>               Defendants, <br>      and <br><br> THE "SHELL" TRANSPORT AND TRADING COMPANIES, PLC and THE ROYAL DUTCH PETROLEUM COMPANIES, <br><br>               Nominal Defendants. | Civil Action No. 2:04-cv-03603 (DMC-MF) <br><br><br> *(Document filed electronically)* |

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .........................................................................................................2

A.  Defendants ......................................................................................................2

B.  Shell's Recategorization of Proved Hydrocarbon Reserves ...................................3

C.  The Companies' Governance Review ...................................................................3

PROCEDURAL HISTORY............................................................................................5

A.  This Action......................................................................................................5

B.  Related Actions ................................................................................................6

THE SETTLEMENT ....................................................................................................7

A.  Negotiations and Execution of the Settlement Discussions....................................7

B.  The August 5, 2005 Order .................................................................................9

C.  Terms of the Proposed Settlement Agreement ......................................................10

DISCUSSION ...........................................................................................................11

I.  THE NOTICE TO SHAREHOLDERS INCLUDES ALL APPROPRIATE
    INFORMATION AND SATISFIES ALL APPLICABLE REQUIREMENTS....11

II.  THE PROPOSED SETTLEMENT SHOULD BE APPROVED BECAUSE IT
     IS FAIR, REASONABLE AND ADEQUATE ...................................................14

    A.  The Benefit to the Companies of the Corporate Governance Principles
        Is Substantial..................................................................................................16

    B.  The *Girsh* Factors Collectively Counsel in Favor of Approval of the
        Settlement. .....................................................................................................17
        1.  Plaintiffs' Likelihood of Success Is Uncertain ...............................17
        2.  Further Litigation Would Be Complex, Expensive and Lengthy ..22
        3.  The Litigation Is at an Appropriate Stage for Settlement ..............24
        4.  Shareholders Have Responded Favorably to the Proposed
            Settlement .....................................................................................25

    C.  The Parties Reached the Settlement After Arm's-Length Negotiations
        Between Experienced Counsel ...........................................................................26
        1.  The Settlement Was Not a Product of Fraud or Collusion ...........26
        2.  The Opinion of Plaintiffs' Counsel Weighs Strongly in Favor of
            Settlement .....................................................................................27

CONCLUSION...........................................................................................................30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re American Family Enterprises,*
   256 B.R. 377 (D.N.J. 2000)...............................................................................16

*In re Austrian & German Bank Holocaust Litigation,*
   80 F. Supp. 2d 164 (S.D.N.Y. 2000)..............................................................26

*Batchelder v. Kawamoto,*
   147 F.3d 915 (9th Cir. 1998)............................................................................20

*Beekmans v. J.P. Morgan & Co.,*
   945 F. Supp. 90 (S.D.N.Y. 1996)...................................................................21

*Bell Atlantic Corp. v. Bolger,*
   2 F.3d 1304 (3d. Cir. 1993).........................................................12, 13, 14,
                                                                                                15, 17, 22,
                                                                                                     25, 26

*Blanco v. Banco Industrial de Venezuela, S.A.,*
   997 F.2d 974 (2d Cir. 1993).............................................................................21

*In re Cendant Corp. Derivative Action Litigation,*
   232 F. Supp. 2d 327 (D.N.J. 2002)..........................................................17, 26

*In re Cendant Corp. Litigation,*
   264 F.3d 286 (3d. Cir. 2001)......................................................................17, 22

*In re Cendant Corp. Securities Litigation,*
   109 F. Supp. 2d 235 (D.N.J. 2000)..........................................................23, 25

*In re Chambers Development Securities Litigation,*
   912 F. Supp. 822 (W.D. Pa. 1995)..................................................................29

*Cohn v. Nelson,*
   375 F. Supp. 2d 844 (E.D. Mo. 2005)............................................................17

*In re Computron Software, Inc. Securities Litigation,*
   6 F. Supp. 2d 313 (D.N.J.1998) .....................................................................24

*In re Dun & Bradstreet Credit Services Customer Litigation,*
    130 F.R.D. 366 (S.D. Ohio 1990) ...................................................................27

*Fisher Brothers v. Phelps Dodge Industries, Inc.,*
    604 F. Supp. 446 (E.D. Pa. 1985) ...........................................................27, 28

*Girsh v. Jepson,*
    521 F.2d 153 (3d. Cir. 1975)...................................................................15, 25

*In re Ikon Office Solutions, Inc., Securities Litigation,*
    194 F.R.D. 166 (E.D. Pa. 2000) ...................................................................16

*Jamison v. Butcher & Sherrerd,*
    68 F.R.D. 479 (E.D. Pa. 1975) .....................................................................29

*Kogan v. AIMCO Fox Chase, L.P.,*
    193 F.R.D. 496 (E.D. Mich. 2000)...............................................................28

*Koster v. (American) Lumbermens Mutual Casualty Co.,*
    330 U.S. 518 (1947) .....................................................................................19

*Lazy Oil Co. v. Witco Corp.,*
    95 F. Supp. 2d 290 (W.D. Pa. 1997) ............................................................27

*Locals 302 and 612 of the International Union of Operating Engineers, et. al.,*
*v. Blanchard,*
    04 Civ. 5954, 2005 U.S. Dist. LEXIS 17679
    (S.D.N.Y., August 25, 2005)........................................................................20

*Maher v. Zapata Corp.,*
    714 F.2d 436 (5th Cir. 1983)...........................................................12, 14, 28

*Masterson v. Pergament,*
    203 F.2d 315 (6th Cir. 1953)........................................................................12

*In re MicroStrategy, Inc. Securities Litigation,*
    148 F. Supp. 2d 654 (E.D. Va. 2001)......................................................23, 24

*In re Pacific Enterprises Securities Litigation,*
    47 F.3d 373 (9th Cir. 1995) ..........................................................................18

*Petrovic v. Amoco Oil Co.,*
    200 F.3d 1140 (8th Cir. 1999) .................................................................13

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235 (1981) ...............................................................................21

*Priddy v. Edelman,*
    883 F.2d 438 (6th Cir. 1989) ..................................................................26

*Republic National Life Insurance Co. v. Beasley,*
    73 F.R.D. 658 (S.D.N.Y. 1977) ..............................................................14

*In re Safety Components, Inc. Securities Litigation,*
    166 F. Supp. 2d 72 (D.N.J. 2001) ......................................................22, 23

