GREENBERG DAUBER EPSTEIN
 & TUCKER
RUSSELL S. BURNSIDE (RB 8484)
SUMEETA A. GAWANDE (SG 9596)
One Gateway Center, Suite 600
Newark, NJ  07102
Telephone:  973/643-3700
973/643-1218 (fax)

LERACH COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
WILLIAM S. LERACH (WL-5944)
JOY ANN BULL (JB-2191)
ARTHUR C. LEAHY (AL-2547)
PATRICK W. DANIELS (PD-5402)
MARY K. BLASY (MB-4314)
VALERIE L. McLAUGHLIN (VM-0958)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITE NATIONAL RETIREMENT FUND, et al., | ) ) ) | No. 04-CV-3603-(DMC) (MF) |
| Plaintiffs, | ) ) ) | DECLARATION OF WILLIAM S. LERACH AND MARY K. BLASY IN SUPPORT OF FINAL APPROVAL OF DERIVATIVE SETTLEMENT |
| vs. | ) ) ) | |
| PHILIP WATTS, et al., | ) ) | DATE:      October 21, 2005 |
| Defendants. | ) ) ) | TIME:      9:30 a.m. COURTROOM: The Honorable Dennis M. Cavanaugh |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................... 1

II.    SUMMARY OF THE FACTUAL BASES FOR PLAINTIFFS'
CLAIMS ................................................................................................... 7

III.   THE LITIGATION .................................................................................... 8

     A.     Investigation ................................................................................... 8

     B.     The Commencement of the Action ................................................ 12

     C.     Removal to Federal Court ............................................................. 12

     D.     Ongoing Investigation During Settlement Negotiations .................... 13

IV.   THE SETTLEMENT .............................................................................. 13

V.     FACTORS TO BE CONSIDERED IN SUPPORT OF
SETTLEMENT ...................................................................................... 35

     A.     The Settlement Was Fairly and Aggressively Negotiated by
Counsel ........................................................................................ 35

     B.     Serious Questions of Law and Fact Placed the Outcome of the
Derivative Action in Significant Doubt ......................................... 36

     C.     The Provisions for Payment of Plaintiffs' Counsel's Attorneys'
Fees Is Reasonable ...................................................................... 38

     D.     The Judgment of the Parties that the Settlement Is Fair and
Reasonable Provides Additional Support for the Approval of
the Settlement .............................................................................. 41

VI.   CONCLUSION ...................................................................................... 42

We, WILLIAM S. LERACH and MARY K. BLASY, declare:

1.      William S. Lerach is a member and Mary K. Blasy is an associate of the firm of Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, counsel for Plaintiffs in this litigation. Both are admitted to the bar of this Court *pro hac vice*. Both have personal knowledge of the matters set forth in this declaration, and if called to testify, could and would competently testify about them. We submit this declaration in support of Plaintiffs' application for this Court's approval of the settlement of the captioned derivative action (the "Action").

## I.    INTRODUCTION

2.      This case is an example of the significant benefit that a derivative action, brought by committed institutional plaintiffs and prosecuted by their counsel, can confer upon a company and its shareholders. Plaintiffs and Plaintiffs' Counsel have diligently pursued this matter since its commencement and have achieved a tremendous result for the Royal Dutch Petroleum Company ("Royal Dutch Petroleum") and The "Shell" Transport and Trading Company, plc ("Shell Transport"), collectively "Shell" or the "Companies," and its shareholders.

3.      The Action arises out of the conduct of certain of Shell's officers and directors who caused or permitted Shell to falsify its proved oil and gas reserves by billions of barrels of oil over several years, overstate its future cash flows by over $100 billion and materially falsify its financial statements. In early 2004 Shell announced the elimination of almost 4.5 billion barrels of proved reserves –

- 1 -

approximately 23% of Shell's previously claimed proved reserves – and restated its 2002-2003 financial statements, eliminating hundreds of millions of dollars of previously reported net income.  This news caused a sharp decline in the former Shell's stock and American Depository Receipt prices, produced a firestorm of criticism from Shell shareholders and the investment community condemning the companies' apparent deceit over the past several years, and the resignation of two of Shell's senior executives.  In addition, Shell was exposed to civil and criminal investigations, billions of dollars in liability for violations of the U.S. securities laws and international law via class action suits and by the impairment of its corporate credit ratings, reputation and goodwill.

4.      For months after the January 2004 revelations, Plaintiffs' Counsel, aided by Robert A.G. Monks of Lens Governance Advisors, P.A., undertook a detailed inquiry into Shell's complex accounting, corporate structure and corporate governance provisions.  On June 25, 2004, Plaintiffs, the UNITE National Retirement Fund and the Plumbers and Pipefitters National Pension Fund, filed a detailed derivative petition in the Superior Court of New Jersey Law Division of Middlesex County that laid out the alleged corporate misconduct of certain of Shell's senior management, its Board of Directors and its auditors.

5.      Following service of process upon them, on July 28, 2004 defendants KPMG LLP ("KPMG") and PriceWaterhouseCoopers LLP ("PWC"), Shell's outside independent accountants, removed this action pursuant to 28 U.S.C. §1441 on the

grounds that: (i) the Court had original jurisdiction under 28 U.S.C. §1331 because Plaintiffs' claims "arise under" the federal securities statutes requiring the resolution of substantial issues of federal law; and (ii) the Court has exclusive jurisdiction under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa.

6.      Shell's senior management and board of director defendants (collectively, the "Individual Defendants") maintained throughout these proceedings (and in connection with their defense to the securities fraud class action and ERISA proceedings) that Plaintiffs' allegations were baseless. For approximately one year Plaintiffs negotiated with Defendants over the breadth and scope of the corporate governance changes eventually agreed to be adopted through this settlement.

7.      During September 2004, Plaintiffs' Counsel and Defendants' Counsel met in New York to discuss the claims alleged in Plaintiffs' complaint, including unification issues and corporate governance changes, as well as the pending unification of the former Royal Dutch Petroleum and Shell Transport into the unified "Royal Dutch Shell." In early October 2004, Plaintiffs sent a detailed 23-page settlement demand concerning unification and corporate restructuring and laid out detailed corporate governance changes. On October 28, 2004, Shell announced the contemplated terms of its unification. Plaintiffs, along with their counsel, and Defendants, along with their counsel, aided by Plaintiffs' corporate governance expert, held numerous in-person and telephonic meetings over the ensuing months culminating in the September 1, 2005 announcement that the parties had reached a full

- 3 -

and complete agreement on the corporate governance enhancements spelled out in Exhibit A to the Stipulation of Settlement filed herein on July 26, 2005.

