GREENBERG DAUBER EPSTEIN
  & TUCKER
RUSSELL S. BURNSIDE (RB 8484)
SUMEETA A. GAWANDE (SG 9596)
One Gateway Center, Suite 600
Newark, NJ  07102
Telephone:  973/643-3700
973/643-1218 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH (WL-5944)
JOY ANN BULL (JB-2191)
ARTHUR C. LEAHY (AL-2547)
PATRICK W. DANIELS (PD-5402)
MARY K. BLASY (MB-4314)
X. JAY ALVAREZ (XA-0117)
VALERIE L. McLAUGHLIN (VM-0958)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITE NATIONAL RETIREMENT FUND, et al., | No. 04-CV-3603-(DMC) (MF) |
| Plaintiffs, | DECLARATION OF ROBERT A.G. MONKS IN SUPPORT OF DERIVATIVE SETTLEMENT |
| vs. | |
| PHILIP WATTS, et al., | DATE:  October 21, 2005 |
| Defendants. | TIME:  9:30 a.m.<br>COURTROOM: The Honorable<br>        Dennis M. Cavanaugh |

DECLARATION OF ROBERT A.G. MONKS IN SUPPORT OF DERIVATIVE
SETTLEMENT

I, ROBERT A.G. MONKS, declare as follows:

1.      I am an attorney and the founder of Lens Governance Advisors, P.A., an organization that specializes in the field of improving corporate governance.  A copy of my resume and a more detailed description of the work of my firm is attached hereto as Exhibit A.

2.      I was retained by plaintiffs' counsel in this shareholder derivative action to assist in the formulation of the improved corporate governance provisions in connection with the recent unification of the newly-combined Royal Dutch Shell ("Shell") (formerly known as Royal Dutch Petroleum Company and The "Shell" Transport And Trading Company, P.L.C.) in connection with the resolution of this action (the "Settlement"), which form the basis for the settlement before the Court for final approval.

3.      My review of the former Company's systemic governance problems commenced prior to the filing of the shareholder derivative action on June 25, 2004; in fact, I assisted plaintiffs' counsel in drafting comprehensive corporate governance enhancement demands directly into the complaint and provided counsel for plaintiffs a blueprint of the changes which in my professional judgment would be most effective to turn around this once great Company's operational and financial performance.

4.      As discussed in greater detail below, I believe that the changes obtained in connection with the Settlement are at the forefront of good corporate governance, are extremely beneficial to

Shell and that settlement on the terms proposed is fair, reasonable and adequate and should be approved by the Court.

5.      The leading international consulting firm *McKinsey & Company* began in 2000 to survey the largest - approximately 2000 - institutional investors ($3.25 trillion of assets under management) with respect to the value they placed on good corporate governance.

6.      The *McKinsey* survey asked: "Suppose you are considering investing in two well-known companies.  Both have performed well in the past but are currently going through difficult times.  However, their board governance practices differ.  Would you be willing to pay more for Company B - having 'good governance' - than for Company A - having 'bad governance'?"

7.      Seventy-five percent (75%) of institutional investors responded that board practices are at least as important to them as financial performance.  Over eighty percent (80%) of investors reported that they would pay more for Company B than Company A.  The actual premium respondents said they would be willing to pay for a well-governed company differs by country. The premium reported for the United States is 18.3%, or $42.2 billion for Shell.

8.      The *McKinsey* report concludes: "Although it remains difficult to measure the impact on market prices of the premiums investors say they are willing to pay for well-governed companies, the amounts they are prepared to pay leave little doubt that good governance does feed through…. If companies could capture but a small proportion of the governance premium that is apparently available, they would create significant shareholder value." This "improved governance premium" was recently confirmed by professors Lawrence D. Brown and Marcus L. Caylor in *Corporate Governance and Firm Performance* who used 51 factors spanning eight categories to assign a "Gov-Score" for 2,327 firm against which they measured operating performance, valuation, and cash payouts, and concluding that "poorly-governed firms (i.e., those with low Gov-Scores) have lower operating performance, lower valuations, and pay out less cash to their shareholders, while better-

governed firms have higher operating performance, higher valuations, and pay out more cash to their shareholders."