*Shlensky v. Dorsey,*
    574 F.2d 131 (3d Cir. 1978) ..............................................................15, 18

*Weiss v. Mercedes-Benz of North America, Inc.,*
    899 F. Supp. 1297 (D.N.J. 1995) ............................................................23

*Williams v. First National Bank,*
    216 U.S. 582 (1910) ...............................................................................14

*Williams v. Vukovich,*
    720 F.2d 909 (6th Cir. 1983) ..............................................................17, 26

*Zimmerman v. Bell,*
    800 F.2d 386 (4th Cir. 1986) ..............................................................24, 28

### STATE CASES

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984) ...................................................................18, 19

*In re Coleman Co. Shareholders Litigation,*
    750 A.2d 1202 (Del. Ch. 1999) ...............................................................12

*Geller v. Tabas,*
    462 A.2d 1078 (Del. Super. 1983) ...........................................................12

*Kostolany v. Davis,*
    Civ. A. No. 13299, 1995 WL 662683 (Del. Ch. Nov. 7, 1995) ....................................21

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990)...........................................................................................19

*Wietschner v. Rapid-American Corp.,*
    Civ. No. 4603, 1977 WL 918 (Del. Ch. Feb. 10, 1977)...........................................14, 22

## FEDERAL STATUTES

Fed. R. Civ. P. 23.1 ................................................................................................11, 14, 18

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................... *passim*

Fed. R. Civ. P. 23(e)(1)(B) ................................................................................... *passim*

**NOMINAL DEFENDANTS' MEMORANDUM IN SUPPORT
OF DERIVATIVE ACTION SETTLEMENT**

Nominal Defendants The Royal Dutch Petroleum Company and The "Shell" Transport and Trading Company, plc (collectively, the "Companies" or "Shell") submit this memorandum in support of the entry of a final order and judgment approving the settlement reached among the parties as fair, reasonable and adequate, and dismissing with prejudice plaintiffs' Amended Verified Shareholders' Derivative Complaint (the "Complaint") and the Related Actions[1] in accordance with the terms of the Stipulation of Settlement ("the Settlement Agreement") executed by the parties on July 22, 2005.[2]

**PRELIMINARY STATEMENT**

Counsel for both sides agree the proposed Settlement Agreement is fair, reasonable and adequate, and that it is in the best interests of the Companies and their shareholders. The Settlement Agreement provides for extensive corporate governance principles to be adopted by the Companies' successor parent, Royal Dutch Shell, plc (the "Company"), resulting in a substantial benefit to the Company and its shareholders, on whose behalf this suit has been brought. This relief is more than adequate in light of the costs and risks to the parties associated with continuing the litigation. In addition, the

---

[1]   The "Related Actions" are defined as *Soojian v. Jacobs, et al.,* Civil Action No. 04 CV-4160 (filed June 2, 2004 in the United States District Court for the Southern District of New York) ("*Soojian*"); *Epstein v. Oxburgh, et al.,* Case No. 04168560 (filed June 8, 2004 in the Supreme Court of the State of New York in the County of New York) ("*Epstein*"); and *Staehr v. Van Der Veer, et al.,* Case No. 04112723 (filed September 2, 2004 in the Supreme Court of the State of New York in the County of New York) ("*Staehr*").

[2]   A proposed Final Judgment and Order Approving Settlement were attached as Exhibits D and E to the Stipulation of Settlement that was submitted to the Court.

notice provided to shareholders was adequate, only one out of millions of shareholders worldwide has objected to the Settlement Agreement,[3] and the negotiations were conducted at arm's length by experienced counsel who had ample opportunity to assess the relative strengths and weaknesses of the case.  For all of these reasons, the Court should approve the Settlement Agreement.

## BACKGROUND

### A.    Defendants

The Royal Dutch Petroleum Company ("RD") is incorporated under the laws of The Netherlands, and has its principal executive offices in The Hague.  Prior to July 20, 2005, its ordinary shares were listed on securities exchanges in eight European countries and on the New York Stock Exchange ("NYSE").  The "Shell" Transport and Trading Company, plc ("ST&T") is incorporated under the laws of the United Kingdom, and has its principal executive offices in London.  Prior to July 20, 2005, ordinary shares of ST&T were listed on stock exchanges in four European countries and on the NYSE, on which American Depository Receipts ("ADRs") representing ST&T ordinary shares trade.  As of July 20, 2005, and as described more fully below, ST&T and RD were unified under a single parent company, Royal Dutch Shell plc (the "Company").  The Company's shares trade on the London Stock Exchange and the Euronext Amsterdam exchange, and its ADRs trade on the New York Stock Exchange.

---

[3]     Objections were due to be filed with the Court and served on the parties by October 7, 2005.

**B.      Shell's Recategorization of Proved Hydrocarbon Reserves**

On January 9, 2004, Shell announced that, based on the results of an internal review, it would recategorize approximately 3.9 billion barrels of oil equivalent ("boe") of proved reserves.  Following completion of the internal review and subsequent efforts on the recategorization, Shell ultimately recategorized 4.47 billion boe, or approximately 23%, of the proved reserves it reported as of year-end 2002 (the "Reserves Recategorization").  On October 28, 2004, Shell announced that it was considering additional recategorizations as a result of the detailed audit processes put in place following the Reserves Recategorization.

On February 5, 2004, Shell announced that its Group Audit Committee ("GAC") was conducting an internal inquiry into the processes surrounding past reserves bookings. On March 3, 2004, following a preliminary report to the GAC on the independent review, two senior executives of the Company resigned: Sir Philip Watts, Chairman of the Committee of Managing Directors, and Walter van de Vijver, CEO of the Exploration and Production business.

**C.      The Companies' Governance Review**

On March 18, 2004, Shell announced a range of enhancements to its governance framework and internal controls.  Shell also indicated that it was "considering the views of investors and the various advisory bodies in respect of overall governance of the Group, including the composition and operation of the parent and holding company boards."  With respect to the independent investigation being conducted by the GAC, the

Companies announced that the independent review would be completed in April 2004, and they committed to make public the main conclusions of the GAC's review.

On April 19, 2004, the Companies reported that the GAC's independent investigation into the circumstances surrounding the Reserves Recategorization had been completed and that the almost 500-page report of the investigation (the "GAC Report") had been accepted by the Boards.  Consistent with its earlier commitment to make public the main conclusions of the GAC investigation, the Companies released to the public the Executive Summary and the Remedial Action sections of the GAC Report.  They also announced that the review of the governance structure of the Companies would be accelerated in light of the GAC Report, including through the appointment of a working committee to focus on the review (the "Governance Review").