8.     Plaintiffs' Counsel negotiated sweeping corporate governance changes for the benefit of Shell's shareholders that were designed to address the root of the problems that Plaintiffs alleged resulted in the false proved oil and gas reserves and related financial statements. As set forth in paragraph 29 below, the measures agreed upon in this settlement are some of the most comprehensive corporate governance changes that have been implemented as part of a derivative settlement and serve as a model for corporate reform going forward, both in the U.S. and abroad.

9.     This exceptional settlement was reached only after Plaintiffs' Counsel: (a) conducted an extensive factual investigation; (b) reviewed and analyzed Shell's publicly filed documents, financial reports and analysts' reports; (c) reviewed and analyzed voluminous media files concerning Shell, including all press releases and public statements issued by the Companies; (d) obtained, reviewed and analyzed voluminous foreign financial regulatory filings concerning Shell's compliance with Dutch and English accounting standards and corporate governance standards; (e) thoroughly researched the law pertinent to the claims and potential defenses asserted, including issues of Dutch, English, U.S. and international corporate and common law; (f) assessed the likelihood of prevailing on any motions to dismiss for want of jurisdiction or otherwise, motions for summary judgment and at trial; (g) researched Shell's compliance with Dutch, English and U.S. corporate and accounting laws and

- 4 -

financial reporting standards and laws, and potential conflicts between those laws and the proposed governance changes; (h) analyzed the damages likely to be proven if the case proceeded to trial; and (i) successfully negotiated, at arm's length, a very favorable settlement for the shareholders.

10. Plaintiffs' Counsel, with the substantial assistance of corporate-governance expert Robert A.G. Monks, designed corporate governance changes that they believed would facilitate the Companies' successful unification and rehabilitation, including:

(a) improved governance procedures at Shell that extend well beyond the corporate governance requirements of the Sarbanes-Oxley Act of 2002 and the New York Stock Exchange listing requirements, while preserving the important characteristics of Dutch and corporate law;

(b) important governance changes regarding solicitation of shareholder input on Supervisory Board nominees going forward, making Shell corporate directors more accountable to shareholders in the governing process;

(c) implementation of an innovative process that will directly involve Shell's shareholders in a process that is designed to produce highly qualified candidates for election to the Shell Board;

(d) significant strengthening of the Companies' independence standards and requirement that a majority of the Board qualify as independent;

- 5 -

(e)     enhanced director stock ownership standards and requirement that Shell's officers or directors hold stock options for two years before exercising them;

(f)     cash incentive compensation plans for Senior Management linking pay to performance and prohibiting the payment of bonuses based on reported levels of hydrocarbon reserves; and

(g)     in addition to international accounting standards, Shell will now comply in all respects with the Generally Accepted Accounting Principles of the United States.

11.     Plaintiffs and Plaintiffs' Counsel submit that as a result of the changes achieved through this Action, along with the new management and oversight of Shell, Shell and its shareholders are much better positioned in the marketplace. Ultimately, Plaintiffs have achieved a settlement that will continue to greatly benefit Shell and its shareholders.

12.     The following paragraphs discuss in greater detail the nature of the claims asserted, the principal proceedings in this Action, the legal services provided by Plaintiffs' Counsel, and why the settlement is fair and in the best interest of the Shell shareholders, including the reasonableness of the amount of Plaintiffs' Counsel's attorneys' fees and expenses that Shell has agreed to pay.

## II.    SUMMARY OF THE FACTUAL BASES FOR PLAINTIFFS' CLAIMS

13.    This is a shareholders' derivative action brought on behalf of Shell against its Board of Directors, certain of its top officers and its outside auditors, seeking to remedy Defendants' intentional or reckless breaches of fiduciary duty, abuse of control, constructive fraud and unjust enrichment; in the case of the auditors, Plaintiffs alleged that the auditors aided and abetted the foregoing misconduct and were negligent in connection with the accounting misstatements at Shell which resulted in the four recategorizations of proved oil and gas reserves.

14.    The complaint alleged, and, in Plaintiffs' view, the documents support Plaintiffs' allegations that Defendants' breached their duties of fidelity, candor and trust. The complaint alleged that the claims arose from Defendants' actions in causing or permitting Shell to falsify its proved oil and gas reserves by billions of barrels of oil equivalent ("boe") for several years, to overstate its future cash flows by over $100 billion and to falsify its financial statements.

15.    On January 9, 2004 Shell revealed the elimination of approximately 3.9 billion barrels of proved reserves. Shell ultimately recategorized 4.47 billion barrels of proved reserves – approximately 23% of the Companies' previously claimed proved reserves – and restated its 2002-2003 financial statements, eliminating hundreds of millions of dollars of previously reported net income. This resulted in a sharp decline in the former Shell Transport's and Royal Dutch Petroleum's stock and

- 7 -

American Depository Receipt ("ADR") prices and produced a flood of criticism from Shell's shareholders and the investment community condemning Shell's apparent deceit over the past several years.

16.     This fiasco damaged Shell by exposing it to massive regulatory, civil and criminal investigations, billions of dollars in potential liability for violations of the U.S. securities laws and international law via class action suits and by impairing their corporate credit ratings, reputation and goodwill.  The U.S. Department of Justice, the Securities and Exchange Commission ("SEC") and the U.K.'s Financial Services Administration ("FSA") each initiated criminal and civil investigations and in August 2004, the SEC and the FSA settled enforcement actions for fines of $120 million and £17 million, respectively.  In short, the manipulation of proved oil and gas reserves was the worst scandal in the Companies' 100-year history and it is the opinion of counsel for Plaintiffs that the governance changes adopted and reflected in Exhibit A to the Stipulation of Settlement will significantly improve and rehabilitate the Companies' internal governance procedures, as well as its reputation with the investment community.