9.      The *McKinsey* results have been confirmed by other academic work.  A noted study of stock performance and governance characteristics at 1500 large firms during the 1990's was published by Gompers, Ishii, and Metrick in 2003.  It showed that a fund that bought firms with strongest shareholder rights and sold firms with the weakest rights would have earned abnormal returns of 8.5 percent per year during the sample period.  The study found that "firms with stronger shareholder rights had higher firm value, higher profits, higher sales growth, lower capital expenditures, and made fewer corporate acquisitions."

10.     As recently as March 2005, Deutsche Bank AG concluded in *Beyond the Numbers – Europe,* "Corporate governance and equity risk are linked. . . .It pays to own the good:  Our analysis shows there is a clear link between corporate governance standards and equity price performance.  It pays to buy the improving:  Corporate governance is not static. . . . . Our analysis has found that companies with improving governance outperformed those with deteriorating standards of governance over a one year period."

11.     Another notable confirmation of the value of good corporate governance is in the immense growth of the private equity segment of the capital markets.  Due to the myriad scandals of value destruction in public companies in recent years, many investors – individual and institutional – have flocked to redeploy their investment dollars into private companies.  These private equity investors are involved owners; they do not have the problems of weak directors, unreliable financials and conflict of interest.  Their investment modality is built upon the strongest possible systems of transparency and accountability by management to the firm's owners.  This accounts for why private equity is a preferred mode of investment today over the public markets.

12.     Legendary investor Henry Kravis commented in September 2004 to the Private Equity Conference about the importance of involved ownership and good governance: "[W]e generally aren't board members who show up once a month and whose primary source of revenue is elsewhere.   Most of us in the industry live with these businesses on a day-to-day basis as shareholders and as guardians of our limited partners' capital….Board meetings are interactive discussions, not reports to passive friendly directors.  All decisions are made with a clear intent to create shareholder value….[A]s an industry, we have always strived for transparency to protect the shareholders.  If you examine all the major corporate scandals of the last 25 years, none of them occurred where a private equity firm was involved….Why?  Because I believe that as general partners we are vigilant in our role as owners and we protect shareholder value."

13.     What Mr. Kravis is saying is that the best corporate governance – increasing value and diminishing risk for shareholders – is to have ownership represented as faithfully and energetically as possible in the board room.

14.     There is no question that in 2004 (prior to the unification and Settlement), Shell was perceived as having egregiously bad governance practices.  As cited in plaintiffs' complaint, Shell's 2003 Annual Financial Report to Shareholders conceded several "identified deficiencies and material weaknesses" were directly responsible for the multi-billion oil and gas reserve overstatement.  An internal Shell inquiry, though limited in scope and diligence, uncovered legions of internal communications evidencing the Company's lax internal controls and culture of deception, including an email from the Chief Executive Officer ("CEO") of Shell's Exploration and Production division to Shell's CEO complaining that he was "becoming sick and tired about lying about the extent of our reserves issues and the downward revisions that need to be done because of far too aggressive/optimistic bookings."

- 4 -

15.     There have been many widely publicized efforts to codify "good governance" in the U.S., including passage of the Sarbanes-Oxley Act of 2002. Though it was easy to drown out the relative ping of bursting U.S. tech bubble stocks during 2000 and 2001 by broadcasting admonitions of responsible investing emphasizing the stability of tried and true "brick & mortar" investments, the crumbling of global powerhouses like Yukos Oil, Nortel, Hollinger, Adecco Royal Ahold, Vivendi, Parmalat, Tenet, and Enron let out a roar that could be heard around the world's financial markets. Accounting falsification had reached a critical mass on a global level and U.S. investors looked to the laws governing players in the U.S. financial markets for recourse and for reform. According to a study published by *PriceWaterhouseCoopers,* as of December 4, 2004, 26 securities fraud class actions were filed in the U.S. against foreign registrants,[1] 42% more than had been filed in 2003. Efforts to expand the extraterritorial reach of U.S. accounting and governance standards assumed a sense of urgency and reforms cast from U.S. courts to foreign shores have been more dramatic. Recent examples, to cite but a few, are:

(a)     During 2003 the New York Stock Exchange (NYSE) updated its listing requirements, as approved by the Securities and Exchange Commission ("SEC") during 2003;

(b)     The Conference Board assembled a Commission on Public Trust and Private Enterprise comprising a number of prominent private business leaders, including now-U.S. Treasury Secretary John Snow, and produced governance guidelines in September 2002 and January 2003; and

(c)     All of the major provisions of the Sarbanes Oxley Act of 2002 were made applicable to foreign issuers registered in the U.S.