On June 17, 2004, Shell issued an update on the Governance Review in advance of the Companies' June 28, 2004 Annual General Meetings of Shareholders.  In the update, Shell announced that a steering group of the Boards had been appointed for the Governance Review and that it was being assisted by a working group of senior management.  Shell noted that the mandate of the Governance Review included "possible simplification of Board/Group management structures" and that a number of potential alternative structures, including "forms of unified Boards," were being studied.  Shell commented that "[n]othing is being ruled out at this stage."  Shell said that it intended to report the results of the Governance Review in November 2004, followed by additional consultation with shareholders, so that the process could be completed by the Annual General Meetings in 2005 and implemented thereafter.

4

On October 28, 2004, Shell announced that "[t]he Boards of RD and ST&T have unanimously agreed to propose to their shareholders the unification of the Royal Dutch/ Shell Group of Companies under a single parent company, Royal Dutch Shell plc" (the "Unification Transaction").  Shell stated that, under the terms of the proposed Unification Transaction, the Royal Dutch/Shell Group of Companies would have a single parent company, Royal Dutch Shell, with a single board of directors and a Chief Executive Officer.

On July 20, 2005, Shell announced that the Unification Transaction had been completed and trading in Royal Dutch Shell shares and ADRs began.

## PROCEDURAL HISTORY

**A.    This Action**

On June 25, 2004, this Action was filed in the Superior Court of New Jersey for Middlesex County.  On July 28, 2004, Account Defendants KPMG LLP and PricewaterhouseCoopers LLP (U.S.) removed this Action to the Court.  On September 30, 2004 the amended Complaint was filed.  The Action includes claims against the Individual Defendants[4] for breach of fiduciary duties or aiding and abetting breaches by others, abuse of their control over the Companies, gross mismanagement, constructive

---

[4]    "Individual Defendants" is defined to include Philip Watts, Judy Boynton, Walter Van De Vijver, Frank Coopman, Jeroen Van Der Veer, Paul Skinner, Marten Van Der Bergh, Robert J. Routs, Malcolm Brinded, Mark Moody-Stuart, Henny De Ruiter, Luis Giusti, Ronald Oxburgh, Aad Jacobs, Lawrence Ricciardi, Peter Burt, Mary (Nina) Henderson, Teymour Alireza, Eileen Buttle, Peter Job, John Kerr, Wim Kok, Jonkheer Aarnout Loudon, Hubert Markl, Jan Timmer and Robbert Van Der List.

fraud and unjust enrichment.  The Action further alleges professional negligence and accounting malpractice against the Auditor Defendants.  The Action seeks monetary damages, an accounting by all defendants of the damages they caused to the Companies and "special benefits and unjust enrichment" the defendants have obtained and an order directing the Companies "to take all necessary actions to reform and improve their corporate governance and internal control procedures to comply with Sarbanes-Oxley." The Complaint specifies a list of corporate governance policies that the Companies would need to adopt, including policies relating to the "unification of the two Boards" and "a proposal to simplify the corporate structure."

### B.    Related Actions

On June 2, 2004, *Soojian* was filed in the United States District Court for the Southern District of New York on behalf of RD shareholders claiming that the individual defendants in that action had breached their fiduciary duties to RD and should be liable for indemnification to RD for the losses they had caused.  The *Soojian* Complaint also seeks an order from the court requiring the defendants to "implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence."

On June 8, 2004, *Epstein* was filed in the Supreme Court of the State of New York for the County of New York on behalf of ST&T shareholders claiming that the individual defendants in that action had breached their fiduciary duties to ST&T and should be liable for indemnification to ST&T for the losses they had caused.  The *Epstein* complaint also seeks an order from the court requiring the defendants to "implement

corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence."

On September 2, 2004, *Staehr* was filed in the Supreme Court of the State of New York for the County of New York on behalf of shareholders of RD claiming that the individual defendants in that action had breached their fiduciary duties and engaged in other misconduct and should be liable to RD for the losses they caused to RD as well as disgorge to RD any unjust profits they realized.

## THE SETTLEMENT

### A.      Negotiations and Execution of the Settlement Discussions

On September 24, 2004, Plaintiffs' counsel and representatives of Plaintiffs met with the Companies' counsel and senior in-house legal counsel for Shell.  The Parties discussed the various jurisdictional, venue and service issues arising out of the Action and the Related Actions.  The Parties also discussed the proposed corporate governance relief that Plaintiffs had included in the Complaint and agreed that Plaintiffs' counsel, together with an expert in corporate governance matters, would provide Shell with a more detailed set of proposed governance terms that could be evaluated by the Companies' counsel and by participants in the Governance Review.  Plaintiffs' counsel provided a detailed list of such terms in early October 2004 (the "Corporate Governance Principles").

On December 1, 2004, the Companies' counsel, senior counsel from Shell, Plaintiffs' counsel, representatives from Plaintiffs and Plaintiffs' corporate governance

expert met at Shell's offices in London.  In that meeting, the Parties held extensive

discussions concerning the Corporate Governance Principles, including a discussion of

provisions that the Companies' counsel would be willing to recommend that Shell adopt

as part of a potential resolution of the Action and the Related Actions.  The Parties also

discussed the prospects of a potential resolution and the timing of such a resolution, given

the progress of the unification transaction announced on October 28, 2004.  At the end of

the meeting and as a next step in the Parties' consideration of a potential resolution, the

Companies' counsel agreed to provide Plaintiffs with revised Corporate Governance

Principles that the Companies' counsel would be prepared to present and recommend to

the Companies and the Boards of Directors.

In settlement discussions on April 7, 2005, the parties reached substantial

agreement on the Corporate Governance Principles and other significant terms of the

settlement.  The negotiations on several specific issues in the Corporate Governance

Principles continued through May 11, 2005, when counsel for the parties agreed on a

final set of Corporate Governance Principles that would be recommended to the

Companies' Boards of Directors as part of a resolution of the Derivative Action and the

Related Derivative Actions.

On July 22, 2005, the parties entered into a Stipulation of Settlement, conditioned

on, among other things, Plaintiffs' counsel's completion of additional discovery,

including review of additional Company documents, and Plaintiffs and Plaintiffs'

counsel's collective conclusion at the end of that additional discovery that the terms of

the settlement are fair, reasonable and adequate.