## III.   THE LITIGATION

### A.    Investigation

17.     In a series of announcements between January 2004 and April 2004, Shell admitted it had improperly classified as proved oil and gas reserves almost 4.5 billion barrels, thus reducing Shell's proved oil reserves by approximately 23% and its

forecasted future cash flows by over $100 billion.   Upon the first of these announcements in January 2004, Shell Transport's ADRs trading on the New York Stock Exchange ("NYSE") fell to below $40 per ADR from $46 per ADR on January 6, 2004. Shell Transport's stock on the London Exchange fell from 401.25p to 371.25p. Royal Dutch Petroleum's ADRs on the NYSE fell from $52.70 per ADR to below $47 per ADR.  As the revelations continued, the stocks and ADRs fell further and billions of dollars of Shell's market capitalization vanished.  Following these revelations and the price declines in Shell's securities, Shell published the results of a limited internal review of its internal governance and reporting controls disclosing that:

(a)     Shell's internal controls were insufficient to assure proper booking of oil and gas reserves, including having deficient internal audit/review procedures;

(b)     Shell's written guidelines for proved reserves did not ensure regulatory compliance;

(c)     the roles and responsibilities of the Shell personnel involved in proved reserves on compliance responsibility were ill-defined;

(d)     consideration of meeting reserve replacement targets was part of the management and executive compensation "scorecard";

(e)     there was not a formal review on an annual basis by the Committee of Managing Directors (the "CMD") and the Group Audit Committee ("GAC") of Shell's proved reserve positions;

- 9 -

(f)    the reporting structure did not require that the CFOs of Shell's business units report directly to Shell's CFO;

(g)    the role of Shell's legal director was insufficiently integrated with the CMD and the Boards to ensure compliance with all regulatory obligations;

(h)    the line responsibilities and compliance training for reserve reporting from local reservoir engineers upwards were inadequate;

(i)    the Shell Group did not have or enforce a culture of compliance with regulatory and fiduciary obligations;

(j)    management and employees were not trained or instructed to recognize that their conduct was required to be in accord with the ethical and legal standards;

(k)    Shell's guidelines blurred the distinction between reserves reporting for internal decision-making and the requirements for regulatory reporting of proved reserves;

(l)    Shell's guidelines were slow to incorporate SEC staff interpretations and, while reflecting an increased awareness of SEC rules, occasionally adopted an expedient of partial compliance;

(m)    Shell's guidelines did not require upper level management employees to review existing bookings for continued compliance and did not adequately address the need for debooking; and

- 10 -

(n)   Shell's guidelines were not clearly and succinctly written or organized to offer useful guidance to reservoir engineers.

18.   With this background, Plaintiffs' Counsel undertook a detailed investigation of the history of Shell's reserve calculations and accounting practices, compliance with U.S. Generally Accepted Accounting Principles and securities laws, including the Sarbanes-Oxley Act of 2002.   Plaintiffs' Counsel undertook to familiarize itself with tenants of Dutch and English law that would have a bearing on Plaintiffs' ability to successfully prosecute this Action against a foreign issuer in the U.S. Plaintiffs' Counsel's investigation included an extensive review and analysis of approximately a decade worth of Shell's SEC filings, securities analysts' reports and advisories about Shell, press releases issued by Shell and articles and media reports about Shell.  Once all of the information was gathered, reviewed and analyzed – a process that took months – Plaintiffs' Counsel began preparing a draft complaint which set forth, in detail, each Defendants' involvement in alleged wrongdoing, how the wrongdoing was accomplished and the resultant injury to Shell and its public shareholders.

19.   After the initial complaint was drafted and filed, Plaintiffs' Counsel continued their investigation as additional recatagorizations were revealed and Shell's previously reported financial results were restated.

20.   During the litigation, Plaintiffs' Counsel conferred with an expert in the field of executive compensation and corporate governance who assisted Plaintiffs'

Counsel in drafting the initial complaint and designing and negotiating the corporate governance changes that were ultimately agreed upon. The information and expertise provided by this consultant was important and proved of great assistance in prosecuting Plaintiffs' claims.

**B.    The Commencement of the Action**

21.    On June 25, 2004, Plaintiffs' shareholder derivative action was filed on behalf of Shell in the Superior Court of New Jersey Law Division. Two other related derivative actions were filed in state court and federal court in New York by other Shell shareholders seeking similar relief.

22.    Plaintiffs immediately completed service of process on PWC and KPMG which both had offices in New Jersey. Plaintiffs sought and obtained consultants experienced in international service of process to serve Shell's management and Board members who resided throughout the world in places such as Europe, Africa and South America.

**C.    Removal to Federal Court**

23.    Following service of process upon them, on July 28, 2004 defendants KPMG and PWC removed this matter to this District pursuant to 28 U.S.C. §1441 on the grounds that: (a) the Court had original jurisdiction under 28 U.S.C. §1331 because Plaintiffs' claims "arise under" the federal securities statutes and thus require the resolution of substantial issues of federal law; and (b) the Court had exclusive jurisdiction under the Exchange Act, 15 U.S.C. §78aa.

24.     On or about September 30, 2004 Plaintiffs filed an Amended Verified Shareholders' Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Unjust Enrichment and Constructive Fraud Seeking Equitable Relief and Damages in the removed action, which updated the complaint's allegations following the resolution of the SEC and FSA actions.

### D.     Ongoing Investigation During Settlement Negotiations

25.     Throughout the duration of the lengthy settlement negotiations, counsel for Plaintiffs continued investigating the underlying misconduct and researched significant legal issues which arose or could have arose, and could have undermined Plaintiffs' efforts.   Plaintiffs monitored the litigation of the securities fraud and ERISA class actions simultaneously being prosecuted in this District.   Plaintiffs prepared to litigate serious jurisdictional challenges and anticipated motions to dismiss based on *forum non conveniens*, lack of personal jurisdiction, the justicability of a shareholder derivative action under Dutch or English law in the U.S. if the Court were to require that such law be applied, and Plaintiffs' decision to file without making a presuit demand on the Shell Board to litigate Plaintiffs' claims.

## IV.    THE SETTLEMENT

26.     The parties began settlement discussions in September 2004 during the period Shell's unification process was being contemplated.   In late September 2004, counsel for Plaintiffs and Defendants met in New York City to discuss Plaintiffs' claims as laid out in their complaint and Plaintiffs' goals with regard to the unification

- 13 -

process and ensuring corporate governance changes.  Counsel discussed a possible framework upon which a settlement could be reached.  Following the meeting, Plaintiffs, aided by their corporate governance specialist, drafted and provided to Defendants a detailed 23-page corporate governance demand.

27.     Over the next ten months, Plaintiffs and Defendants, along with their counsel and their corporate governance specialists, met in-person in the U.S. and in London and telephonically on numerous occasions to discuss the terms of specific corporate governance measures, Shell's willingness and ability to comply with certain U.S. laws and standards, and detailed studies outlining commonalities and differences between U.S., Dutch, English, and European corporate law, accounting codes, financial reporting standards and corporate governance regimes.  The parties had a comprehensive, "all hands on deck," settlement meeting at Shell's international headquarters in London, England in December 2004, where again there were complex discussions concerning the proposed corporate governance measures, as well as the specific language of those measures.

28.     Following this meeting up through July 22, 2005 when the final governance terms and the terms of the Stipulation of Settlement were agreed upon, the parties continued their discussions regarding the exchange of information and the potential corporate governance changes that Defendants would adopt.   Via the exchanges of many iterations of corporate governance language, again with the assistance of a specialist in corporate governance, the parties reached an agreement on

- 14 -

each of the key corporate governance measures adopted by Shell as part of this settlement.