---

[1]     *See* "Securities Litigation Cases in the U.S. Reach Highest Quarterly in Total Since 1998, and Foreign Registrants Continue to Face Unprecedented Securities Litigation," PriceWaterhouseCoopers, Dec. 4, 2004. Available at http://www.pwcglobal.com, visited 1/21/05.

- 5 -

16.     Plaintiffs Counsel, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, in association with Lens Governance Advisors, P.A., has made a practice of insisting on governance components to settlement demands in the effort to provide enhanced value to shareholders as a result of litigation. Other shareholder litigation firms have followed this example. The result is a better and a more valuable company after settlement.

17.     In the Shell settlement agreement, several very important matters were agreed upon which merit specific discussion:

(a)     *Shareholder Engagement in Governance.* The critical focal point of Global Corporate Governance reform has been the problem earlier addressed by Henry Kravis – "ownership represented as faithfully and energetically as possible in the boardroom". The efforts over several years in the United States associated with former SEC Chairman William Donaldson to provide a scintilla of involvement for shareholders in the nomination process has, alas, failed. The Settlement has made important – and precedent setting – progress in addressing this question. Institutional Shareholders have been reluctant to appear to intrude beyond their traditional role in making demands of management. The prevailing practice has had the same effect as law in excluding shareholders from involvement in director nomination. As a result of this Settlement, it is now not inappropriate for institutional investors to make specific suggestions of individuals to be considered for the company's Board of Directors. "Best practice" has been changed. Indeed, the company has committed itself to obtain and consider views from "significant institutional shareholders" on "director selection and qualifications, including such issues as the experience and expertise of candidates…." (See Stipulation of Settlement, Exhibit A, in A.5.(d).) While there has been much advertence over the SEC proposal on shareholder nomination of directors, the plaintiffs in this case have been quietly acting to insert into this settlement a workable provision for a process of nomination that includes shareholder views. For U.S. and U.K. institutional investors, this is a

welcome invitation to involve themselves directly – at the core – of the governance of Shell. This is a real break through in the history of Corporate Governance.

(b)      *Accounting Practices.*  Shell will comply with all aspects of U.S. Generally Accepted Accounting Principles, in addition to other international standards.  With respect to the estimation of proved hydrocarbon reserves, the Company will employ for at least five years an outside independent consultant to assist in its proved hydrocarbon reserves auditing process and to assist in devising uniform, company-wide standards which shall be disclosed on the Company's website.  In recognition of the major deficiencies Shell has admitted existed in the functioning of its Chief Financial Officers ("CFO") in the past, in the future the performance, the absence of conflicts and significant business and investment transactions of Shell's CFO will be scrutinized by the Audit Committee annually.  Finally, the Company's independent auditors are prohibited from providing a number non-audit related functions thought to compromise their independence.

(c)      *The Annual General Meeting ("AGM").*  The AGM takes on special significance in European countries.  When a shareholder of Dutch or English citizenship votes to approve the closing of the books of a European company, he may later have been said to have forever waived claims of mismanagement or misconduct by that Board.  Though U.S. corporate law takes a radically different approach, and U.S. investors in European companies are arguably not bound by the limitations in European law, the significance the waiver effect has on the substantial number of their fellow shareholders at the AGM cannot be understated.  In recognition of the importance of the AGM for this European company, the Settlement Agreement provides for: (i) an opportunity for general questions and comments following the CEO's presentation at the AGM; (ii) requires that chairmen (or other representatives) of the Audit, Remuneration and Nomination and Succession Committees be present and take questions at the AGM; and (iii) opens the AGM to the media.

(d)    *Executive Compensation:* A 2004 *McKinsey* survey of 150 U.S. corporate directors serving as members of boards of more than 300 public companies across all economic sectors found 64% of directors surveyed attributed the recent onslaught of financial scandals to faulty executive compensation plans and 52% felt executive compensation was still too high today, following the past four years of reforms.  In order to reign in the excessive compensation factors at Shell which are blamed with contributing to the reserve overstatement, it was decided that cash incentive compensation plans would be designed to "link pay" to achievement of performance conditions established in advance.  Moreover, forthwith no Shell executive would receive a bonus "based solely on levels of proved hydrocarbon reserves."  Compensation arrangements which use Company stock in any way shall be designed to promote long-term ownership.  Non-executive directors will not receive any stock options.  Stock options received by management will not be exercisable for "at least two years" from their grant date.