After the parties had negotiated a mutually acceptable confidentiality agreement, Plaintiffs' counsel conducted additional discovery, reviewing approximately 34 boxes of documents relevant to the issues in this case.  In addition, the Companies provided Plaintiff's counsel with the transcripts of the Financial Services Authority ("FSA") and Securities and Exchange Commission ("SEC") testimony of 25 high-level Company employees and executives, including several of the Individual Defendants in this action. This additional discovery was completed by August 31, 2005.  Based on their previous investigation and the additional discovery conducted pursuant to the terms of the initial settlement agreement, Plaintiffs and Plaintiffs' counsel concluded that the terms of the Settlement Agreement are fair, reasonable and adequate and in the best interests of the Company and its shareholders.[5]

**B.      The August 5, 2005 Order**

On August 5, 2005, the Court entered the Order Preliminarily Approving Settlement, Directing Notice to Shareholders and Setting Hearing for Final Approval of the Settlement (the "August 5 Order") in which it:

- set the date of the settlement hearing to determine, among other things, "whether the proposed Settlement Agreement is fair, reasonable, adequate and in the best interests of the [Companies] . . . and their shareholders and should be approved by the Court" and "whether the Action should be dismissed with prejudice pursuant to the terms of the Settlement Agreement" [¶ 2 (a,e)];

---

[5]     On October 4, 2005, the Parties filed the First Amendment to Stipulation of Settlement with the Court, removing the discovery contingencies.

9

- found that the proposed Settlement Agreement "is sufficiently fair, reasonable and adequate to warrant providing notice of the Action and the proposed Settlement Agreement to shareholders" [¶ 5];

- found that the "form and method of notice specified in the Settlement Agreement constitute the best practicable notice, satisfy the requirements of the Federal Rules of Civil Procedure (including Rule 23.1), the United States Constitution (including the Due Process Clause), the Rules of the Court, and any other applicable law, and is sufficiently informative of the Settlement Agreement and the Fairness Hearing and provides sufficient opportunity for response to all persons or entities entitled to receive such notice" [¶ 7]; and

- set a date and procedure for shareholders who wished to object to the settlement and/or appear at the Fairness Hearing [¶¶ 11-13]; and

- preliminarily enjoined plaintiffs, the Company's shareholders and the Company from "filing, commencing, prosecuting, intervening in, participating in (as a nominal defendant or otherwise) or receiving any benefits or other relief from, any other lawsuit, arbitration or administrative, regulatory or other proceeding or order" against the parties released by the Settlement Agreement based on any claims or causes of action that are released by the Settlement Agreement [¶ 10].

## C.    Terms of the Proposed Settlement Agreement

The proposed Settlement Agreement provides that the Company will adopt, implement and maintain an extensive series of Corporate Governance Principles. *See* Declaration of Emily S. Pierce, Esq., in Support of Settlement ("Pierce Decl."), Exhibit 1. The principles include policies and standards in the areas of Board composition and qualifications; Board independence; the nomination process; membership and functions of Board committees; compensation of directors and senior management; establishment of an Annual General Meeting; financial reporting and control, including proved

hydrocarbon reserve estimates; Audit Committee composition, qualifications and role; insider trading controls; and corporate ethics and legal compliance.

In consideration of this comprehensive relief, the Settlement Agreement contemplates that the Court will enter an Order approving the settlement that incorporates a release, which is contained in Section VII.A. of the Settlement Agreement.

## DISCUSSION

I.   **THE NOTICE TO SHAREHOLDERS INCLUDES ALL APPROPRIATE INFORMATION AND SATISFIES ALL APPLICABLE REQUIREMENTS**

Rule 23.1 of the Federal Rules of Civil Procedure requires that notice of the proposed settlement be given to shareholders in such manner as the Court directs.  The Court already has preliminarily found that the notice required by its August 5 Order (the "Notice") was sufficiently informative of the Settlement Agreement and the Fairness Hearing, provided sufficient opportunity for response to all persons or entities to receive the notice, and satisfied all the judicial and constitutional requirements.  *See* August 5 Order, ¶7.

The form of Notice approved by the Court was published on September 1, 2005 in *The Wall Street Journal*, *USA Today*, *Daily Telegraph* (U.K.), *The Times* (U.K.), *NRC Handeslblad* (Netherlands); *De Telegraaf* (Netherlands), *International Herald Tribune* (including the U.S. edition) and *Financial Times* (including the U.S. edition).  *See* Pierce Decl., Exhibits 2-9.  In addition, as indicated in the Notice, copies of both the Notice and the Corporate Governance Principles were published on the Companies' website (www.shell.com) on August 31, 2005 and remain available on that website.  *See* Pierce

Decl., Exhibit 10.  Further, on the same day the Notice was published on the website, the Companies issued a press release announcing the settlement, describing its terms and directing shareholders to the notice.  *See Id.*  Plaintiffs have also complied with their obligation to publish the Corporate Governance Principles on Plaintiffs' counsel's website.  *See* Pierce Decl., Exhibit 11.  Now that the approved Notice has been provided to the Company's shareholders in accordance with the August 5 Order, this Court can and should reaffirm its earlier findings concerning the adequacy of the Notice in this case.

Courts have held that notice in a derivative action is adequate as long as it is "sufficiently informative and give[s] sufficient opportunity for response." *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1317 (3d Cir. 1993) (quoting *Kyriaza v. Western Elec. Co.,* 647 F.2d 388, 395 (3d Cir. 1981)); *see also Maher v. Zapata Corp.*, 714 F.2d 436, 452 (5th Cir. 1983) ("notice is not required to eliminate 'all occasion for diligence on the part of the stockholders'"); *Geller v. Tabas*, 462 A.2d 1078, 1080 (Del. Super. 1983) (same). As this Court preliminarily found in the August 5 Order, the Notice in this case fully satisfies the requirements of due process.  As described above, the Notice was published widely 50 days before the Fairness Hearing and remains available on the Companies' website.[6]  The Notice provides policyholders with sufficient information about the

---

[6]    Here, the Notice was published on September 1, 2005 – 50 days before the date of the fairness hearing on October 21, 2005 and five days before the date ordered by this Court. *See* August 5 Order, ¶ 6.  This time frame comports with those found to be acceptable by courts in other jurisdictions.  *See, e.g., Masterson v. Pergament*, 203 F.2d 315, 330 (6th Cir. 1953) (one month between notice and hearing sufficient); *In re Coleman Co. Shareholders Litig.,* 750 A.2d 1202, 1210 (Del. Ch. 1999) (30 days notice prior to hearing is sufficient). The notice in this case was provided in accordance with the direction of this Court (*see* Fed.

settlement of this action:  (1) it advises shareholders of the date of the fairness hearing;

(2) it summarizes the underlying litigation, the parties' contentions, the issues involved,

the reasons each party supports settlement and terms of the settlement agreement; and (3)

it advises shareholders of their right to object, consequences of not doing so and how to

go about obtaining further information.  *See generally Bell Atlantic Corp.,* 2 F.3d at 1317

(affirming a district court's approval of the form of notice containing similar

information); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999)

(notice provided "a reasonable summary of the stakes of the litigation, and class members

could easily acquire more detailed information"; "[d]ue process requires no more").