29.    The parties agreed that the Shell directors would cause Shell to adopt the following corporate governance measures, designed to preclude the reoccurrence of the wrongdoing alleged in this Action and to greatly enhance the Companies going forward.

(a)    **The Board of Royal Dutch Shell plc (the "Board")**

(i)    With respect to the Board:

(A)    The CEO and other Senior Management of the Company   will not take on more than one non-executive directorship in a FTSE 100 company nor the chairmanship of such a company.

(B)    A majority of the Board, including the Chairman, shall be non-executive directors determined by the Board to be "independent directors," as defined below.

(C)    To be deemed "independent" in any calendar year, a director must satisfy the following:

(1)    Except   as   otherwise   determined   to   be independent by the Board and accompanied by disclosure of the reasons for the Board's determination, the director has not been an employee of the Company or the Royal Dutch/Shell Group of Companies within the last five calendar years;

(2)     Except as otherwise determined to be independent by the Board and accompanied by disclosure of the reasons for the Board's determination, the director has not within the last three years: (a) had a material business relationship with the Company either directly, or as a partner, shareholder, director or senior employee of a body that has such a relationship with the Company; or (b) received additional remuneration other than director's fees or de minimis amounts.

(3)     Except as otherwise determined to be independent by the Board and accompanied by disclosure of the reasons for the Board's determination, the director has not been a director, executive officer or controlling person of a not-for-profit entity that has received contributions from the Company or from its Senior Management in the previous twelve months that are in excess of the greater of $1 million (U.S.) or 2% of the entity's gross revenues.

(4)     Except as otherwise determined to be independent by the Board and accompanied by disclosure of the reasons for the Board's determination, the director does not hold cross-directorships or have significant links with other Company directors through involvement in other companies or bodies.

(5)     Except as otherwise determined to be independent by the Board and accompanied by disclosure of the reasons for the

- 16 -

Board's determination, the director does not have close family ties with any of the Company's advisers, directors or Senior Management.

(6)    A director is deemed to have "a material business relationship with the Company" if remuneration, other than de minimis remuneration or director's fees, was paid by the Company, its subsidiaries, or affiliates, to the director, to any entity in which the director has a beneficial ownership interest of five percent or more, or to an entity by which the director is employed or self-employed other than as a director.    Remuneration is deemed de minimis remuneration if such remuneration is $50,000 or less in any calendar year, or as otherwise determined and disclosed by the Board.

(D)    No individual shall serve for more than 12 years as an independent director of the Company, and disclosure will be made for an independent director that has served on the Board for more than nine years.

(E)    Non-executive directors will undertake that they have sufficient time to meet what is expected of them.  Their other significant commitments will be disclosed to the Board before appointment, with a broad indication of time involved, and the Board will be informed of subsequent changes.  Additionally, the Chairman will not accept a second chairmanship of a FTSE 100 company.

(F)    Directors will be encouraged to invest in the Company.

(ii)    The Board shall be responsible for a formal and rigorous annual evaluation of its own performance as well as that of its committees and individual directors.  Individual director evaluations will aim to show whether each director continues to contribute effectively and demonstrates commitment to the role, including commitment of time for board and committee meetings and any other duties.  The Company will disclose in the annual report how the Board, its committees and its individual directors conducted performance evaluations.  Additionally, the Board will ensure that plans are in place for orderly succession of appointments to the Board and to Senior Management, so as to maintain an appropriate balance of skills and experience within the Company and on the Board.

(iii)   The Chairman will routinely convene meetings of the non-executive directors without the executive directors present.  The quality of the Company's financial and hydrocarbon reserve reporting and disclosure practices, the Company's system of internal controls, the integrity and performance of Senior Management of the Company, and corporate strategy shall be among the topics discussed at such meetings. The non-executive directors will also meet without the Chairman present at least annually to appraise the Chairman's performance and as the non-executive directors determine is otherwise necessary.

(iv)    The Nomination and Succession, Remuneration and Audit Committees shall be composed entirely of non-executive directors.

(v)      The Nomination and Succession Committee shall perform the following functions:

(A) The Nomination and Succession Committee, or such other committee of independent directors as the Board shall direct, in consultation with the Chairman and CEO, shall be responsible for periodic review, interpretation, and administration of the Company's corporate governance policies, standards, procedures and/or guidelines, as well as consideration of other corporate governance issues that may, from time to time, merit consideration by the entire Board.  The Annual Report shall include a report specifically addressing whether such policies and guidelines are adequate, any recommendations for changes and the status of their implementation;

(B)      The Nomination and Succession Committee, in consultation with the Chairman and CEO, shall consider and make recommendations to the Board concerning the appropriate size and needs of the Board;

(C) The Nomination and Succession Committee, in consultation with the Chairman and CEO, shall consider candidates to fill vacant Board positions.  Candidates shall be selected for their character, judgment, business experience, time commitment, and acumen;

(D)      The Nomination and Succession Committee, in consultation with the Chairman and CEO, in the ordinary course of its communications with significant institutional shareholders and in the case of any

particular vacancy, will obtain views from such institutional shareholders, including, where applicable, institutional shareholders based in each of The Netherlands, the United Kingdom, and the United States concerning Board member selection and qualifications, including such issues as the experience or expertise of candidates, in the context of evaluating candidates proposed or identified by the Committee to fill vacant Board positions, and will consider those views; provided however, that this provision neither confers any right or standing under this Agreement, or otherwise, to any shareholder, nor is intended to serve as the basis for any future legal action or challenge in any form by or on behalf of any shareholder against the Company, the Board, the Nomination and Succession Committee or any member of the Board; and further provided, that the determination of candidates' qualifications and selection of candidates for nomination shall remain within the discretion of the Nomination and Succession Committee, in consultation with the Chairman and CEO; and

(E) The Nomination and Succession Committee shall consider policies relating to the Board and directors, including committee structure and size, retirement and resignation.

(vi) The Remuneration Committee shall meet at least once each calendar year in executive session, without the CEO or CFO present. The Remuneration Committee shall set annual and long-term performance goals for the CEO and evaluate his or her performance against such goals and the performance of the Company's peer companies.

(vii)  Each of the Board's Committees shall have standing authorization, on its own decision, and at the sole expense of the Company, to retain legal and/or other advisors of its choice, which advisors shall report directly to the Committee.