18.    A number of other governance remedies that will be implemented because of this settlement agreement will make Shell an exemplar of best practices.  These include but are not limited to the following:  a board with at least a majority of independent members, with a rigid definition of "independent;" imposition of term limits on directors; limitations on directors' service on other boards.  As supported by 62% of investors and 72% of directors surveyed in the 2004 *Mackinsey* survey, Shell will ***permanently*** separate the roles of Chairman of the Board and CEO of the Unified Company going forward.  Institutional investors (including those in the U.S., the U.K. and the Netherlands) will forthwith be consulted on the selection and qualifications of board replacements.

19.    The Shell Settlement establishes a new standard of governance remedies accomplished through the settlement of litigation in response to specific allegations of wrongdoing.  In addition to the abovementioned, the governance reforms contemplated in the settlement

agreement include the development, implementation and monitoring of compliance with insider trading policies designed to preclude trading by insiders while in possession of material, non-public information. Specifically, members of Shell's Senior Management and its directors will forever be prohibited from entering into securities transactions where they will directly profit from a decline in the price of the Company's stock, including, through "short" sales of the Company's stock on any exchange.

20.    These provisions individually and overall represent a significant enhancement above today's minimum standards of the NYSE listing requirements and of the Sarbanes Oxley Act of 2002. In fact, many of the Settlement Agreement's provisions have been documented by professors Brown and Caylor to correlate positively with higher operating performance, higher valuations, and more cash payouts to shareholders.

21.    It is, therefore, my conclusion that the Settlement has had a significant impact on the value of Shell. The capacity of institutional owners to involve themselves in the nomination of directors provides unique and unprecedented capacity for owners to hold management to account. While it is impossible confidently to assign a precise dollar figure to this increase over this period of vast increases in the price of oil, it is my conclusion that the value added is on the high end of the scales for market value attributable to governance concluded by McKinsey – 18% of total value – and by Gompers, Ishii – 9% of "surplus value". It is not less than 1% of market value or $2.3 billion dollars.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13th day of October, 2005, at Portland, Maine.

_____

ROBERT A.G. MONKS

**EXHIBIT A**

# LENS GOVERNANCE ADVISORS, P.A.

ROBERT A. G. MONKS
ATTORNEY

RICHARD A. BENNETT*
GOVERNANCE CONSULTANT TO THE FIRM

JOHN P. M. HIGGINS*
GOVERNANCE CONSULTANT TO THE FIRM

Suite 400
45 Exchange Street
Portland, Maine 04101

Phone: (207) 775-4296
Fax: (207) 775-4289

## THE FIRM

Lens Governance Advisors, P.A., is a law firm founded by Robert A.G. Monks, its sole partner, in 2002. Mr. Monks created the firm to continue his work in holding corporate management accountable to ownership and in improving shareholder value through increasing shareholder involvement. The corporate scandals coming to light in recent years have underscored the need for effective corporate governance and the potential of shareholder litigation as a means of reforming corporate governance. LGA's purpose is to realize that potential, while continuing the work of shareholder consulting and engagement performed successfully by Lens Investment Management, LLC, from 1992 to 2002.

Since 2002, LGA has advised the country's leading plaintiffs' securities law firms and the firms' clients on corporate governance remedies for more than 30 of the largest alleged securities frauds in recent years. This work has yielded landmark settlement provisions for governance reforms at Sprint, Hanover Compressor, Ashland, and Royal Dutch Shell, among others.

### Robert A.G. Monks

Mr. Monks is a graduate of Harvard College (magna cum laude, 1954), Cambridge University (1955), and Harvard Law School (1958; winner Ames moot court competition). He was a general partner in the Boston, Massachusetts, law firm of Goodwin & Procter. Subsequent to the full-time practice of law, he has had careers in business (CEO of C.H. Sprague & Son Company - coal and oil), investments (principal of Gardner Associates and Chairman of the Board of the Boston Company and Boston Safe Deposit & Trust Company), and state government administration (Energy Commissioner for the State of Maine, Chairman of two commissions to oversee the administration of the Maine State Retirement System appointed by Governor McKernan). Mr. Monks also has served in federal government administration as founding Trustee of the Federal Employees' Retirement System by appointment of President Reagan, and Administrator (office is now Assistant Secretary) of the Office of Pension and Welfare

Benefits Administration (Department of Labor) in charge of the private pension system in the United States.