Specifically, the title of the Notice makes clear that is for a derivative action.  *See,

e.g.,* Pierce Decl., Exhibit 2.  The Notice also provides background information on the

claims and the positions of the Parties.  It explains the benefits of the settlement and

clearly outlines the risks of ongoing litigation to both Plaintiffs and Defendants.  The

Notice also states the time and place of the Fairness Hearing and describes how

shareholders can object or appear at that hearing.  The Notice provides the amount of

attorneys' fees and expenses to be sought by Plaintiffs' counsel and states how

shareholders can obtain more information regarding these proceedings, directing them to

---

R. Civ. P. 23.1), and publication was not only "reasonable," but also the "best notice
practicable under the circumstances", where millions of shareholders reside all over the
world.  *See* Fed. R. Civ. P. 23(c)(2)(B) and 23(e)(1)(B).  The Notice was also communicated
to shareholders via a press release available on the Shell website, the routine form of
communication between the Company and its shareholders in the normal course of business.
*See* Pierce Decl., Exhibit 10.

Plaintiffs' counsel.  Finally, the Notice describes the releases to be given to defendants, shareholders' right to object to the Settlement Agreement and the consequences of failing to object.  *Id*.

The Court therefore should reaffirm its preliminary holding in the August 5 Order that the Notice in this case satisfies the requirements of Rule 23.1 and constitutional due process.

## II.      THE PROPOSED SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS FAIR, REASONABLE AND ADEQUATE

It is within this Court's sound discretion to approve the resolution of this derivative action as described in the Settlement Agreement.  In the exercise of that discretion, the Court should be guided by the longstanding principle that courts favor settlement of disputed claims.  *See Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910).  In particular, courts favor the voluntary settlement of derivative litigation such as this.  *See, e.g.*, *Maher*, 714 F.2d at 455 (settlements of derivative actions are particularly favored because such litigation is "notoriously difficult and unpredictable"); *Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. 1977) (courts do not lightly reject settlements in derivative actions because of the complexity of litigation in such claims); *Wietschner v. Rapid-Am. Corp.*, Civ. No. 4603, 1977 WL 918, at *8 (Del. Ch. Feb. 10, 1977) ("the delay, expense and trouble of derivative litigation is always a consideration which lends itself to the support of a settlement").

A court should approve a proposed derivative action settlement if it determines that the settlement is "fair, adequate, reasonable and proper and in the best interests of the

class and the shareholders." *Bell Atlantic Corp.,* 2 F.3d at 1310 (quoting the district court order being appealed).  In the Third Circuit, "[t]he principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978) (citing *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.,* 543 F.2d 1058 (3d Cir. 1976)); *Bell Atlantic Corp.,* 2 F.3d at 1311 (same).  In addition, courts in the Third Circuit consider the following factors when evaluating the fairness of a proposed settlement of a derivative action:

> "(1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceedings and the amount of discovery completed . . .; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class action through the trial . . .; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . .."

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)); *see also Shlensky*, 574 F.2d at 147 ("the standards annunciated in *Girsh* . . . have accordingly been applied, although perhaps with somewhat less rigor, in the settlement of shareholders' derivative suits").

In this case, the substantial benefit to the Company that will be provided by the Settlement, combined with the other relevant considerations, collectively demonstrate that the Court should approve the proposed settlement.[7]

### A.    The Benefit to the Companies of the Corporate Governance Principles Is Substantial

The benefit to the corporation is the "most important question in determining the fairness of a derivative settlement." *In re Ikon Office Solutions, Inc., Sec. Litig.,* 194 F.R.D. 166, 191 (E.D. Pa. 2000).  As described above, the Corporate Governance Principles will serve as significant and substantial governance principles for the Company.  These principles will impact board governance, overall compliance, executive compensation, financial and other reporting and management efforts at a number of levels within the Company and are designed to assure compliance with applicable governance, accounting, legal and ethical standards.  Furthermore, Plaintiffs' counsel and their expert made significant contributions to the development of the Corporate Governance Principles, and they directly address the Plaintiffs' concerns and demands for equitable relief.  *See* Complaint ¶¶ 208-220 and Prayer for Relief C (outlining alleged governance failures and suggested governance reforms).  Such comprehensive principles will benefit both the Company and its shareholders.  Courts have found corporate governance benefits to corporations to be adequate and appropriate relief, particularly

---

[7]    Not all of the factors need to be met in order for the settlement to be approved – they are "a guide and the absence of one or more does not automatically render the settlement unfair." *In re Am. Family Enters.,* 256 B.R. 377, 418 (D.N.J. 2000).

when the relief is intended to prevent future harm.  *See Bell Atlantic Corp.*, 2 F.3d at 1311 (noting that nonpecuniary benefits may support a settlement, citing cases); *see also Cohn v. Nelson*, 375 F. Supp. 2d 844, 854 (E.D. Mo. 2005) (corporate governance reforms provide valuable benefits to public companies, and when independent of monetary benefits, "the therapeutic benefits are even more worthwhile").

     **B.**     **The *Girsh* Factors Collectively Counsel in Favor of Approval of the Settlement.**

     **1.**     **Plaintiffs' Likelihood of Success Is Uncertain**

In reviewing the substantive adequacy of the benefit bestowed on the Company, the Court must also consider fairness of a proposed settlement in light of the complexity and costs of prolonging the litigation and plaintiff's likelihood of success.  *Bell Atlantic Corp.,* 2 F.3d at 1312-13 (approving non-monetary derivative settlement when probability of success on the merits was uncertain); *see also In re Cendant Corp. Derivative Action Litig.,* 232 F. Supp. 2d 327, 333 (D.N.J. 2002) (when proof of liability is "a complex question and is far from certain," this factor weighs in favor of approving a settlement).  In evaluating this factor, a court does not have "the right or the duty to reach any ultimate conclusions on the issues of the fact and law which underlie the merits of the dispute."  *In re Cendant Corp. Litig.*, 264 F.3d 286, 301 (3d Cir. 2001) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *see also Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983) (in determining fairness of consent decree "[t]he Court has no occasion to determine the merits of the controversy or the factual underpinning of the legal authorities advanced by the parties").