(viii)  The Chairman of the Board and CEO shall not be the same person. The Chairman will be appointed by the Board as a whole and the process will be led by the Nomination and Succession Committee. The Chairman is responsible for ensuring that the Board and its Committees function effectively. With the CEO, he shall ensure that members of the Board receive accurate, timely and clear information. To this end the Chairman of the Board shall see to it that:

(A) there is an adequate induction and training programme that all directors follow;

(B)  the development needs of individual directors are identified and met;

(C)  all directors receive in good time all information which is necessary for the proper performance of their duties and have sufficient time to make decisions;

(D)  the performance of the CEO, the other executive directors and non-executive directors is assessed at least once a year;

(E)  the Board elects a Deputy Chairman; and

(F)  the Board has proper contact with the CEO and the Executive Committee.

(ix)  The Chairman shall have the authority and discretion to retain such counsel or consultants as the Chairman deems necessary to perform his or her responsibilities and those of the Board;

(x)  The Chairman shall receive additional compensation for performing the function of Chairman and will have a secretariat sufficient to allow performance of that position.

**(b)  Compensation of Directors and Senior Management**

(i)  The Remuneration Committee shall use the following compensation principles in considering compensation for directors and Senior Management:

(A)  Levels of compensation shall be sufficient to attract, retain and motivate directors of the quality required to run the Company successfully. A significant proportion of executive directors' compensation shall be structured so as to link rewards to corporate and individual performance.

(B) In circumstances where compensation arrangements involve Company stock, the arrangements shall promote long-term ownership of the Company's stock to align the interests of Senior Management and stockholders.

(C)  Performance-related elements of remuneration shall form a significant proportion of the total remuneration package of executive directors

- 22 -

and other members of Senior Management and should be designed to align their interests with those of shareholders to provide performance incentives.

(D)    In approving compensation, the recent compensation history of the executive director or other member of Senior Management, as the case may be, including special or unusual compensation payments, shall be taken into consideration.

(E)    Cash incentive compensation plans for Senior Management shall link pay to achievement of performance conditions set in advance by the Remuneration Committee, but no bonuses will be based solely on levels of proved hydrocarbon reserves.

(F)    The Remuneration Committee may separately retain independent experts to advise it as to compensation of executive directors and members of Senior Management, which shall provide separate, independent and comparative compensation data.

(G)    The Company will disclose the features of any equity-based compensation arrangements for executive directors.

(H)    Compensation for non-executive independent directors will not include share options. The Company will disclose the compensation arrangements for non-executive directors.

(I)     Pay shall be increased in an amount determined from time to time by the Board and disclosed by the Company because of service as chair of one of three main committees (Audit, Remuneration, Nomination and Succession).

(J)     The Company will comply with applicable disclosure and other requirements of the Directors' Remuneration Report Regulations 2002, as amended from time to time.

(K)     The Company will disclose severance or termination payments of members of Senior Management in excess of the greater of $1 million (U.S.) or the annual target compensation of the terminated member of Senior Management.

(L)     The Company will disclose the names of any consultant(s) retained by the Remuneration Committee and the nature of any other services the consultant(s) provided to the Company.

(M)     Other than as approved by the Remuneration Committee on a case-by-case basis based on a showing of special need, no option to acquire Company stock issued to Senior Management of the Company shall be exercisable for at least two years from its grant date; provided however, that nothing in this provision shall affect the rights of option-holders with respect to options issued by any predecessor to the Company.

**(c)**     **Annual General Meeting ("AGM")**

(i)     There must be one AGM at which directors are elected, if applicable, management presents, and shareholders are given opportunity to question.

(ii)     There shall be an opportunity at the AGM for general question and comment following the CEO's presentation and for each item on the agenda, which may be directed to particular directors or members of Senior Management.

(iii)     The Chairman of the Board should arrange for the chairmen or other representatives of the Audit, Remuneration and Nomination and Succession Committees to be present at the AGM to answer questions.  The Chairman should provide that shareholder views are effectively communicated to the whole Board. Subject to legal restrictions on selective disclosure, it is the responsibility of the Chairman, with the CEO, to discuss governance and strategy with major shareholders.

(iv)     The AGM shall be open to the media, subject to reasonable policies and procedures governing media coverage necessary for the orderly conduct of the AGM.  The AGM shall generally be held in The Netherlands and drawing as necessary on technological links to permit active two-way participation by persons physically present in both the UK and The Netherlands.

**(d)**     **Financial Integrity, Reporting and Controls**

(i)     The Company will comply with all applicable provisions of Sarbanes-Oxley as well as the Combined Code in London.  The Company will commit

- 25 -

to provide timely disclosure of changes in its applicable Code of Ethics and of changes to material off-balance sheet transactions or obligations.

(ii)     The Company's CFO shall not have been employed by one of the Company's outside auditor firms during the prior two years or, if involved in the firm's audit of the Company, during the prior five years.

(iii)    The Company shall implement and maintain an effective internal audit function, including specific procedures concerning hydrocarbon reserve estimates and a department specifically charged with the responsibility of reviewing hydrocarbon reserve estimates.  The Chief Internal Auditor, whose appointment shall be confirmed by the Audit Committee and who will report to the Audit Committee at every regularly scheduled Audit Committee meeting, shall oversee an internal audit staff that shall audit the Company's internal control environment, including the Company's internal financial controls.   The Chief Internal Auditor shall be responsible for consolidating an Internal Audit Plan for each fiscal year which will be presented to the Audit Committee of the Board.  Reports of the Chief Internal Auditor to the Audit Committee shall provide a balanced assessment of significant risks and the effectiveness of the system of internal controls in managing these risks.  The reports shall also include discussion of any significant control failings or weaknesses identified in the audits, including discussion of the impact of such failings or weaknesses.  The Audit Committee shall discuss any remedial actions proposed or adopted with the Chief Internal Auditor and Senior Management, as appropriate.

(iv)    At each regularly scheduled Board meeting following quarter end, the Company's CFO shall provide a report as to the Company's financial condition and prospects, including, as applicable, but not limited to, a comparison of the Company's performance to relevant internal financial forecasts or budgets as well as any external guidance provided by the Company to investors, significant reasons for material increases in expenses and liabilities and material decreases in revenues and earnings, including any modification or adjustment of reserve accounts or contingencies, and management plans for ameliorating or reversing any negative trends and the success or failure of any such plans presented in the past.    This presentation will be reflected as appropriate in the Board minutes.

(v)    The CEO and CFO shall be responsible for ensuring that the Company's accounting practices, including proved hydrocarbon reserve estimates, comply with International Financial Reporting Standards and any other applicable and mandatory reporting requirements.    Significant practices shall be reviewed and discussed with the Board.