Subsequent to his federal government service in 1985, Mr. Monks has devoted his full time and energy to the creation of a system of corporate governance in the United States. In order to accomplish this, he has been active in several different, but importantly related, spheres. He has founded four businesses which provide needed governance services:

- Institutional Shareholder Services (1985) provides proxy and ownership services to institutional investors around the world. ISS has achieved the position that its recommendation is often the single deciding factor in contested proxy situations, like for example the merger of Compaq and Hewlett Packard in 2002. ISS is today a major company dominating the proxy field worldwide. Monks sold his interest in 1994 to the Thompson group. In 1999, the Thompson family sold ISS at public auction, and it was bought by a consortium organized by Mr. Monks's son, also Robert Monks, who is today its chairman.

- Subsequent to disposing of his interest in ISS, the senior Mr. Monks organized Lens Investment Management, LLC, an activist investor with several private and public partners, which functioned as an "activist investor" and over the decade of the 1990s outperformed the principal indices.

- Mr. Monks also organized and still functions as Deputy Chairman of the Hermes Lens Asset Management Company in the United Kingdom which has successfully employed the same "activist investment" policy in funds in the UK and Europe.

- With his long time partner, Nell Minow, Mr. Monks organized The Corporate Library, an independent information, investment and rating service which provides corporate governance data and analysis to institutional and individual investors around the world.

Mr. Monks has written and spoken about corporate governance widely. With Nell Minow, he has published *Power & Accountability* (Harper Collins, 1991), *Watching the Watchers* (Blackwell, 1996), and three editions of the standard case book, *Corporate Governance*, (Blackwell, 3rd ed. 2004). Mr. Monks has also published *The Emperor's Nightingale*, (Capstone, 1999), and *The New Global Investors* (Capstone, 2001), and a recent novel *Reel and Rout* (Brook Street Press, 2004). He has published more than a hundred papers in publications around the world and has spoken about corporate governance on six continents. He has lectured widely, including to classes at Oxford, Cambridge, Harvard, Yale, Columbia, Stanford, University of California, Dartmouth, Chicago, and Northwestern. He has testified more than a dozen times before Congressional and Senate Committees on governance-related matters. He maintains a

live relationship with corporate governance experts around the world on his web site - http://www.ragm.com - and is a frequent commentator in television, radio, magazine and newspapers coverage of corporate governance subjects.

He is referred to by *The Economist* and *Fortune* magazines as the leading shareholder activist and governance advocate in the world. He was the recipient of the Award for Excellence in Corporate Governance from the International Corporate Governance Network ("ICGN") in 2002.

Mr. Monks organized repeated efforts to improve corporate governance systems in the United States, including most prominently a self-nominated candidacy for the Board of Directors of Sears Roebuck in 1991. Notwithstanding the successful effort to organize a majority of shareholders to express their policy preferences in many companies, it became clear that managements could largely ignore shareholder expressions with impunity. Mr. Monks has become convinced that one of the best ways to improve the governance of American corporations is through the settlement process of securities lawsuits. This insight has been ratified by many other class action and derivative litigators and by the United States Bankruptcy Court in enforcing the comprehensive governance restatement proposed by former SEC Chairman Richard Breeden in the MCI (formerly WorldCom) matter.

Working with Mr. Monks at LGA are two of his long-time associates from Lens Investment Management:

### Richard A. Bennett

Richard A. Bennett, who also serves as Governance Advisor to the Firm, has an extensive background in politics and government service as well as a wide range of private sector experience, including the founding and management of several businesses. He worked as director of corporate governance for Lens Investment Management, LLC, from 1997 to 2002. A former President of the Maine Senate, Mr. Bennett has been elected to four terms in the Maine Senate and two terms in the Maine House of Representatives. He is a principal of The Corporate Library, LLC, and an independent director of Biddeford Internet Corporation. Mr. Bennett serves as a non-executive director of Trucost, plc, a United Kingdom-based firm that offers products and services allowing companies, governments and fund managers to better understand their environmental performance. He has been written about in *Pensions & Investments*, *The Daily Deal*, and *Barron's*, and cited in numerous publications including *BusinessWeek, USA Today, Fortune*, and the *Wall Street Journal*. Mr. Bennett has spoken publicly about corporate governance issues at Columbia University, University of Southern Maine School of Business, and for The Conference Board among others. He is a member of the President's Commission on White House Fellowships. He received his B.A. with honors from Harvard University in 1986 and his M.B.A. from the University of Southern Maine in 2000.