This inquiry weighs heavily in favor of settlement in this case.  Derivative cases are by nature difficult to prove.  *See In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 & n.4 (9th Cir. 1995) (affirming settlement because, "[e]ven if [case] had gone to trial, derivative lawsuits are rarely successful").  In the case at hand, Plaintiffs face the difficulties inherent in derivative litigation as well as significant procedural and substantive obstacles to ultimate success.

As a preliminary matter, Plaintiffs would face a significant procedural barrier because of the difficulties they face in effectuating service of process on both the Companies and the individual defendants.  In addition, Plaintiffs would need to demonstrate compliance with the demand requirement of Fed. R. Civ. P. 23.1.[8]  Failure to surmount either of these obstacles would be independent grounds for dismissal of the case.  *See Shlensky,* 574 F.2d at 140-141 (dismissing derivative claims against defendant for failure to allege with particularity their efforts to make demand in relation to an individual defendant).

Furthermore, even if Plaintiffs were able to serve an appropriate demand on the Board or meet the demand futility pleading requirements, Plaintiffs would have to

---

[8]   F.R.C.P. 23.1 states: "[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."  A Court might also require the plaintiffs to plead demand futility under the two-pronged test articulated in *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), which requires that plaintiffs support their futility claim with allegations of specific, non-conclusory facts creating a "reasonable doubt" that either (*i*) the corporate directors who would have considered any demand are "disinterested and independent" or (*ii*) "the challenged transaction was otherwise the product of a valid exercise of business judgment."  *Id.* at 814.

overcome the business judgment rule or its equivalent protections under United Kingdom and Netherlands law.  Prior to the filing of the Amended Verified Complaint, the Companies had completed their independent investigation into the factual allegations raised by the Plaintiffs and were in the process of a thorough Governance Review. Defendants believe that the law would require the Court to defer to the Board's exercise of its business judgment that it was not in the Company's best interest to pursue litigation against the Individual Defendants.  *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) ("[t]he decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation . . . [c]onsequently, such decisions are part of the responsibility of the board of directors"); *see also Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (courts will defer to the judgment of an independent and disinterested, fully informed and deliberative board in business decisions in the context of derivative actions).

If the Plaintiffs were able to overcome these procedural hurdles, the Companies believe that the derivative claims are vulnerable to dismissal for additional substantive reasons.  First, the Companies could raise a challenge to this court's subject matter jurisdiction over the derivative claims of at least the non-U.S. shareholders, if not over any derivative claims brought against the Companies.

Second, even if Plaintiffs survived a motion to dismiss for lack of jurisdiction, the Companies would also have a strong case for dismissal on the grounds of *forum non conveniens*.  Even in domestic derivative actions, a plaintiff's choice of forum generally receives less deference.  *Cf. Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S.

518, 524 (1947) (where a plaintiff sues derivatively on behalf of a corporation with

numerous shareholders outside the chosen forum, his or her choice of forum is entitled to

less deference).  In this case, the Plaintiffs' claims concern the governance of Dutch and

English corporations.  The Companies believe that the United States is both an

inconvenient and inappropriate forum for these claims to be heard.

      Defendants are incorporated in the Netherlands and the United Kingdom, and thus

are not subject to the corporate law codes of individual U.S. states.  Under the internal

affairs doctrine, established choice-of-law principles dictate the application of the law of

the place of incorporation in derivative actions:

> "The right of a shareholder to object to conduct occurring
> in the operation of the corporate enterprise is determined by
> the law of the state of incorporation. This includes acts that
> are beyond the purposes of incorporation, acts which are
> prohibited either by the state of incorporation or by the
> state where the acts are to be performed and the acts which
> are alleged to be beyond the authority of the officers or
> directors."

*Locals 302 and 612 of the Int'l Union of Operating Eng'rs, et. al., v. Blanchard,* 04 Civ.

5954, 2005 U.S. Dist. LEXIS 17679 (S.D.N.Y., August 25, 2005) (quoting *Hausman v.*

*Buckley*, 299 F.2d 696, 702-3 (2d Cir. 1962)) (noting that internal affairs doctrine applies

equally to foreign corporations).  Plaintiffs would also face challenges presented by

forum-selection and choice-of-law clauses in the ADRs held by U.S. shareholders.  *See,*

*e.g., Batchelder v. Kawamoto*, 147 F.3d 915, 918 (9th Cir. 1998) (choice-of-law clauses

in depository agreements are "routinely enforced, particularly when the country whose

law is selected has some nexus with the action").  These choice-of-law issues would also

make it difficult for plaintiffs to survive a motion to dismiss.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 n.29 (1981) ("Many *forum non conveniens* decisions have held that the need to apply foreign law favors dismissal.") (collecting cases).

Finally, Plaintiffs would have to overcome substantive grounds for dismissal that exist under both Dutch and English law, including the arguments that derivative actions are not available under Dutch law, and only available in very limited circumstances in the United Kingdom.  *See, e.g, Kostolany v. Davis*, Civ. A. No. 13299, 1995 WL 662683 at *4 (Del. Ch. Nov. 7, 1995) (finding that Dutch law does not recognize a stockholder's right to pursue a derivative action on behalf of a corporation and dismissing derivative claim).  Not only would this fact make it difficult for the Plaintiffs to find a statutory basis for sustaining the derivative claims, it would also be another factor in favor of dismissal on *forum non conveniens* grounds.  *See Beekmans v. J.P. Morgan & Co.*, 945 F. Supp. 90, 94 (S.D.N.Y. 1996) (*forum non conveniens* motion for dismissal granted because "Dutch courts are far better situated to apply and interpret Dutch law"); *cf. Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 983 (2d Cir. 1993) (where it was "unclear whether shareholder derivative actions may be maintained in Venezuela[,] . . . [t]he district court was entitled to conclude that such questions of Venezuelan substantive and procedural law are better addressed by Venezuelan courts").