(vi)    With respect to estimation of proved hydrocarbon reserves, the Company shall employ, for at least five years, an outside independent consultant to assist in its proved hydrocarbon reserves auditing process and to assist in devising uniform company-wide standards, which shall be disclosed on its website.    Any such consultants employed will be available to the Audit Committee and Board for questions on the reported levels of proved hydrocarbon reserves.

(vii)  The CEO and CFO will be responsible for assuring compliance of the Company's financial and other reporting practices with all applicable laws, rules, regulations and Company policies.

### (e)    **Auditing and the Audit Committee**

(i)    The Board will establish and maintain an Audit Committee consisting of at least 3 members who should all be independent, non-executive directors. Each Audit Committee member shall be financially literate as defined by the Board (or become financially literate within a reasonable period of time after appointment to the Audit Committee) and one member will be designated as the audit committee financial expert based on relevant accounting or related financial management experience.

(ii)   The chairmanship of the Audit Committee shall rotate on a periodic basis. At the end of such rotation the former chairman may remain as a member of the Audit Committee, and may serve a non-consecutive term as chairman again in the future.

(iii)  The Audit Committee will meet with the Company's Legal Director (or the functional equivalent of the most senior internal legal advisor to the Company) at least semi-annually to review legal and compliance issues.

(iv)   The CFO's performance, the absence of any conflicts or related party transactions and his or her significant business and investment transactions shall be reviewed by the Audit Committee annually. The CFO shall be

prohibited from any profit-making business activities outside the Company that relate to activities of the Company.

(v)     The Audit Committee shall identify and, as it determines is necessary and appropriate in its sole discretion, retain an independent law firm, as well as any independent analytic resources deemed beneficial to the Committee. While such professionals need only be consulted as deemed useful by the Committee, a relationship with an independent law firm shall be established in advance so that advice can be taken quickly when situations warrant.

(vi)    The Company shall engage independent auditing firm(s) to perform an annual audit of its financial statements in accordance with applicable auditing standards.  The Audit Committee has primary responsibility for making recommendations on appointment, reappointment and removal of external auditors.

(vii)   The Audit Committee shall review the budget of, and the compensation of personnel in, the internal audit department.

(viii)  The Company's Auditors may not provide the following non-audit services to the Company: (i) bookkeeping or other services related to accounting records or financial statements of the Company or any of the Company's affiliates or subsidiaries; (ii) design and implementation of the Company's financial systems; (iii) appraisal or valuation of the Company's financial systems; (iv) actuarial services; (v) internal audit outsourcing services; (vi) management functions; (vii) human resource functions; (viii) broker-dealer, investment adviser, or investment

- 29 -

banking services; (ix) legal services; and (x) expert services unrelated to the audit. Further, the annual report will explain how, if an auditor provides any other non-audit services, the auditor's objectivity and independence is safeguarded.

     **(f)**     **Insider Trading Disclosure and Controls**

     (i)     The Board will appoint a senior officer of the Company who will be responsible for effecting compliance with the Company's stock trading and market communications policy. That individual will be responsible for developing (with Board involvement), presenting to the Board for approval, and implementing, monitoring and updating (with Board involvement and approval) one or more Codes of Conduct designed to ensure compliance with the Company's trading policies. At least once yearly, the independent directors will receive a report on compliance, which report shall be reflected as appropriate in the Board minutes.

     (ii)     Except as otherwise provided in a pre-approved written trading policy or pursuant to any exception available under applicable law, any director or officer of the Company who possesses non-public material inside information, as defined by applicable law, concerning the Company's financial results shall be prohibited from trading in the Company's securities while in possession of such information. The Company will establish a trading period before and after issuance of financial results or the release of other material information.

     (iii)     The Code(s) of Conduct governing trading shall prohibit directors and other members of Senior Management from entering into any securities

transaction by which they would directly profit from a decline in the price of the Company's stock, including, but not limited to, "short" sales of Company stock.

### (g)    Corporate Ethics, Honesty and Legal Compliance

(i)    The Company will adopt and implement an effective compliance function, including the appointment of a senior compliance officer who shall have the duty and authority to do the following:

(A)    Create, implement and oversee a system by which corporate employees, suppliers, customers and advisor professionals and the like can, on a confidential basis and without fear or reprisal, provide information concerning possible illegal or unethical conduct regarding the Company; and

(B)    Subject to the consent of the Company's Legal Director (or the functional equivalent of the most senior internal legal advisor to the Company), retain separate and independent counsel at the Company's expense to provide advice and counsel.

(ii)    This officer, whose identity will be disclosed on the Company's website, will also act as a neutral party for the employees to report instances of illegal behavior or other compliance-related concerns.

(iii)    The senior compliance officer will report directly to the Company's Legal Director (or the functional equivalent of the most senior internal legal advisor to the Company).

30.    These corporate governance changes were designed to address both the specific misconduct alleged in the Action as well as the overall corporate culture that allowed the misconduct to take pace.  Post-unification, Shell is now incorporated in the U.K. and headquartered and a tax resident in The Netherlands.  Throughout the settlement negotiations Shell's senior management and directors were very sensitive to maintaining the Companies' European governance traditions while acknowledging that due to substantial international and U.S. investment the Companies' practices and governance structures would have to be altered to come into compliance with the U.S. securities laws, including the Sarbanes-Oxley Act of 2002, and U.S. Generally Accepted Accounting Principles, the New York Stock Exchange listing requirements and certain important tenants expected by U.S. investors.

31.    The corporate governance measures eventually adopted in this settlement – after much debate – specifically require compliance with U.S., Dutch and English accounting laws and that Shell's accounting for oil reserves, the Companies' singularly most important asset, be computed by an independent expert retained by Shell on a continuous basis.  The remainder of the corporate governance measures adopted provide a means to ensure that the Board will consist of a super-majority of independent and empowered directors who will make certain that Shell is being run for the benefit of the public shareholders and not the corporate insiders.

32.    As a condition of going forward with the settlement, Plaintiffs' Counsel required that they and Plaintiffs be entitled to conduct discovery designed to ensure

- 32 -

that the alleged facts underlying the Action were as they had been pled, and also to confirm that the settlement was based on such facts and was thus fair, reasonable and appropriate.    Accordingly, in August 2005, Plaintiffs' Counsel reviewed approximately 200,000 pages of documents produced by Defendants related to the allegations of the Action, including documents concerning the reduction of Shell's proved reserves and transcripts of testimony provided by Shell personnel to the SEC and FSA.  This review of key documents and testimony confirmed to Plaintiffs' Counsel that the settlement of this Action on the terms negotiated was fair to Shell and its stockholders and that the terms of the settlement are  appropriately designed to prevent the alleged malfeasance from reoccurring at Shell.