**John P.M. Higgins**

John P.M. Higgins, who serves as Governance Advisor to the Firm, has had broad
domestic and international experience as an asset manager of private and public
securities, real estate and oil & gas investments. Formerly an officer of Citicorp (Santo
Domingo), the Lambert Brussels Corporation (New York), and the Banque de Gestion
Privee (Paris), he has for the past dozen years been president and chief investment officer
of Ram Trust Services, a Portland, Maine-based investment management organization.
As chief investment officer of Lens Investment Management, LLC, he was active in
applying for corporate governances changes to generate shareholder value. He is
a principal of The Corporate Library, LLC, and a non-executive director of Trucost, plc.
He served as director and chairman of the executive committee of Atlantic Bank. He
received his B.A. with honors from Harvard University in 1970.

# ROBERT A. G. MONKS
Ram Island Farm
Cape Elizabeth, ME 04107

45 Exchange Street
Portland, ME 04101
T: 207-775-4296 F: 207-775-4289
Email: ragmonks@lensadvisors.com  Web: www.ragm.com

## EDUCATION

**Harvard College**, 1954, BA
**Trinity College**, Cambridge University, 1955
**Harvard Law School**, 1958, LLB

---

## PRIVATE SECTOR - Work Experience

**Practicing Lawyer** (specialized in corporate law)
  Goodwin, Procter & Hoar, General Partner, 1958-65

**Management of Investments**
  Gardner Associates (now Gardner & Preston Moss), Vice President, 1965-67 (a
  Boston-based company which manages money)

**Industrial Management**
  C.H. Sprague & Son Company, President and CEO, 1968-72 (a New England
  based energy firm - coal, oil)
  Sulpetro of Canada, Ltd., (natural gas) Finance Committee, Chairman, 1973-76

**Trust Company Management**
  The Boston Company and The Boston Safe Deposit & Trust Co., Director, 1975-
  81 (a bank holding company that provides financial services to, among others,
  public and private pension funds)
    Finance Committee, Chairman, 1977-79
    Board of Directors, Chairman, 1979-81

**Corporate Governance**
  Lens Governance Advisors, PA, Founder – 2002 to present
  Institutional Shareholder Services, President, 1985-1990
  LENS Inc., President, 1990 to 2002
  Hermes Lens Asset Management, Joint Deputy Chairman, 1998 to 2000
  Hermes Asset Fund Managent, Deputy Chairman 2000 to present

**Miscellaneous Corporate Directorships**
  Esterline, 1966-71  (NYSE)
  Westmoreland, 1965-70  (OTC)
  Jefferies & Company, Los Angeles, CA, Director, 1989-May 1990 (OTC)

**[Miscellaneous Corporate Directorships - cont'd]**

> John Hancock Capital Growth Management, Inc., Boston, MA., Advisory Board Member, 1988-89
> Mitsubishi International Corporation, New York, Advisor, 1987-1991 (Dec) (wholly owned subsidiary of Mitsubishi Corporation; listed on Tokyo Exchange)
> Tyco Laboratories, Inc., Exeter, NH, Director, 1985-1994 (Jan) (NYSE)
> Lambert Brussels Capital Corporation, New York, Director, 1983-May 1990 (affiliated corporations, listed Geneva, Brussels).
> Kennedy Group, Advisory Director - Jan 1993-December 1994

## PUBLIC SECTOR - Work Experience

**Vice President Bush's Commission on Deregulation, 1981-82**

**Federal Corporation (Presidential Appointment, Senate Confirmation)**
> Synthetic Fuels Corporation, Director, 1981-84

**Federal Government (Management of Pension Benefit Plans)**
> U.S. Department of Labor, Administrator of the Office of Pension & Welfare Benefit Programs ("ERISA"), 1984-85