In addition, Plaintiffs face similar challenges in pursuing their case against the individual defendants.  All but three of the individual defendants are non-U.S. citizens who reside in Europe and have very strong arguments for lack of personal jurisdiction.  In order to prove liability, in addition to "the usual business judgment hurdle," Plaintiffs

would have to identify the relevant Dutch or English laws relating to indemnity, fiduciary duty and fraud and overcome those pleading and proof standards as well.  *See, e.g., Bell Atlantic Corp.*, 2 F.3d at 1312 (when corporate charter shielded directors from liability, plaintiffs would face additional hurdle in proving the claims, counseling in favor of settlement).

### 2.   Further Litigation Would Be Complex, Expensive and Lengthy

In evaluating the overall fairness, reasonableness and adequacy of the proposed settlement, the Court must balance the value of an immediate recovery against the possibility of future relief after protracted and expensive litigation, an expense that would be born, for the most part, by the Company.  *See In re Cendant Corp. Litig.*, 264 F.3d at 264 (this factor "captures the probable costs, in both time and money, of continued litigation"); *see also In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72 (D.N.J. 2001) (complexity of case weighed in favor of settlement).

By their nature, derivative actions are complex and lengthy.  *See, e.g., Wietschner* 1977 WL 918 at *8 ("the delay, expense and trouble of derivative litigation is always a consideration which lends itself in support of a settlement").  As demonstrated above, this case presents complex jurisdictional and choice-of-law issues that will only add to the expense and length of pre-trial proceedings and trial.  Furthermore, the Complaint's allegations raise many complex legal and factual issues, including the application of foreign corporate law, the relatively new and untested application of Sarbanes-Oxley provisions to directors of foreign corporations, complicated oil reserves reporting specifications and the reasonableness of the Board's reliance on the advice of

professionals within Shell and third parties such as the outside accountants.  Litigation

relating to such fact-intensive and difficult to prove claims would thus be extraordinarily

complicated and time consuming and would require expert testimony, including the

testimony of foreign law experts.  A resolution of the case could take years and involve

enormous expense for all parties – and for the Court – if this case were to proceed.  *See In

re Cendant Corp. Sec. Litig.,* 109 F. Supp. 2d 235, 256-57 (D.N.J. 2000), *aff'd* 264 F. 3d

201 (3d Cir. 2001) (length of time until possible trial and complexity of accounting issues

and novel legal issues counsel in favor of settlement); *In re Safety Components,* 166 F.

Supp. at 84-85 (when, among other things, motions to dismiss were likely, technical

accounting issues were involved, and significant expert testimony would be required, first

*Girsh* factor weighed "strongly in favor of settlement"); *see also In re MicroStrategy,*

*Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 667 (E.D. Va. 2001) (recognizing that "additional

litigation of plaintiffs' claims . . . would likely have been protracted and costly, requiring

extensive expert testimony concerning the company's accounting practices and the

significance of the Individual Defendants' decisions in relation to GAAP" and

concluding that "the old adage, 'a bird in hand is worth two in the bush' applies with

particular force in this case"); *Weiss v. Mercedes-Benz of North America, Inc.* 899 F.

Supp. 1297, 1301 (D.N.J. 1995), *aff'd,* 66 F.3d 314 (3d. Cir. 1995) (given the

"staggering" expense of trial, especially in complex commercial litigation, "'a bad

settlement is almost always better than a good trial'" (citation omitted)).

Ultimately, even in the unlikely event Plaintiffs did succeed at trial, they could

expect a vigorous appeal by defendants and an accompanying delay in the receipt of any

relief.  *See, e.g., In re Computron Software, Inc., Sec. Litig.,* 6 F. Supp. 2d 313, 317

(D.N.J. 1998) ("even if the Plaintiff Class were to recover a larger judgment at trial,

which is not guaranteed, the additional delay caused by a trial, post-trial motions and the

appellate process, would delay recovery . . . for years"); *see also In re Microstrategy*, 148

F. Supp. 2d at 667 ("a jury verdict for either side would only have ushered in a new round

of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and

significantly delaying any relief for plaintiffs") (citation omitted).

     In contrast to the long, costly process of litigation in the event Plaintiffs were able

to surmount the procedural hurdles, under the Settlement Agreement, the Plaintiffs

receive their desired equitable relief without subjecting the Company and its shareholders

to the risk, complexity, duration and expense inherent in continuing this litigation.  *See*

*Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986) (settlement of derivative action

favored because "management can return its attention and energy from the courtroom to

the corporation itself").  In addition, the Company and its shareholders benefit from the

protections of the corporate governance procedures, which are to be implemented within

30 days of the Court's approval.  Given that Plaintiffs are not at all assured of success

through continued litigation, the balance tips decidedly in favor of this Court approving

this settlement that provides prompt substantial relief.

     **3.    The Litigation Is at an Appropriate Stage for Settlement**

     The "stage of the litigation" factor also counsels for approval of the Settlement

Agreement.  This factor is intended to "capture[] the degree of case development that

class counsel have accomplished prior to settlement.  Through this lens, courts can

determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d at 258 (citations omitted); *see also Bell Atlantic Corp.,* 2 F.3d at 1314 (the stage of the litigation factor can "cut both ways" and requires a balancing inquiry by the court).  In this case, the relatively early settlement will save substantial costs, avoiding lengthy motion practice, discovery, trial preparation and trial; but those savings will not be at the expense of the parties' knowledge of the relative strengths and weaknesses of the case.  *See In re Safety Components*, 166 F. Supp at 88 (despite the fact that formal discovery had not commenced, counsel had conducted independent investigations and sufficient informal discovery and "acted efficiently in reaching a settlement quickly," counseling in favor of approval).  As described above, both before and after the Settlement Agreement was executed, Plaintiffs engaged in substantial case development, consulted with experts on the adequacy of the relief and completed extensive confirmatory discovery.  Thus, they are well-positioned to assess the benefits of the Settlement Agreement to their clients.