33.    The parties also separately negotiated the payment of attorneys' fees and the reimbursement of expenses spent litigating this Action for Shell's benefit.  These negotiations were arm's-length discussions conducted after the corporate governance terms were agreed upon.  As part of the settlement, Shell agreed to pay Plaintiffs' Counsel $9.2 million in the aggregate for attorneys' fees and reimbursement of out-of-pocket expenses for creating substantial benefits on behalf of Shell and its shareholders.

34.    Following an agreement on the terms of this settlement, the parties documented them in the Stipulation of Settlement dated as of July 22, 2005 (the "Stipulation") and sought and obtained preliminary approval of the Stipulation on August 11, 2005.  The NOTICE OF PENDENCY OF DERIVATIVE ACTION,

- 33 -

PROPOSED SETTLEMENT, SETTLEMENT FAIRNESS HEARING AND RIGHT

TO APPEAR AND/OR OBJECT ("Notice") was published in 8 major newspapers in

the United States and Europe on September 1, 2005 and posted on the Shell and

Lerach Coughlin Stoia Geller Rudman & Robbins LLP websites. In the U.S., the

Notice was published in *The Wall Street Journal* and *USA Today*. In the U.K., the

Notice was published in *The Daily Transcript* and *The Times*. In The Netherlands, the

Notice was published in *NRC Handeslblad* and *De Telegraaf*. The Notice was also

published in the *International Herald Tribune* and *Financial Times*, including in their

papers distributed in the United States. Response to the Notice by Shell's

shareholders is extremely favorable. The time to file objections to the proposed

settlement expired on October 7, 2005. To date, only one objection to the settlement

has been received. The lone objector to this settlement, R. F. Dickinson, seeks

compensation from Shell for his asserted financial loss due to the actions of the

Defendants. Plaintiffs, in this lawsuit, did not seek to recover any loss Mr. Dickinson

may have suffered as an individual Shell shareholder. The primary purpose in

bringing this Action on behalf of Shell was to require the Defendants to implement

corrective measures to rectify the alleged wrongdoing and to prevent a recurrence of

such events. As set forth above, the implementation of the corporate governance

measures negotiated as part of this settlement will help to ensure that future proved oil

reserve estimates meet the required standards. *See* §IV.D of the Memorandum of Law

in Support of Final Approval of Derivative Settlement ("Memorandum") for a more detailed discussion of the objection and its lack of merit as it relates to this Action.

35.     This settlement is the product of time-consuming, intensive investigation, well-thought out and carefully considered litigation, and aggressive arm's-length negotiations. It was negotiated by experienced counsel on both sides with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses. The corporate governance measures agreed upon confer an immediate and substantial benefit on Shell and its shareholders and eliminate the risks associated with continued litigation, the outcome of which could not be assured for either side. It is respectfully submitted that under these circumstances the settlement, including payment of attorneys' fees and expenses, should be approved as fair, reasonable and adequate.

## V.     FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

### A.     The Settlement Was Fairly and Aggressively Negotiated by Counsel

36.     As set forth above, the terms of the settlement were fairly, honestly and aggressively negotiated by all parties. The corporate governance provisions proposed by Plaintiffs' Counsel were designed with the assistance of Robert A.G. Monks, one of the country's preeminent governance specialists. Ultimately, the settlement was the product of many meetings and innumerable telephone calls and e-mails between Plaintiffs' and Defendants' counsel. Throughout the course of the negotiations, all

- 35 -

parties were represented by counsel with extensive experience in complex litigation in general, and derivative actions in particular. The settlement was the result of an adversarial process where Plaintiffs' proposed governance changes were analyzed in detail and during negotiations modified to produce a fair and honest compromise.

**B.    Serious Questions of Law and Fact Placed the Outcome of the Derivative Action in Significant Doubt**

37.    The existence of serious questions of law and fact, also supports the conclusion that the settlement is fair, reasonable and adequate to the shareholders.

38.    Personal jurisdiction would have been hotly contested by Defendants. All but three of the Individual Defendants reside outside of the U.S. and the Companies' headquarters are located outside of the U.S. The Individual Defendants would argue New Jersey's long-arm statute does not extend far enough to invoke personal jurisdiction over them, and that assumes Plaintiffs were able to legally effect personal service on these Individual Defendants under the laws of the nation they reside in. These Individual Defendants would likely argue that unlike the federal securities fraud class action and the ERISA action, this case was brought under New Jersey state corporate law which does not provide for nationwide jurisdiction, much less global jurisdiction. Plaintiffs would counter that Defendants' actions took effect in the State of New Jersey and injured Shell in the State of New Jersey and that traditional notions of fairness would not be offended by bringing the Individual

Defendants into court in New Jersey. Plaintiffs' Counsel recognized that personal jurisdiction presented a serious hurdle to the successful prosecution of this Action.

39.     Subject matter jurisdiction was also a serious issue faced by Plaintiffs. At the commencement of the Action, Shell was actually comprised of two separate companies, with two separate boards of directors located in two European countries. The combined entity, known as the "Shell Group of Companies," was owned 60% by a Dutch holding company and 40% by an English holding company. Its corporate headquarters was nominally located in The Netherlands while its operational head was in the U.K. As a result of the U.S. Supreme Court's decision in *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90 (1991), Defendants would vigorously maintain that any substantive questions of law arising in this shareholder derivative action against Shell would be governed by Dutch and English law. Defendants would also argue that Dutch law permits no shareholder derivative action and that while English law provides for a shareholder derivative action, a rule emanating from an old English case entitled *Foss v. Harbottle*, (1843) 2 Hare 460, 67 E.R. 189, severely circumscribes shareholders' ability to maintain such actions. Plaintiffs were prepared to present compelling arguments and analysis to counter Defendants' arguments, including the rapidly changing legal landscape in The Netherlands and England and recent attempts by the government in both countries to liberalize their laws to more readily facilitate shareholder actions such as the instant Action. However, these issues

- 37 -

would provide significant procedural obstacles to the successful prosecution of this Action by Plaintiffs' Counsel.

40. Defendants would have attacked Plaintiffs' demand futility allegations. Shell had a large and diverse Board of Directors (comprised of a Supervisory Board and a Board of Management), many of whom have a solid reputation in the international financial and investment community. In order to prevail in the Action, Plaintiffs would have to prove that the decisions made by these corporate fiduciaries were not products of valid business judgment. This standard can be very difficult to overcome.

**C. The Provisions for Payment of Plaintiffs' Counsel's Attorneys' Fees Is Reasonable**

41. Defendants have agreed to pay Plaintiffs' Counsel $9.2 million for their work on behalf of Shell and its shareholders. This fee was agreed to by the parties after all substantive relief was obtained for Shell and its shareholders. Defendants' agreement to pay Plaintiffs' Counsel's fees fairly reflects the benefits conferred on Shell by virtue of the settlement.