**Federal Employee Retirement System (Presidential Appointment)**
> Federal Retirement Thrift Investment Board, Member - 1986-88

**State Government (Governor's Appointment), Chairman**
> Committee to Study the Maine State Retirement System, 1987-88
>
> Committee to Study the Maine State Retirement System, 1993-94

**State Government (Senate Appointment), Committee Member**
> Senate [California] Commission on Corporate Governance, Shareholder Rights and Securities Transactions, 1986

**State Government (Governor's Appointment), Administrator of Office of Energy**
> Resources (Maine), 1973-74

## MISCELLANEOUS

Chairman, Massachusetts Republican State Committee, Finance 1967-68,

Republican Candidate for U.S. Senate, Maine 1972, 1976, 1996

Member, Republican National Committee, 1977-78

Chairman, Maine Republican State Committee, 1977-78

Member Massachusetts, Maine and various federal bars

**[MISCELLANEOUS - cont'd]**

Member Phi Beta Kappa

Security Clearance - Federal Security Clearance obtained - Secret - July 1986 - Present

Author of many articles and books on Corporate Governance.  With Nell Minow, he has published *Power & Accountability* (Harper Collins, 1991), *Watching the Watchers* (Blackwell, 1996), and three editions of the standard case book, *Corporate Governance*, (Blackwell, 3rd ed. 2004).  Mr. Monks has also published *The Emperor's Nightingale*, (Capstone, 1999), and *The New Global Investors* (Capstone, 2001), and a recent novel *Reel and Rout* (Brook Street Press, 2004). He has published more than a hundred papers in publications around the world and has spoken about corporate governance on six continents.  He has lectured widely, including to classes at Oxford, Cambridge, Harvard, Yale, Columbia, Stanford, University of California, Dartmouth, Chicago, and Northwestern.  He has testified more than a dozen times before Congressional and Senate Committees on governance-related matters.  He maintains a live relationship with corporate governance experts around the world on his web site - http://www.ragm.com - and is a frequent commentator in television, radio, magazine and newspapers coverage of corporate governance subjects.  Mr. Monks was also the subject of a biography chronicling the corporate governance movement, *A Traitor to His Class* by Hilary Rosenberg.

## DECLARATION OF SERVICE BY UPS DELIVERY

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on October 14, 2005, declarant served by UPS, next day delivery, the **DECLARATION OF ROBERT A.G. MONKS IN SUPPORT OF DERIVATIVE SETTLEMENT** to the parties listed on the attached Service List.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of October, 2005, at San Diego, California.

YVETTE D. GRAY

ROYAL DUTCH SHELL (SETTLEMENT)
Service List - 10/13/2005   (04-0210S)
Page 1 of  2

**Defendant(s)**

Jonathan R. Tuttle
Debevoise & Plimpton LLP
555 13th Street, N.W., Suite 1100 East
Washington, DC  20004
  202/383-8000
  202/383-8118 (Fax)

Peter W. Devereaux
Latham & Watkins LLP
633 West Fifth St., Suite 4000
Los Angeles, CA  90071-2007
  213/485-1234
  213/891-8763 (Fax)

Ralph C. Ferrara
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
1875 Connecticut Avenue, N.W., Suite 1200
Washington, DC  20009-5715
  202/986-8000
  202/986-8120 (Fax)

Jeffrey A. Cohen
Robertson, Freilich, Bruno & Cohen, L.L.C.
One Riverside Plaza, 4th Floor
Newark, NJ  07102
  973/848-2100
  973/848-2138 (Fax)

Joseph  Baio
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY  10019-6099
  212/728-8000
  212/728-8111 (Fax)

**Plaintiff(s)**

Russell S. Burnside
Greenberg Dauber Epstein & Tucker, A P.C.
One Gateway Center, Suite 600
Newark, NJ  07102
  973/643-3700
  973/643-1218 (Fax)

Arthur C. Leahy
Patrick W. Daniels
Mary K. Blasy
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423 (Fax)

ROYAL DUTCH SHELL (SETTLEMENT)
Service List - 10/13/2005  (04-0210S)
Page 2 of  2

 **Objector(s)**

R. F. Dickinson
Objector
8 Turner Road, Taunton, Somerset
TA2 6DR, UK,