### 4. Shareholders Have Responded Favorably to the Proposed Settlement

The Court also should consider the reaction of the Company's shareholders to the proposed settlement.  *See Girsh*, 521 F.2d at 156 (reaction of the class is one of the nine core factors to be considered); *Bell Atlantic Corp.*, 2 F.3d at 1311 ("we also consider the response of the other shareholders to the lawsuit").  As of October 7, 2005, only one shareholder had filed a submission with the Court objecting to the settlement in

accordance with its instructions set forth in the August 5 Order.[9]  The lack of objections

demonstrates that the vast majority of shareholders support the settlement.  *See Bell*

*Atlantic Corp.*, 2 F.3d at 1313 (approving settlement when 30 out of 1.1 million

shareholders objected – "an infinitesimal number "); *In re Cendant Corp. Derivative*

*Action Litig.,* 232 F. Supp. 2d at 333 (when only four out of 200,000 shareholders

questioned the settlement, there was "little doubt" that this factor weighed in favor of

settlement); *accord In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164,

175 (S.D.N.Y. 2000) ("[i]f only a small number of objections are received, that fact can

be viewed as indicative of the adequacy of the settlement"), *aff'd sub nom., D'Amato v.*

*Deutsche Bank*, 236 F.3d 78, 87 (2d Cir. 2001).

> **C.    The Parties Reached the Settlement After Arm's-Length Negotiations Between Experienced Counsel**

> **1.    The Settlement Was Not a Product of Fraud or Collusion**

In addition to evaluating the substance of the proposed settlement, the Court

should examine the process by which it was negotiated to ensure "interests of counsel and

the named plaintiffs are not unjustifiably advanced at the expense of unnamed class

members."  *Williams v. Vukovich*, 720 F.2d at 923; *see also Priddy v. Edelman*, 883 F.2d

---

[9]    The only objection filed with the Court was by R.F. Dickinson, Esq., a British lawyer (the "Dickinson Objection").  Mr. Dickinson appears to misunderstand the nature of a derivative action and makes a claim for personal compensation.  Dickinson Objection, ¶13.  Moreover, his claim for compensation appears to based on the novel theory that he will miss out on profits from Shell's future performance because some equity income fund managers can no longer invest in Shell for reasons allegedly related to the unification, one of the remedies sought by the Plaintiffs.  Dickinson Objection, ¶¶7-11.  The substance of this objection is irrelevant to the derivative action and should be dismissed by the Court.

438, 477 (6th Cir. 1989) (court should examine "the process by which the settlement was arrived at" to ensure that "the settlement is not the product of fraud, overreaching, or collusion").

The settlement negotiations in this case were extensive, contentious and undertaken at arm's length.  Throughout the negotiation process, the parties employed their own teams of attorneys and experts to assess the validity of the allegations underlying the Complaint.  In addition, Plaintiffs' counsel diligently pursued the action. Even after the parties reached a preliminary settlement agreement, Plaintiffs' counsel insisted on additional discovery before they agreed that the terms of the settlement were fair, reasonable and adequate.

Because "there has been no suggestion that these settlements were not conducted in good faith at arms length," the Court can be confident that the interests of the Companies and the shareholders have been properly represented.  *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985); *see also In re Dun & Bradstreet Credit Servs. Customer Litig.,* 130 F.R.D. 366, 371 (S.D. Ohio 1990) (approving settlement negotiated at arms' length, with no evidence of collusion and no indication that any party benefited at class's expense).

> **2.      The Opinion of Plaintiffs' Counsel Weighs Strongly in Favor of Settlement**

When evaluating the fairness, adequacy and reasonableness of a settlement, courts should consider the opinions of experienced counsel.  *See Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 331 (W.D. Pa. 1997), *aff'd* 166 F.3d 581 (3d Cir. 1999) (court

evaluating settlement "should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation" (quoting Manual for Complex Litigation § 30.42 (3d ed. 1995))); *see also Maher*, 714 F.2d at 454.  In a case like this one, where both Plaintiffs' counsel and the Company's counsel have extensive experience in derivative and class action litigation and have engaged in thorough investigation and discovery, the court should "defer to the judgment of experienced trial counsel."  *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 501 (E.D. Mich. 2000); *see also Fisher Bros.,* 604 F. Supp. at 452 (when a "settlement 'bears the imprimatur of seasoned and experienced counsel . . . ,'" the Court should be confident in relying on their judgment (quoting *Blank v. Talley Industries, Inc*., 64 F.R.D. 125, 132 (S.D.N.Y. 1974))).

In this case, Plaintiffs' counsel obtained sufficient information to assess the strengths and weaknesses of their positions.  It is apparent that Plaintiffs have concluded that, in light of the comprehensive equitable relief obtained in the form of the Corporate Governance Principles, the substantial defenses available to defendants and the economic difficulties associated with such extensive litigation, this settlement represents a fair and reasonable resolution of Plaintiffs' claims.  It benefits both the Company and its shareholders.  Shell likewise has concluded that, although it believes that the defenses would have been conclusive, it might have been forced to engage in extensive formal discovery and perhaps even to litigate through trial.  Such litigation could tie up many of the Company's top-level executives and members of its Board of Directors whose time could be used more productively.  *See Zimmerman*, 800 F.2d at 392 (settlement of

derivative action favored because "management can return its attention and energy from the courtroom to the corporation itself").

As a result of their thorough investigation, counsel on both sides have concluded that the proposed settlement is fair, reasonable and adequate. As other courts have done in similar contexts, this Court should give counsel's support of the settlement substantial weight in considering whether to approve the settlement. *See In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 843 (W.D. Pa. 1995) ("the Court is not at liberty to rewrite the terms of the settlement of . . . the derivative action, but must only determine whether they should be approved in whole, and in this regard the judgment of counsel is entitled to substantial weight"); *see also Jamison v. Butcher & Sherrerd*, 68 F.R.D. 479, 481 (E.D. Pa. 1975) (court should avoid substituting its opinion "for that of counsel intimately associated with the litigation and, consequently far more able to weigh its relative strengths and weaknesses").

## CONCLUSION

For the reasons stated above, the Court should approve the proposed settlement as fair, reasonable and adequate.

Respectfully submitted,


 /s/ Jeffrey A. Cohen

Jeffrey A. Cohen, Esq. (JAC 7975)
ROBERTSON, FREILICH, BRUNO &
COHEN LLC
The Legal Center
One Riverfront Plaza
Newark, New Jersey  07102-5468
(973) 848-2100

Ralph C. Ferrara, Esq.
LeBoeuf, Lamb, Greene & MacRae LLP
1875 Connecticut Ave, N.W.
Washington, D.C.  20009

Jonathan R. Tuttle, Esq.
Debevoise & Plimpton
555 13th Street, N.W.
Washington, D.C.  20004
(202) 383-8000

Attorneys for Nominal Defendants Royal Dutch Petroleum Company and The "Shell" Transport and Trading Company, plc


October 14, 2005