42. Plaintiffs' Counsel's compensation for the services rendered here is wholly contingent. Plaintiffs' Counsel achieved this beneficial result for Shell and its shareholders in the face of the risk of no recovery (and, hence, no fee) and were unwavering in their dedication to the interests of Shell and its shareholders and their

investment of the time and resources necessary to bring this Action to a successful conclusion.

43.    As described above, this case was litigated efficiently and settled only after Plaintiffs' Counsel had received, reviewed and analyzed substantial investigatory materials and documents, prepared a detailed 202-page amended complaint, and conducted the legal research to successfully oppose any motion to dismiss Defendants could have brought.  Plaintiffs' Counsel devoted significant efforts to gather, digest and process research concerning incidents that occurred around the globe that were governed by many conflicting legal standards against numerous highly skilled attorneys retained by Defendants.

44.    As discussed above, this Action was undertaken by Plaintiffs' Counsel on a wholly contingent basis.  From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of being compensated for the investment of time and money the case would require.  In undertaking that responsibility, Plaintiffs' Counsel were obligated to assure that sufficient attorney resources were dedicated to the prosecution of this Action and that funds were available to compensate staff and to pay for the considerable out-of-pocket costs which a case such as this entails.  International service of process alone was estimated to exceed $40,000.

45.    Because of the nature of a contingent practice, where cases are predominantly "big cases," not only do contingent litigation firms have to pay regular

overhead, but they also have to advance the expenses of the litigation. Prosecution of the instant action required that Plaintiffs' Counsel be able to conduct a worldwide investigation given the international characteristic of Shell's business, the citizenship of the Individual Defendants, and the allegations at issue. Thus, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

46.    The above does not even take into consideration the possibility of no recovery. It is wrong to assume that a law firm handling complex contingent litigation always wins. Tens of thousands of hours have been expended in losing efforts. The factor labeled by the courts as "the risks of litigation" is not an empty phrase. There are numerous cases where plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours and millions of dollars, have received no compensation. It is only because defendants and their counsel know that the leading members of the plaintiffs' bar are actually prepared to, and will, force a resolution on the merits and go to trial that meaningful settlements in actions such as this can occur.

47.    We are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel. These losses are exceedingly expensive. Changes in the law through legislation or judicial decree can be catastrophic, frequently affecting contingent counsel's entire inventory of pending cases. These are real threats.

- 40 -

48.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement can only occur if the private plaintiffs can obtain parity in representation with that available to large corporate interests such as Shell, a large multinational oil company. If this important public policy is to be carried out, private plaintiffs' counsel must be paid fees that will adequately compensate them, taking into account the enormous risks undertaken. When we undertook to act for the Plaintiffs in this matter, we were aware that the only way we would be compensated was to achieve a successful result. Defendants have agreed to undertake significant corporate measures designed to preclude the reoccurrence of the wrongdoing alleged in this Action and to comply with U.S. securities and investor protection laws, as detailed above. This is a very successful outcome.

**D.      The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for the Approval of the Settlement**

49.     Another factor in considering whether to approve a settlement is the judgment of the parties that the settlement is fair and reasonable. As outlined in detail above, the settlement was the product of protracted and arm's-length negotiations between adversaries with significant experience in derivative and securities litigation aided by a renowned corporate governance specialist.

50.     Counsel strongly believe that the settlement represents the best possible resolution for Shell and its shareholders.  As outlined above, the settlement is fair, reasonable and adequate in all respects and should be approved by the Court.

51.     Shell's shareholders also appear to agree.  The date for objection has passed, and Plaintiffs' Counsel are aware of only one objection to the settlement, which as discussed above does not complain about the significant relief obtained by Plaintiffs' Counsel through the settlement, but seeks individual compensation, relief that was not sought in this lawsuit.

## VI.    CONCLUSION

52.     For the reasons set forth above and in the accompanying Memorandum, we respectfully submit that the settlement is fair, reasonable and adequate and should be approved, and the attorneys' fees and reimbursement of expenses should be paid as provided for by the agreement of the parties to the settlement.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of October, 2005, at San Diego, California.

_____
WILLIAM S. LERACH

_____
MARY K. BLASY

S:\Settlement\Royal Dutch Shell.set\JOINT DECL 00024935.doc

<u>DECLARATION OF SERVICE BY UPS DELIVERY</u>

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the

United States and a resident of the County of San Diego, over the age of 18 years, and

not a party to or interested party in the within action; that declarant's business address

is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on October 14, 2005, declarant served by UPS, next day delivery,

the **DECLARATION OF WILLIAM S. LERACH AND MARY K. BLASY IN**

**SUPPORT OF FINAL APPROVAL OF DERIVATIVE SETTLEMENT** to the

parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of October, 2005, at San Diego, California.

_____
YVETTE D. GRAY

ROYAL DUTCH SHELL (SETTLEMENT)
Service List - 10/13/2005   (04-0210S)
Page 1 of  2

**Defendant(s)**

Jonathan R. Tuttle
Debevoise & Plimpton LLP
555 13th Street, N.W., Suite 1100 East
Washington, DC  20004
  202/383-8000
  202/383-8118 (Fax)

Peter W. Devereaux
Latham & Watkins LLP
633 West Fifth St., Suite 4000
Los Angeles, CA  90071-2007
  213/485-1234
  213/891-8763 (Fax)

Ralph C. Ferrara
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
1875 Connecticut Avenue, N.W., Suite 1200
Washington, DC  20009-5715
  202/986-8000
  202/986-8120 (Fax)

Jeffrey A. Cohen
Robertson, Freilich, Bruno & Cohen, L.L.C.
One Riverside Plaza, 4th Floor
Newark, NJ  07102
  973/848-2100
  973/848-2138 (Fax)

Joseph  Baio
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY  10019-6099
  212/728-8000
  212/728-8111 (Fax)

**Plaintiff(s)**

Russell S. Burnside
Greenberg Dauber Epstein & Tucker, A P.C.
One Gateway Center, Suite 600
Newark, NJ  07102
  973/643-3700
  973/643-1218 (Fax)

Arthur C. Leahy
Patrick W. Daniels
Mary K. Blasy
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423 (Fax)

ROYAL DUTCH SHELL (SETTLEMENT)
Service List - 10/13/2005  (04-0210S)
Page 2 of  2

**Objector(s)**

R. F. Dickinson
Objector
8 Turner Road, Taunton, Somerset
TA2 6DR, UK,